ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**IMPEVA LABS, INC.,**<br><br>Debtor.<br><br>2570 West El Camino Real, Suite 100<br>Mountain View, California 94040<br><br>Employer Tax I.D. No.: 20-2084435 | Case No. 10-53056-ASW-11<br><br>Chapter 11<br><br>Date: April 1, 2010 *[subject to entry of order shortening time]*<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA 95113<br>Judge: Honorable Arthur S. Weissbrodt |

### MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

1

Impeva Labs Incorporated, the debtor and debtor in possession herein (the "Debtor" or the "Company") hereby moves this Court for entry of an order approving certain sale procedures in connection with the proposed sale of certain of the Debtor's assets to ARINC Engineering Services, LLC, a Delaware limited liability company, and ARINC Acquisition, LLC, a Delaware limited liability company (collectively, "ARINC" or the "Buyer").

This motion (the "Motion") is made pursuant to 11 U.S.C. § 363 and Federal Rules of Bankruptcy Procedure 2002 and 6004. This Motion is supported by the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF FIRST DAY MOTIONS (the "Omnibus Declaration"), the DECLARATION OF DORIS A. KAELIN IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS (the "Kaelin Declaration") and the DECLARATION OF KATIE A. LANE IN SUPPORT OF MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTORS, and will be based on such other evidence and argument as may be presented at the hearing on the Motion.

## I.    SUMMARY OF SALE AND RELIEF REQUESTED

1.    In February 2010, the Debtor agreed to enter into a Letter of Intent (the "LOI") with ARINC. The LOI provided for a 45 day exclusivity period during which the Company could not enter into a sale, merger, or other business combination with any other party. The LOI required the proposed sale to be approved in the context of a Chapter 11 case with debtor in possession financing to be provided by ARINC to allow the Debtor to continue operations pending a closing of the sale.

2.    The Debtor has agreed upon the terms of a definitive Asset Purchase Agreement (the "Purchase Agreement")[1] with ARINC for the sale ("Sale") of certain of the assets of the Debtor, including its intellectual property (the "Purchased Assets"), together with the assumption and assignment of certain specified executory contracts and unexpired leases of the Debtor. A copy of the Purchase Agreement in substantially the form to be executed (excluding exhibits and schedules) is attached as **Exhibit "B"** to the Omnibus Declaration and incorporated herein by reference.

3.    The Purchase Agreement provides for a purchase price of $2,000,000, less any amounts loaned and any unpaid accrued interest thereon pursuant to the DIP financing (discussed

---

[1] Certain schedules to the Purchase Agreement are being finalized as of the date of this Motion.

Case: 10-53056    Doc#: 9    Filed: 03/31/10    Entered: 03/31/10 17:05:05    Page 2 of 25

below) and less the Bidder Deposit (defined below), which shall be paid at the Closing by wire transfer or the delivery of other immediately available funds. In addition, ARINC will assume performance of certain Assumed Contracts and cure Debtor defaults by assuming specified liabilities designated by ARINC not to exceed $1,000,000, which the Debtor presently estimates will be approximately $690,000 (the total consideration set forth herein is hereafter referred to as the "Purchase Price"). The Purchase Agreement also provides for a 60-day period during which the Debtor, subject to the other terms and conditions therein, shall indemnify Buyer against, and hold Buyer harmless from, all loss arising out of the failure of any representation or warranty of the Debtor, in an amount up to $300,000, as the exclusive remedy for such claims in the absence of fraud. The post-closing performance of certain covenants survive the closing of the Sale and are not subject to the $300,000 cap.

4.    In connection with the Purchase Agreement and the Sale, and pursuant to that certain written SECURED SUPER-PRIORITY AND DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"), a copy of which in substantially the form to be executed is attached as **Exhibit A"** to the Omnibus Declaration, the Debtor proposes to borrow up to $1.2 million (the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by ARINC to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the Sale of the Purchased Assets to the highest bidder pursuant to the Sale Motion. The Debtor anticipates that it will exhaust the DIP Financing by the third week of May 2010. The Debtor's MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING, FOR ADEQUATE PROTECTION SECURED BY LIEN ON PROPERTY OF THE ESTATE UNDER SECTION 364 AND FOR MODIFICATION OF AUTOMATIC STAY (the "DIP Financing Motion") filed concurrently herewith seeks authority to borrow pursuant to the Loan Agreement.

5.    The Debtor has covenanted under the Loan Agreement to seek entry of a final order approving the Bidding Procedures delineated below and identifying ARINC as the stalking horse bidder.

6.    In its Chapter 11 case, the Debtor contemplates that it will continue its operations under a Budget (as may be amended from time to time and as is defined in the DIP Financing

Motion and the Loan Agreement) approved by ARINC, a copy of which is attached as **Exhibit "C"** to the Omnibus Declaration and incorporated herein by reference. The Debtor intends that it will file its motion to approve the sale of the Purchased Assets pursuant to the terms of the Purchase Agreement as soon as possible following entry of the Court's order on the Motion.

7. As discussed further below, the Debtor believes that the Sale pursuant to the Bidding Procedures will allow the Debtor to maximize the value of the Purchased Assets. The Debtor further believes that the scheduling of the Sale Hearing for April 30, 2010 or as soon thereafter as practicable will provide sufficient opportunity for other interested persons to submit a competing bid and participate in the auction. A closing by mid-May is critical in that the Company is unlikely to have adequate financing or resources to sustain operations beyond the third week of May when the DIP Financing is estimated to be fully used. Because the DIP Financing reduces the net proceeds received by the Debtor, the earliest possible closing benefits creditors (i.e., if less of the DIP Financing is utilized, more cash will be payable to the Debtor at closing).

8. By this Motion, the Debtor seeks approval of certain sale procedures including the terms and conditions of any competing bids and the payment of an expense reimbursement for actual out-of-pocket expenses incurred by the Buyer, not to exceed $300,000 as discussed below, in the event that the Debtor's assets are sold to another party following an auction.

9. Pursuant to this Motion, the Debtor also requests that the Court specially set the hearing (the "Sale Hearing") on the motion to approve the sale of the Purchased Assets free and clear of all liens and encumbrances (the "Sale Motion") on April 30, 2010 or as soon thereafter as practicable (on regular notice) so that the Sale may close by mid-May. In connection with the Sale, the Debtor also requests that the Court specially set for the same date and time the hearing on the Debtor's motion to approve the assumption and assignment of executory contracts and unexpired leases (collectively, the "Assumed Contracts") to be included in the transaction (the "Assumption Motion").

## II. BACKGROUND SUMMARY

10. The Company was incorporated in California on December 16, 2004. It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that

enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System.  The Debtor provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Debtor's Global Sentinel™ Units ("GSUs") and Device Management Center ("DMC"). The system can ensure continuous tracking and monitoring of customer assets, no matter where they are in the world.  The Debtor's GSU incorporates a customizable suite of electronic sensors to monitor the assets' condition and location. It communicates seamlessly worldwide with the Debtor's DMC through multiple wireless technologies, providing immediate secure access via the Internet to data from the asset being tracked, monitored or managed. The DMC can also link to customer data centers through other options including standard XML over a secure network connection. If the asset experiences an abnormal event, the concerned customers and/or appropriate agencies can also be notified within minutes via SMS text messaging and email notification.

11.     In 2006, the Company teamed with ARINC to serve as prime contractor with the Company as subcontractor, to compete for a 5-year, $20 million Department of Defense ("DOD") contract (the "NGWC Contract") to develop and deploy mesh net technology products.  In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor, was awarded the NGWC Contract.

12.     In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor Agility Logistics ("Agility") monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor on tracking and monitoring strategic assets such as jet engines.  The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule.

13.     Before the end of 2008, while additional financing rounds were being considered, the Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility.  In early 2009, the candidate informed the Company that it was unable to get approval from its major

investor due to their economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

14.     By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company. This unanticipated news caused the Company to accelerate its efforts at obtaining the needed financing. It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "Kims"), agreed to invest under provisions that included a discount on the conversion valuations and a ceiling. The Debtor, Agility and the Kims entered into convertible promissory notes that purported to grant Agility and the Kims security interests in the Company's assets. These transactions closed in June of 2009, with Agility contributing $631,507 and the Kims contributing $231,165. Neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later.[2]

15.     In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint Logistics Over-the-Shore). JLOT attracted the attention of the DOD senior officials that opened major opportunities for the Company. The Company continued with its efforts to find new investment and established contact with a Kuwaiti based company as a potential investor as well as a potential major customer. Negotiations and drafting of documents concerning a $6 million investment by this entity in the Company continued through December 3, 2009 and were close to conclusion when the Company received an unexpected Formal Suspension Notice from the Defense Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and

---

[2] Agility and the Kims did not file UCC-1 Financing Statements until March 12, 2010. The Debtor believes that these filings are avoidable transfers of an interest of the Debtor under § 547 of the Bankruptcy Code.

could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension list with the DOD and concluded that the Company was an affiliate of Agility subject to the same suspension list. As a result, the negotiations with this potential investor were put on hold.

16.     The suspension was extremely detrimental to the Company's business.  The Company was not allowed to receive any new DOD contracts or even new task orders under the NGWC Contract.  Company management worked diligently, and due to lack of funds, without legal representation, to release the suspension.  Finally, through major efforts, Agility gave up their two Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-voting. Agility agreed to the removal of all blocking and control terms from all the investment documents with the Company.  Thereafter, DLA released the Company from the suspension on December 31, 2009.

17.     Negotiations with the potential investor were resumed; however, this time it decided that any investment would be staged, beginning with an initial $500,000 through a convertible note and which was received on February 16, 2010.  Any further investment amounts were to be dependent upon the completion of due diligence and the Company's progress.  On February 16, 2010, the Company received $500,000 in proceeds of this convertible note.  Following this development, the Company increased its efforts to locate a strategic investor or merger and acquisition candidate, speaking with approximately 12 entities, including both public multinationals and private entities in commercial and DOD-related fields.  The Company signed an exclusive letter of intent with a major DOD contractor, which conducted due diligence on the Debtor.  However, on February 11, 2010 this contractor informed the Company that it had decided to forgo the opportunity.

18.     The Company continued to investigate strategic alternatives and contacted ARINC, which had previously expressed interest and conducted due diligence on the Company in 2008, to ascertain the level of its interest.  Following multiple discussions, ARINC presented a Letter of Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets which was accepted by the Company's board and senior management on February 24, 2010.  The LOI provided for a 45 day exclusivity period during which the Company could not enter into a sale,

Case: 10-53056   Doc#: 9   Filed: 03/31/10   Entered: 03/31/10 17:05:47   Page 7 of 25

merger, or other business combination with any other party with the proposed Sale to be made in the context of a Chapter 11 case. ARINC provided the Company with a $100,000 advance against work to be performed under the NGWC Contract[3] immediately on the execution of the LOI and from which, together with the remaining proceeds from February 16, 2010 convertible note, allowed the Company to make its February payroll.

19.    On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a pre-petition secured credit agreement in which ARINC agreed to lend the Debtor the principal amount of $100,000 to fund its Chapter 11 operations, including payment of a retainer to bankruptcy counsel. Contemporaneously with such extension of funds, on March 19, 2010, ARINC filed its UCC-1 Financing Statement. Soon thereafter, the Debtor and ARINC entered into the Asset Purchase Agreement.

### III.    THE CHAPTER 11 FILING AND THE NECESSITY OF A HIGH SPEED SALE

20.    The Debtor filed its voluntary petition under chapter 11 of the United States Bankruptcy Code[4] on March 26, 2010 (the "Petition Date") and is presently operating its business as a debtor in possession under 11 U.S.C. §§ 1107 and 1108. No official committee of unsecured creditors has been formed in the bankruptcy case to date.

21.    The Debtor's bankruptcy schedules list liabilities in the amount of $2,284,115. As noted above, ARINC will assume certain liabilities in connection with the Sale.

22.    The Company has minimal cash and does not have sufficient resources to sustain its business operations at the level necessary to preserve its going concern value through the projected close of the Sale. Approval of the relief requested herein is required in order for the Debtor to have access to the DIP Financing. The Company's regular payroll is due on March 31, 2010. A preliminary hearing on the DIP Financing Motion will be requested concurrent with this Sale Procedures Motion, as will the Debtor's motion to allow the priority portion of pre-petition

---

[3] On March 15, 2010, the Company was awarded its sixth delivery order under the NGWC Contract. Under the terms of the LOI, this $100,000 advance was a prepayment of amounts due from ARINC.
[4] All statutory references are to Title 11 of the United States Code ("Code" or "Bankruptcy Code") as amended by Congress and enacted by the President on April 20, 2005, unless otherwise specified herein.

employee wages to be paid. It is critical that the Debtor retain its employees in order to maintain the value of the intellectual property. Contingent employment offers have been extended by ARINC to certain key employees and it is anticipated that other bidders will likewise require employment of key employees in connection with the Sale. The Debtor also has critical operating expenses that must be paid in order to preserve its going concern value, as set forth more fully in the DIP Financing Motion and Budget.

23.     If the proposed Sale is not consummated quickly, the Company may lose both the ability to preserve its intellectual property and the ability to retain its employees whose services are essential to the Company but who may pursue alternative employment opportunities, thereby diminishing the Company's value. As noted above, the Company has limited resources to maintain its operations, and to pay its suppliers, employees and expenses, and its going concern value may be completely lost if it is unable to maintain its operations and complete the Sale to ARINC on the proposed terms.

24.     Given the Debtor's distressed financial condition, time is of the essence for the Sale. The Debtor cannot continue to operate for an extended period of time, even with the DIP Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially reducing the net cash to be received at the closing of the Sale (due to the depletion of the DIP Facility) and the return to creditors.

## IV.     MOTION

### A.     Bidding Procedures

25.     As an inducement to the Buyer to agree to enter into the Purchase Agreement subject to third party diligence and bidding, and in order that the sale process will not be delayed by last minute offers, the Debtor believes that the Court should establish a competing bid procedure concerning bids by any other prospective buyers. The Debtor submits that the proposed competing bid procedure described herein below is reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Purchased Assets for the Debtor's Chapter 11 estate.

26.     The Debtor proposes the following competing bid procedures (the "Bidding

Procedures") for persons wishing to present a competing offer with respect to the Purchased Assets:[5]

       a.     Parties wishing to conduct due diligence with the Debtor for purposes of participating at the Sale auction (the "<u>Auction</u>") for the Purchased Assets must first execute a confidentiality agreement in a form reasonably satisfactory to the Debtor and provide the Debtor with sufficient and adequate information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (i) has the financial wherewithal and ability to consummate the Sale transaction, including, but not limited to, adequate financing by commitment letter and financial guaranty, if appropriate, and (ii) can provide all non-debtor contracting parties to the Assumed Contracts with adequate assurance of future performance of all contracts and leases to be assigned. Only the Buyer and any other party having satisfied the above conditions shall be permitted to conduct due diligence with the Debtor.[6]

       b.     Parties wishing to bid at the Auction must first become qualified in accordance with the following procedures. A party shall become a "Qualified Bidder" by submitting the following (the "<u>Competing Bid</u>") to those parties set forth in paragraph 26-c hereof: (i) a good faith deposit in the amount of $50,000, in the form of a wire or a certified or cashier's check made payable to "Impeva Labs, Incorporated" (a "<u>Bidder Deposit</u>"); (ii) a written bid in an amount at least $350,000[7] greater than the cash consideration set forth in the Purchase Agreement under a contract on terms at least as favorable and otherwise substantially identical to such agreement, (for example, any favorable waivers of conditions, representations or other terms that may constitute an improvement of the Purchase Agreement); (iii) a black-line copy of the Purchase Agreement marked

---

[5] Persons meeting the requirements set forth below will be deemed a "Qualified Bidder."

[6] The Debtor shall afford each Qualified Bidder due diligence access to the Debtor's assets and business, subject to competitive and other business concerns, which diligence may include access to the Debtor's data room, management presentations and site visits, and such other diligence which Qualified Bidders may request and to which the Debtor, in its discretion, may agree, <u>provided</u>, <u>however</u>, that the Debtor shall have no obligation to provide due diligence access to any Qualified Bidder after the Qualified Bid Deadline (as defined below), except as the Bankruptcy Court may otherwise order. The Debtor will coordinate efforts and provide all reasonable requests for additional information and due diligence access for Qualified Bidders. Debtor makes no representation or warranty to the information to be provided through this due diligence process or otherwise, except to the extent set forth in the final Purchase Agreement.

[7] This initial bid amount is based on the minimum incremental bid amount of $50,000 plus the maximum amount of the Expense Reimbursement which may be less based on estimated expenses by ARINC as of the Qualified Bid Deadline (defined below). Prior to the Qualified Bid Deadline, interested bidders may contact Debtor's counsel for the actual amount required for the initial bid.

Case 10-53056  Doc#9  Filed 03/31/10   Entered 03/31/10 12:06:45  Page 10 of 25

to show any and all changes requested by such bidder to the Purchase Agreement; and (iv) sufficient and adequate written information to demonstrate, to the satisfaction of the Debtor, that such competing bidder (a) has the financial wherewithal and ability to consummate the Sale transaction, including, but not limited to, evidence of adequate financing by commitment letter and financial guaranty, if appropriate, and (b) can provide all non-Debtor contracting parties to the Assumed Contracts with adequate assurance of future performance as contemplated by Section 365 of the Bankruptcy Code, including proof of compliance with 22 CFR Part 122.4, which requires 60 days' advance notification to the Directorate of Defense Trade Controls of any sale or transfer to a foreign person of ownership or control of the registrant (collectively, the documents that comprise a Competing Bid are herein referred to as a "Bid Package"). No bid may contain a financing or due diligence contingency. No Competing Bid shall include any conditions to closing other than those set forth in the Agreement and shall provide for a closing on the same (or more favorable) terms as the Agreement.

       c.     Any bidder other than the Buyer shall submit its completed Bid Package, as outlined in the preceding paragraph to (i) Impeva Labs, 2570 W. El Camino Real, Suite 100, Mountain View, California 94040; Fax (831) 303-3329, Attention: Randall Shepard; (ii) counsel to the Debtor, at Murray & Murray A Professional Corporation, 19400 Stevens Creek Boulevard, Suite 200, Cupertino, California 95014-2526, Fax: (650) 852-9244, Attention: Doris A. Kaelin, e-mail: dkaelin@murraylaw.com; and (iii) counsel to the Buyer, at Arent Fox LLP, 1050 Connecticut Avenue, N.W., Washington, DC 20036, Fax: (202) 857-6395, Attention: Judith B. Kassel and Mary-Joanne Dowd, e-mail: dowd.mary@arentfox.com; kassel.judith@arentfox.com so as to be received by such parties on or before [**four business days before the Sale Hearing**], 2010 at 4:00p.m. (Pacific Daylight Time) (the "Qualified Bid Deadline"). Parties not submitting Bid Packages by the Qualified Bid Deadline shall not be permitted to participate at the Auction.

       d.     The sale of the Purchased Assets shall be on an "as is, where is" basis without representations or warranties of any kind or nature, except to the extent set forth in the Purchase Agreement or respective definitive purchase agreement(s) with the winning bidder. Except as may be set forth in the Purchase Agreement or respective definitive purchase agreement(s), any and all of

the Debtor's assets shall be sold free and clear of any and all liens, claims, restrictions, charges and encumbrances of any kind or nature to the fullest extent permissible under the Bankruptcy Code and other applicable law, with such liens, claims, restrictions, charges, and encumbrances to attach to the net proceeds of the sale in their order or priority under the Bankruptcy Code and other applicable law.

e.   All bids of Qualified Bidders must provide that the bid is irrevocable until two (2) business days after the closing of the Sale transaction.  Each Qualified Bidder that participates in the Auction must further agree that its final and best bid at the conclusion of the Auction, if not deemed the Winning Bid (as defined below), shall serve, without modification, as a Back-up Bid (as defined below) or Alternate Back-up Bid (as defined below) as may be designated by the Debtor at the Sale Hearing, in the event the Winning Bidder fails to close as provided by the Bidding Procedures, this Order, and the Sale Order.

f.   The Debtor shall determine which, if any, of the parties submitting Bid Packages before the Qualified Bid Deadline are Qualified Bidders and such parties shall be notified before **[two business days]** _____, 2010 at 4:00 p.m. (Pacific Daylight Time).  Only Qualified Bidders may participate in the Auction.

g.   The Debtor shall, after the Qualified Bid Deadline and prior to the Auction, evaluate the Qualified Bids received, and determine which of such bids reflects the highest and best offer for the Purchased Assets at that time.  The Debtor shall announce such determination as the opening bid value (the "Baseline Bid") at the commencement of the Auction, and the Court shall conduct the Auction among the Qualified Bidders and the Buyer to determine if any higher and better offer may be obtained.  Any further bids made at the Auction shall be increments of at least $50,000 greater than the Baseline Bid and any bid made thereafter.

h.   In the event the Debtor does not receive by the Bid Deadline at least one Qualified Bid for the Purchased Assets, other than the Purchase Agreement, the Debtor will seek approval of the sale of the Purchased Assets to the Buyer at the Sale Hearing.

i.   At the conclusion of the bidding, the Debtor shall (1) review the Qualified Bid(s) on the basis of, among other things, the following: (a) the amount of the Qualified Bid(s), (b)

Case 10-53056   Doc#9   Filed 03/31/10   Entered 03/31/10 12:06:22   Page 12 of 25
Skip Barber Motorsports First Day Motions and Procedures related to Sale (x).doc
MOTION FOR ORDER APPROVING OVERBID
PROCEDURES AND OTHER MATTERS RE
SALE OF CERTAIN ASSETS OF THE DEBTOR

the form of the proposed transaction (i.e., any improvement in the terms set forth in the Purchase Agreement), (c) the number, type and nature of any changes to the Purchase Agreement, (d) the extent to which such modifications are likely to delay closing of the Sale of the Purchased Assets and the cost to the Debtor of such modifications or delay, (e) the likelihood of the bidder's ability to close a transaction and the timing thereof, and (f) the net value to the Debtor, taking into account the Buyer's right to the Expense Reimbursement, and such other aspects as determined by the Debtor in consultation with any Creditors' Committee; and (2) submit the highest and best bid (the "Winning Bid") for approval by the Bankruptcy Court pursuant to Section 363 of the Bankruptcy Code.

j.  Prior to the Bankruptcy Court approving the successful bid, the bidder recommended by the Debtor as the Winning Bid shall supplement the Court's record with evidence establishing such bidder's provision of adequate assurance of future performance of executory contracts and unexpired leases to be assumed and assigned to such bidder.

k.  In the event either the Winning Bid is approved, but not consummated by the closing of the Sale as provided by the Purchase Agreement (or such later date as the Debtor and Winning Bidder shall mutually agree in writing), the Debtor will request that the next highest and best bid, and the next highest and best bid to that bid (and so on), be approved without the necessity of further order of the Bankruptcy Court, and that such bidder be required to consummate the transaction contemplated in its bid within seven (7) days of being declared the Winning Bidder.

l.  Any bidder that intends to request that the Bankruptcy Court make a finding under Bankruptcy Code Section 363(m) that such bidder's purchase of the Purchased Assets or the assignment to it of an executory contract or unexpired lease is in good faith, shall, in advance of the Sale Hearing, file with the court and serve on the persons identified in Paragraph 26-c above, a written declaration of a competent witness demonstrating (1) the bidder's good faith, and (2) the absence of fraud or collusion between the bidder and any other bidder, or between the bidder and the Debtor's or the estate's agents or employees.  The declaration must also disclose any facts material to the good faith determination, including:

i.  The bidder's pre- and post-petition relationships with (a) any other bidder, (b) the Debtor or the Debtor's current or former officers,

Case 10-53056  Doc#9  Filed 03/31/10  Entered 03/31/10 12:30:43  Page 13 of 25

directors, agents or employees, and (c) any of the Debtor's major creditors or equity security holders;

    ii.    The bidder's anticipated relationship after the sale with any of the Debtor's current or former officers, directors, agents or employees;

    iii.    Whether any offers of employment or compensation have been or will be made to any of the Debtor's current or former officers, directors, agents or employees; and

    iv.    Whether the bidder has paid or contemplates paying consideration in connection with the sale to any person other than the Debtor.

m.    The Debtor reserves the right, in consultation with any Creditors' Committee, to select the next highest and best offer after the Winning Bid as a back-up bid (the "Back-up Bid" and each bidder is herein referred to as the "Back-up Bidder"), and one or more alternate back-up bids (each, the "Alternate Back-up Bid" and each bidder(s) is/are herein referred to as the "Alternate Back-up Bidder"), as applicable, for the Purchased Assets.

n.    In the event that a Qualified Bidder is the Winning Bidder for the Purchased Assets, such bidder shall be bound by all the terms and conditions of the Agreement with appropriate modifications for (i) the identity of the successful bidder; (ii) the purchase price, as the same shall have been increased at the Auction; and (iii) any modifications to the Agreement as may be agreed to by the Debtor and the Winning Bidder.

o.    In the event that the Buyer is not the Winning Bidder, then Buyer shall be entitled to the Expense Reimbursement (as defined below) as provided by this Order. Should overbidding take place at the Auction, the Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the Winning Bidder at the Sale Hearing based upon any such overbid, provided, however, that the Buyer shall receive a credit against any additional incremental bid in an amount equal to the estimated Expense Reimbursement and any amounts due under the DIP Financing.

p.    All Bidder Deposits of Qualified Bidders shall be retained in a segregated account by the Debtor (but any certified or cashier's checks will not be cashed) pending the Sale

Hearing.  The good faith deposit of the Winning Bidder (i.e., the deposit of Buyer or the Bidder

Deposit, as applicable, collectively referred to herein as the "Good Faith Deposit") shall be applied

to the purchase price of such transaction at the closing.  The deposit of the Winning Bidder, other

than that of the Buyer, whose good faith is further evidenced by the provision of the DIP Financing,

shall also, within five (5) business days following the Sale Hearing, be increased to an amount

sufficient to reflect ten percent (10%) of the cash portion of the Purchase Price of such winning bid.

The Good Faith Deposit of each of the Back-up Bidder and Alternate Back-up Bidder shall be held

until the earlier of five (5) days after the closing of the transactions contemplated by the Winning

Bid, or, if applicable, the Back-up Bid or Alternate Back-up Bid, and thereafter returned to the Back-

up Bidder and/or Alternate Back-up Bidder.  Good Faith Deposits of any bidder not selected as a

Back-up Bid or Alternate Back-up Bid by the Debtor shall be held until no later than two (2)

business days after the Sale Hearing, and thereafter returned to the respective bidders.  If a Winning

Bidder, Back-up Bidder, or Alternate Back-up Bidder, as applicable, fails to consummate an

approved sale because of a breach or failure to perform on the part of such bidder, the Debtor (a)

shall retain the Good Faith Deposit of such bidder as liquidated damages resulting from the breach or

failure to perform by such bidder; and (b) be authorized but not required to consummate the Back-up

Bid, or Alternate Back-up Bid, as applicable, without further notice or order of the Bankruptcy

Court.

        q.      All bids for the purchase of the Purchased Assets shall be subject to approval

of the Court.

        r.      Only bids by Qualified Bidders and the Buyer shall be considered at the

Auction.  The Debtor, in its discretion, may reject any Bid Package prior to the Auction or any

subsequent bid at the Auction as not in conformity with the requirements of the Bidding Procedures,

the Bankruptcy Code, the Bankruptcy Rules, or the Local Bankruptcy Rules, or contrary to the best

interests of the Debtor and other parties in interest.

        s.      The Debtor, in its discretion, may adopt rules for the Auction at the Auction

that, in its reasonable judgment, will better promote the goals of the Auction and that are not

inconsistent with any of the material provisions of the Bidding Procedures Order or the Agreement.

Case 10-53056  Doc#9  Filed 03/31/10  Entered 03/31/10 18:06:43  Page 15 of 25

### B. Expense Reimbursement

27.     The Purchase Agreement entitles the Buyer to be reimbursed for all actual, reasonable out-of-pocket costs and expenses (including fees to professionals) incurred by the Buyer in connection with the Purchase Agreement, up to a cap of $300,000 (the "Expense Reimbursement"). Specifically, the Purchase Agreement provides that the Expense Reimbursement shall become payable to the Buyer upon the occurrence of the following: (a) entry of a final order approving the sale of the Purchased Assets to another bidder; (b) close of a sale to another bidder; and (c) approval by the Bankruptcy Court. As to this last event, the Buyer shall file with the Court and serve by email upon counsel for any Creditors' Committee and the Office of the United States Trustee (with a copy to Debtor's counsel), a declaration setting forth the expenses incurred and the amount of the asserted Expense Reimbursement. Counsel for the Creditor's Committee (if any) and the Office of the United States Trustee (the "UST") shall have five (5) business days to review the same, and within which to file and serve by email its objection. The absence of a timely objection shall constitute approval by the Creditors' Committee (if any) and the UST of payment of the requested Expense Reimbursement, and the Buyer then may request approval of the Expense Reimbursement by the Bankruptcy Court. In the event an objection is timely made and cannot be resolved, the matter shall be set for hearing. No Expense Reimbursement shall be payable to the Buyer if it breaches its obligations under the Purchase Agreement without having its performance excused under the terms of the Purchase Agreement.

28.     In the event that the Buyer is entitled to the Expense Reimbursement, the Purchase Agreement further provides that such obligation will constitute allowed administrative expense of the Debtor's bankruptcy estate pursuant to section 503(b)(1)(A) of the Bankruptcy Code and entitled to the priority set forth in section 507(a)(2) of the Bankruptcy Code.

29.     The Debtor believes that the foregoing Bidding Procedures and the Expense Reimbursement are fair, reasonable, and are appropriately structured to ensure that the Debtor will obtain the best offer for the Purchased Assets. The proposed overbid procedures allow the Debtor to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are received from entities interested in purchasing the Debtor's interest in the Purchased Assets; and (b)

Case 10-53056 Doc#9 Filed 03/31/10 Entered 03/31/10 12:06:49 Page 16 of 25

any overbid is sufficient to cover the Expense Reimbursement required to be paid to the Buyer if an overbid is accepted and the sale consummated. The Debtor further believes, in its reasoned business judgment, that the proposed Sale (subject to the Bidding Procedures) is in the best interests of the estate and creditors because it will maximize the value of the Debtor's assets.

## V. ARGUMENT

### A. The Proposed Bid Procedures Are Fair, Reasonable and in the Best Interests of Debtor's Estate.

30. Bankruptcy Code § 363(b) and Rule 6004 of the Federal Rules of Bankruptcy Procedure authorize a debtor to sell assets of the estate other than in the ordinary course of business, after notice and a hearing. See, e.g., Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc. (In re Qintex Entertainment, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991). In accordance with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course of business may be by private sale or public auction. See Fed. R. Bankr. P. 6004(f)(1). Here, the Debtor believes that its ability to select the highest and best bidder at a Court-supervised auction enhances and benefits the marketing process by providing a motivation for bidders to submit a qualified bid with a high market value.

31. Among the bid procedures commonly approved by bankruptcy courts is the requirement that a competing bid exceed the stalking horse purchaser transaction by a specified minimum amount. The Bidding Procedures will help the Debtor obtain the highest and best possible price for the Purchased Assets. The initial Competing Bid by a Qualified Bidder must include at minimum, the Purchase Price, plus the estimated Expense Reimbursement amount, plus the Overbid Increment of $50,000 cash (the foregoing is the minimum initial Competing Bid under the Bidding Procedures). The Minimum Initial Bid requirement protects the estates from the $300,000 Expense Reimbursement (discussed below) and costs associated with the transaction. The Bidding Procedures also require $50,000 cash increments at the Auction (the Overbid Increment under the Bidding Procedures). The Debtor believes the Overbid Increment is appropriate for this case and will encourage meaningful overbids.

32. Sellers of assets often employ bidding protections in order to encourage the making of bids. Arrangements such as the Expense Reimbursement proposed here, are "important tools to

encourage bidding and to maximize the value of the debtor's assets." Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659 (S.D.N.Y. 1992), *app. dism. on jurisdictional grounds* 3 F.3d 49 (2d Cir. 1993).

33.     Historically, bankruptcy courts have approved bidding incentives similar to the Expense Reimbursement under the "business judgment rule," which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (bidding incentives may "be legitimately necessary to convince a 'white knight' to enter the bidding by providing some form of compensation for the risks it is undertaking") (citation omitted); see also In re Integrated Resources, Inc., 147 B.R. at 657-58 (establishing three basic factors for determining whether to permit break-up fees in bankruptcy: whether "the relationship of the parties who negotiated the break-up fee [is] tainted by self-dealing or manipulation," whether the "fee hamper[s], rather than encourage[s], bidding," and whether "the amount of the fee [is] unreasonable relative to the proposed purchase price"); In re Hupp Indus., Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) (identifying certain factors to be considered in determining the propriety of bid protections); but see In re America West Airlines, Inc., 166 B.R. 908, 912 (Bankr. D. Ariz. 1994) (concluding that the standard is not whether a break-up fee is within the business judgment of the debtor, but instead, whether the transaction will "[f]urther the diverse interests of the debtor, creditors and equity holders, alike").

34.     "It has become increasingly common in section 363 sales of significant portions of an estate's assets for the prospective buyer to demand a breakup fee or other protection in the event that the sale is not consummated." In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909, at *30 (S.D.N.Y. July 28, 2003) (quoting 3 Collier on Bankruptcy ¶ 363.03[7] (15th ed. 2002)); see also 3 Collier on Bankruptcy ¶ 363.02[7] (15th ed. rev. 2009).  Courts which limit or deny such break-up fees do so not because they lack statutory authority, but because they find the fee or amount is not in the best interests of the various parties and/or the estate.  In re Bethlehem Steel Corp., 2003 U.S. Dist. LEXIS 12909, at *30; see also Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) (denying § 503 claim for breakup fee); In re APP

Plus, Inc., 223 B.R. 870 (Bankr. E.D.N.Y. 1998) (denying topping fee).

35.     One form of bid protection afforded a stalking horse purchaser is the reimbursement of its actual expenses. Some courts allow expense reimbursement using the same analysis as is applied for breakup fees. In re O'Brien Envtl. Energy, Inc., 181 F.3d at 535 (Section 503(b) applies to both breakup fees and expenses). Furthermore, at least one court outside this Circuit has held that expense reimbursements are not limited like breakup fees to a percentage of the bid. AgriProcessors, Inc. v. Fokkena (In re Tama Beef Packing, Inc.), 321 B.R. 496, 498 (8th Cir. B.A.P. 2005) (stating that usual cap on break-up fees of one to four percent of the purchase price is inapplicable to expense reimbursements; the only requirement is that the fees and expenses satisfy the requirement of § 503(b)).

36.     In this instance, the Bidding Procedures only provide for an Expense Reimbursement and not any breakup fee. The Debtor has formulated a bidding process that is fair and reasonable in view of the transaction size and type and which the Debtor believes will induce prospective competing bidders to present a bid. The Debtor believes the Expense Reimbursement is reasonable relative to the nature and size of the transaction. The Debtor is informed that ARINC has incurred approximately $180,000 in out of pocket expenses to date. Here, because the Debtor provides products and services, which are licensed by the Department of State, in connection with the performance of a contract with the United States Department of Defense, more extensive due diligence was required than would otherwise be required if the Debtor simply engaged in commercial work. Additionally, the Expense Reimbursement functions to (i) attract and retain ARINC's proposal and (ii) establish a standard against which the Debtor can evaluation other proposals. As discussed above, the Debtor has explored various strategic alternatives ranging from raising new investment to a merger and acquisition transaction. ARINC's proposal as a baseline bid represents at minimum a desirable result for this bankruptcy case which the Debtor wishes to retain.

37.     The Debtor believes (i) that the Expense Reimbursement not to exceed $300,000 is reasonable given the amount of the Purchase Price, the benefits to the estate of having a definitive agreement, and the risk to the Buyer that a third-party offer ultimately may be accepted, and (ii) that the Expense Reimbursement and Bidding Procedures are necessary to preserve and enhance the

Case 10-53056   Doc# 9   Filed 03/31/10   Entered 03/31/10 12:30:46   Page 19 of 25

value of the Debtor's estate.

38. The Expense Reimbursement is the product of good faith, arm's-length negotiations between the Debtor and ARINC. While ARINC and the Debtor have maintained a business relationship, that relationship is limited strictly to one between customer and vendor. Given the complexity and specialized nature of the Debtor's business, this relationship merely led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets. No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa. While ARINC may retain some of the Debtor's key employees, including insiders, this will only occur if the Sale is consummated to ARINC (it is contemplated that other bidders may also require that certain key employees accept employment as a condition of the purchase). Other than the customer-vendor relationship, the Purchase Agreement and Loan Agreement, there is no material relationship between the Debtor and ARINC.

39. The Expense Reimbursement is also fair and reasonable in amount in view of ARINC's efforts to date and the risks associated with being a "stalking horse." The Debtors are informed that ARINC's out-of-pocket costs and expenses for negotiating, drafting and implementing the Purchase Agreement and the Loan Agreement, and for conducting the extensive due diligence in connection thereto, combined with additional expenses incurred in contemplation of the pending Sale may equal the amount of the Expense Reimbursement (as noted above, ARINC's out-of-pocket expenses to-date are approximately $180,000). Notably, before it may receive the Expense Reimbursement, the Bidding Procedures require ARINC to file a declaration setting forth the expenses incurred and the asserted amount, which shall be reviewed and may be contested by counsel for the Creditor's Committee (if any) and the Office of the United States Trustee.

40. The Expense Reimbursement benefits the estate because it assists in maximizing the value to the estates by facilitating a sale of the Debtors' business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of ARINC's offer. See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537 (explaining that a break-up fee could be found to be a benefit to the estate where "assurance of a break-up fee promoted more competitive bidding").

41. The Debtors do not believe that the amount of the Expense Reimbursement is so

substantial so as to chill other potential bidders from submitting competing bids. The capped amount will only be paid if the assets are sold to a bidder other than ARINC necessarily providing greater value for the Purchased Assets. Even in the absence of the Expense Reimbursement, an incremental amount would be appropriate to assure that the Debtor is dealing with only serious bidders with the financial ability to complete a transaction without delay.

42. Further, the Expense Reimbursement has arguably already encouraged competitive bidding, in that ARINC would not agree to negotiate and execute the Purchase Agreement without this provision. The Expense Reimbursement thus has "induc[ed] a bid that otherwise would not have been made and without which bidding would [be] limited." See In re O'Brien Envtl. Energy, Inc., 181 F.3d at 537. Similarly, ARINC's offer provides a minimum bid on which other bidders can rely, thereby "increasing the likelihood that the price at which the [assets will be] sold will reflect [their] true worth." Id. Finally, the mere existence of the Expense Reimbursement permits the Debtor to insist that competing bids for the Debtor's assets be sufficiently higher than that being offered by ARINC, a clear benefit to the Debtor's estate.

43. Protection of opening bidders is the price paid for a debtor's enjoyment of the best of both worlds - the assurance of a contractually bound purchaser at a fair price, on the one hand, and at the same time the potential of an even better bid with the corresponding enhanced benefit to the estate. The Debtor's ability to offer the Expense Reimbursement enables it to ensure the sale of the Debtor's assets to a contractually-committed bidder. Under the circumstances, the Debtor believes the Expense Reimbursement (capped at $300,000) is reasonable and should be approved.

44. The Debtor believes that the foregoing Bidding Procedures and the Expense Reimbursement are fair, reasonable, and are appropriately structured to ensure that the Debtor will obtain the best offer for the Purchased Assets. The proposed Bidding Procedures allow the Debtor to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are received from entities interested in purchasing Debtor's interest in the Purchased Assets; and (b) any overbid is sufficient to cover the Expense Reimbursement required to be paid to ARINC if an overbid is accepted and the Sale consummated. The Debtor further believes, in its reasoned business judgment, that the proposed Sale (subject to the Bidding Procedures) is in the best interests of the

MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND OTHER MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

estate and creditors because it will maximize the value of the Debtor's assets.

**B.    Provisions for Notice and Objection Dates**

45.    The Debtor has brought this Motion on shortened notice to satisfy ARINC's conditions precedent to the DIP Finance Loan as well as to maximize the time period between establishing the Bidding Procedures and the closing of the Sale, in order to market the opportunity to overbid and to provide interested parties adequate time to conduct due diligence.  However, the Debtor also requires that the Sale be consummated as soon as possible before it exhausts its resources and depletes its cash (possibly including the DIP Facility, the repayment of which reduces the cash payable by ARINC at closing) and its going concern value is lost.  As stated above, the Debtor estimates that it will exhaust the DIP Financing by the third week of May 2010.  The Debtor requests that the Sale Hearing be scheduled by the Court on regular notice so as to allow the Sale to close by May 17, 2010.  In connection therewith, the Debtor requests that the Court establish certain objection deadlines including the date by which persons must object to the Debtor's proposed "cure" amounts in connection with the proposed assumption and assignment of executory contracts and unexpired leases.

46.    **Notices**

i.    **Bid Procedures and Sale Motion**.  The Debtor will cause, by twenty-eight days before the Sale Hearing, service by first class mail of the notice of the Sale (including the Bidding Procedures approved by the Court) on all known creditors, all non-Debtor parties to the Assumed Contracts, the UST, counsel for ARINC, and Interested Bidders (defined below) (the foregoing service list collectively referred to herein as the "Global Service List").

ii.    **Assumption Motion.**  In connection with the Sale Motion, the Debtor will seek authority to assume and assign to the Buyer or any successful bidder at the Auction, the Assumed Contracts pursuant to the Purchase Agreement.  The Debtor seeks authority to file with the Court and serve on the Global Service List a notice (the "Assumption Notice") of the Debtor's intention to assume and assign the Assumed Contracts of the non-Debtor parties.  The Assumption Notice with an attached schedule setting forth the cure amounts as determined by the Debtor (the "Cure Amounts") shall be served by first class mail within twenty-eight days before the Sale

Hearing.

47. **Moving Papers (Bid Procedures, Sale Motion and Assumption Motion).**
Following approval of this Motion, the Debtor shall cause, not less than twenty (20) days before the Sale Hearing, service of the pleadings in support of the Sale Motion (which shall include as exhibits, the Purchase Agreement and the Bidding Procedures approved by the Court), the Assumption Motion, and all declarations in support thereof, by first class mail upon (a) the UST; (b) counsel for the Buyer; (c) the Creditors' Committee and its counsel (if any); (d) all entities (or counsel therefor) known to have asserted any lien, claim, encumbrance, right of refusal, or other property interest in or upon the Debtor or its Assets; (e) all parties (the "Interested Bidders") that have expressed a bona fide interest in purchasing the Company's assets or that the Debtor believes may be interested in proposing a competing bid for the Company's assets; (f) the Internal Revenue Service; (g) all entities who have filed a notice of appearance and request for service of papers in these cases and (h) all non-Debtor parties to the Assumed Contracts.  For purposes of service as set forth in this paragraph, upon the approval of this Motion, the Debtor will immediately contact potential bidders by email regarding the Debtor's assets and the proposed Sale.  Those parties who respond showing interest to the Debtor will be designated as Interested Bidders.

48. **Objection Bar Dates**

   i. **To Asset Sale.**  The Debtor requests, pursuant to Fed. R. Bankr. P. 9014, that objections, if any, to the Sale, must:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, San Jose Division, 280 South First Street, Room 3020, San Jose, California 95113, on or before **[fourteen days before the Sale Hearing]**, and (d) be served no later than **[fourteen days before the Sale Hearing]** upon (1) Debtor's counsel, Doris A. Kaelin of Murray & Murray, A Professional Corporation, 19400 Stevens Creek Boulevard, Suite 200, Cupertino, California 95014, facsimile (650) 852-9244, email: dkaelin@murraylaw.com; (2) counsel for the Creditors' Committee (if any); (3) counsel for ARINC, Judith B. Kassel, Mary-Joanne Dowd, and Katie A. Lane of Arent Fox LLP, 1050 Connecticut Avenue, N.W., Washington, DC 20036, Fax: (202) 857-6395, email: dowd.mary@arentfox.com; kassel.judith@arentfox.com;

Case: 10-53056   Doc# 9   Filed: 03/31/10   Entered: 03/31/10 12:16:49   Page 23 of 25

lane.katie@arentfox.com; and (4) the Office of the United States Trustee, 280 South First Street, Room 268, San Jose, California 95113, facsimile (408) 535-5532 (the foregoing are collectively referred to as the "Service Parties").

           ii.    **To Assumption and Cure Amounts**.  The Debtor further requests that the non-Debtor parties to the Assumed Contracts have until the fourteenth day before the Sale Hearing (the "Cure Bar Date") to (a) object to the assumption and assignment of any of the Assumed Contracts, (b) object to the amount of the Cure Amounts, and/or (c) assert that non-monetary defaults, conditions or pecuniary losses or other amounts must be cured or satisfied (including all compensation for any pecuniary loss resulting from a default in respect of the Assumed Contracts) under any of the Assumed Contracts in order for such Assumed Contracts to be assumed and assigned.  Such party must file and serve an objection upon the Service Parties (the "Assumption and/or Cure Objection") setting forth (i) the basis for the objection (non-monetary or otherwise), and, if applicable, (ii) the amount the party asserts as the cure amount and/or the amount of all compensation for any actual pecuniary loss resulting from a default in respect of the Assumed Contracts (with appropriate documentation in support thereof).  If no objection is received by the Cure Bar Date, the Cure Amounts attached to the Assumption Notice shall be controlling as to the amount necessary to be paid to cure under § 365(b)(1)(A) and (B) notwithstanding anything to the contrary in any Assumed Contract or other document, and the non-Debtor party to the Assumed Contract shall be forever barred from asserting any claims for the Cure Amount against the Debtor, the Buyer or such other purchaser of the Assets through the effective date of the assumption and assignment in respect of such Assumed Contract, and each party to any Assumed Contracts shall be deemed to have consented to the assumption and assignment of the Assumed Contract to ARINC or any other purchaser of the Purchased Assets.

           iii.    Notwithstanding anything herein to the contrary, if any non-Debtor party to an Assumed Contract is not satisfied with the showing of adequate assurance of future performance by any Competing Bidder by the Sale Hearing, then the non-Debtor party shall have the right to raise that objection to the Assumption Motion at the time of the Sale Hearing.

        WHEREFORE, the Debtor respectfully requests that the Court enter its order:

Case: 10-53056   Doc# 9   Filed: 03/31/10   Entered: 03/31/10 12:06:14   Page 24 of 25

MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND OTHER MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR

1.      Granting the Motion;

2.      Approving the Bidding Procedures and the Expense Reimbursement as set forth herein;

3.      Approving ARINC as the Stalking Horse Bidder;

4.      Scheduling the hearing on the Sale Motion and the Assumption Motion for April 30, 2010 or a date as soon thereafter as practicable;

5.      Establishing the Cure Bar Date and the deadline for objections to the Sale Motion and the Assumption Motion for the fourteenth day before the Sale Hearing; and

6.      For such other and further relief as the Court deems appropriate.

Dated:  March 31, 2010                    **MURRAY & MURRAY**
A Professional Corporation


By:  */s/ Doris A. Kaelin*
              Doris A. Kaelin
              Attorneys for Debtor

MOTION FOR ORDER APPROVING OVERBID
PROCEDURES AND RELATED MATTERS RE
SALE OF CERTAIN ASSETS OF THE DEBTOR