ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: rfranklin@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

In re:

**IMPEVA LABS, INC.**,

Debtor.

2570 West El Camino Real, Suite 100
Mountain View, California 94040

Employer Tax I.D. No.: 20-2084435

Case No. 10-53056-ASW-11

Chapter 11

Date: April 1, 2010 *[subject to entry of order shortening time]*
Time: 10:00 a.m.
Place: United States Bankruptcy Court
       280 S. First St., Room 3020
       San Jose, CA 95113
Judge: Honorable Arthur S. Weissbrodt

**MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING, FOR ADEQUATE PROTECTION SECURED BY LIEN ON PROPERTY OF THE ESTATE UNDER SECTION 364 AND FOR MODIFICATION OF AUTOMATIC STAY**

Impeva Labs, Inc., the debtor and debtor in possession (the "Debtor" or "Company") in this bankruptcy case (the "Bankruptcy Case"), hereby moves (the "Motion") pursuant to section 364 of the Bankruptcy Code,[1] for an interim order (i) allowing it to incur post-petition secured financing; setting a final hearing anytime after the fourteenth (14th) day following the service of the Motion; and (iii) entry of a final order authorizing the Debtor to incur post-petition secured financing on the

---
[1] All statutory references are to Title 11 of the United States Code ("Code" or "Bankruptcy Code") as amended by Congress and enacted by the President on April 20, 2005, unless otherwise specified herein.

terms and conditions set forth in the Motion. The Motion is made on the grounds that the Debtor requires post-petition financing to maintain its operations pending a sale of substantially all of its assets to ARINC Engineering Services, LLC ("ARINC" or "Secured Lender") and/or its affiliate ARINC Acquisition, LLC, or a successful overbidder; that the Debtor cannot obtain unsecured financing from any other source and that interim relief is necessary to prevent irreparable harm to the estate and maintain the operations of the Debtor to maximize the value of its assets for the benefit of its creditors.

The Motion is based on the Memorandum of Points and Authorities set forth herein, the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF FIRST DAY MOTIONS AND APPLICATIONS ("Omnibus Declaration") filed concurrently herewith, the INTRODUCTORY STATEMENT AND CERTIFICATION OF COMPLIANCE WITH GUIDELINES RE MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING, FOR ADEQUATE PROTECTION SECURED BY LIEN ON PROPERTY OF THE ESTATE UNDER SECTION 364 AND FOR MODIFICATION OF AUTOMATIC STAY ("Introductory Statement"), the pleadings and papers on file herein, and on such other oral or documentary evidence as may be submitted before the Court at the hearing on the Motion.

In support of the Motion, the Debtor respectfully represents the following:

I. **JURISDICTION**

1. The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2. The statutory basis for the relief requested herein is § 364 of the Bankruptcy Code.

II. **BANKRUPTCY RULE 4001 CONCISE STATEMENT**

3. Through this Motion, and pursuant to that certain written SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"), a copy of which in substantially the form to be executed is attached as **Exhibit "A"** to the Omnibus Declaration, the Debtor (i) proposes to borrow up to $1.2 million in a "debtor-in-possession" credit facility (the "DIP Facility") provided by ARINC Engineering Services, LLC (the "Secured Lender"), a Delaware

limited liability company, to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the sale (the "Sale") of substantially all of the Debtor's assets (the "Purchased Assets") to the Secured Lender as stalking horse bidder pursuant to motions to be filed approving the Sale under Bankruptcy Code § 363 (the "Sale Motion") and authorizing the assumption and assignment of executory contracts and unexpired leases under Bankruptcy Code § 365; (ii) seeks to provide security for such financing and all obligations arising thereunder (the "Obligations") by granting liens on all of the assets of the Debtor pursuant to Bankruptcy Code §§ 364(c)(2) and (3); and (iii) seeks to provide additional adequate protection through the grant of a superpriority claim pursuant to Bankruptcy Code § 364(c)(1).

4. The Secured Lender's obligations under the Loan Agreement are conditioned upon entry of an interim order in substantially the form of the proposed interim order attached to the Introductory Statement (the "Interim Order") authorizing such initial and interim financing pending the entry of a Final Order[2] and thereafter, entry of the Final Order.[3]

5. Pursuant to Federal Rule of Bankruptcy Procedure ("Bankr. R.") 4001(c)(1)(b), material provisions of the Loan Agreement are set forth in the following sections of the Loan Agreement and/or the Interim Order:

> (a) **Maximum Borrowing Available Under Revolver.** Subject to the conditions herein, the Debtor may borrow up to $500,000 on an initial and interim basis and in an aggregate amount of up to $1,200,000.00 under the DIP Credit Facility. Loan Agreement, Recitals § 4.2(e), Interim Order, p.4:9-13.
>
> (b) **Advances.** Subject to the conditions herein, the Company may submit a Borrowing Request in the form attached as **Exhibit "D"** to the Loan Agreement to fund disbursements as set forth in the Budget (as may be amended from time to time) attached as **Exhibit "A"** to the Loan Agreement. Loan Agreement, §§ 1.1(b); 4.2(b).

---

[2] Capitalized terms not otherwise defined have the meaning ascribed to them in the Loan Agreement.
[3] Concurrently with the filing of this DIP Financing Motion, the Debtor has filed, among other motions, its MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR and has requested a hearing date on the same day as the DIP Financing Motion to request entry of the Bidding Procedures Order.

RAF/
C:\Imperia-Data\PDI\INC DIP Agreement\Mot v1.docx    3    MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Case 10-53056    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:55    Page 3 of 18

(c) **Interest Rate.** The Company agrees to pay to Lender interest on the Outstanding Principal Balance at an annual rate equal to the prime rate, as published in the Wall Street Journal's "Consumer Money Rates" column, plus four percent (4%), which interest shall be payable on the Maturity Date. All interest on the Loan shall be computed on the basis of a three hundred sixty (360) day year and the actual number of days elapsed. Upon the occurrence and during the continuance of any defaults in the payment of principal, interest or other amounts due under the Agreement or the Note, interest on such defaulted payments shall be payable at an annual rate equal to ten percent (10%), which interest shall be payable monthly in arrears on the last Business Day of each month. Loan Agreement, § 1.3.

(d) **Maturity Date.** Maturity Date" shall mean the earlier of (i) May 31, 2010, (ii) Lender's decision to accelerate the Loan in accordance with Section 6.2, or (iii) the date of a sale of all or substantially all of the Company's assets to Lender or a competing bidder under section 363 of the Bankruptcy Code. Loan Agreement, Definitions, p. 17

(e) **Events of Default.** Events of Default under the Loan Agreement include, but are not limited to (i) failure to pay the Outstanding Principal Balance, accrued interest on the Note, or any other Obligations when due, or failure to pay or reimburse Secured Lender for any expense reimbursable thereunder or under any other Loan Document within ten (10) days following Secured Lender's demand for such reimbursement or payment of expenses; or (ii) any representation or warranty made by the Company in any Loan Document proves to have been incorrect when made or deemed made; or (iii) failure by to comply with the Budget within a weekly line item variance of 10% as provided in the Loan Agreement; (iv) failure by the Company to comply with, or otherwise breach any covenant or other provision of the Loan Agreement, any documents entered into in connection therewith or any order of the

Case: 10-53056    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:55    Page 4 of 18

RAF/
R:\Impera\DaBi\PO\RINC DIP Agreement\Mot.v1.docx    4    MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Bankruptcy Court, including the Orders approving the financing contemplated hereby; (v) any material provision of any Loan Documents or either of the Orders shall, for any reason, cease to be valid and binding on the Company, or the Company shall so assert in any pleading filed in any court; (vi) entry of an order of the Bankruptcy Court appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; (vii) entry of an order of the Bankruptcy Court reversing, amending, supplementing, staying or otherwise modifying either of the Orders (without the prior written consent of Secured Lender); (viii) entry of an order of the Bankruptcy Court dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code; (ix) any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $100,000 in the aggregate or which would operate to divest the Company of any of the Collateral with a value of greater than $100,000 in the aggregate shall be rendered against The Company and the enforcement thereof shall not have been stayed; (x) the Company shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-petition claims against the Company; (xi) authorization by the Bankruptcy Court (or an action by the Company to seek authority) to (a) impose against Secured Lender, or its claims, any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except as otherwise provided in Section 3.8 of the Loan Agreement, or (b) to lend money to the Company post-petition and such financing to be senior to or p*ari passu* with the liens or claims of Secured Lender under the Loan Agreement; (xii) entry by the Bankruptcy Court of an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of

Case: 10-53056   Doc# 12   Filed: 03/31/10   Entered: 03/31/10 13:27:58   Page 6 of 18

5

MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

foreclosure or the like) on any assets of the Company with a value greater than $100,000 in the aggregate or (y) to the holders of any judgments in excess of $100,000 in the aggregate against the Company to permit enforcement thereof (including by way of injunction); (xiii) failure of the Bankruptcy Court to enter the Final Financing Order, in form and substance satisfactory to Secured Lender and which permits extensions of credit under the Agreement not to exceed in the aggregate $1,200,000, within 30 days following entry of the Interim Financing Order; (xiv) the filing of any challenge by the Company, an official or unofficial creditors' committee, or any party in interest to the validity, priority, or extent of any liens in favor of Secured Lender or the validity and enforceability of the claims of Secured Lender; (xv) any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any Loan Document or on the condition (financial or otherwise), assets, operations or liabilities of the Company. Loan Agreement, § 6.1.

(f) **Liens.** The Obligations are secured by first priority liens on and security interests pursuant to Section 364(c)(2) of the Bankruptcy Code in all of the assets of the Debtor, and the Secured Lender is to be granted a continuing, valid binding enforceable, nonavoidable, and automatically perfected security interest and lien (subject only to the Carve-Out[4] and Chapter 7 Carve-Out[5]) on all currently existing and after-acquired or arising Collateral; *provided however,* that the Collateral shall not include the right, title and interest of the Company in the Avoidance Actions, other than Avoidance Actions pursuant to Section 549 of the Bankruptcy Code. Loan Agreement, §§ 2.1, 2.2, 2.3, 2.4 and Definitions (p. 16), Interim Order, p.4:24-5:20.

---

[4] "Carve-Out" is defined in the Loan Agreement as the payment of professional fees and disbursements incurred by the Debtor and any statutory committees in the Bankruptcy Case accrued but unpaid in an aggregate amount not to exceed $100,000.00.

[5] "Chapter 7 Carve-Out" is defined in the Loan Agreement as the fees and expenses of administration (including attorneys' fees) of a superseding Chapter 7 case.

RAF/
C:\Impera-DaN\PDARINC DIP Agreement\Motv1.docx

6

MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Case: 10-53056    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:58    Page 6 of 18

        (g) **Fees.** The Company shall pay to Lender a facility fee equal to $4,000, which shall be payable at the Closing. Loan Agreement, § 1.4.

6. The provisions described in Bankruptcy Rule 4001(c)(1)(B)(i)-(xi) are set forth at the following sections of the Loan Agreement and/or the Interim Order:

        (a) **Grant of Priority or a Lien on Property of the Estate.** Loan Agreement, § 2.1, Interim Order, p.4:24-5:16.

        (b) **Indemnification of Any Entity.** Loan Agreement, §§ 5.11(b), 8.10.

        (c) **Release, Waiver, or Limitation on Rights under Section 506(c).** Loan Agreement, § 3.7, Interim Order, p.6:8-10 (waiver limited to period in which the Company is authorized to use cash collateral or borrow funds in accordance with Guidelines)

        (d) **Liens Not Granted on Claims Arising Under Chapter 5, except for § 549.** Loan Agreement, Definitions (p. 2.1(a)(ix), Interim Order, p.5:17-20.

### III. HISTORY AND RELEVANT FACTS

#### A. Bankruptcy Petition

7. On March 26, 2010, (the "Petition Date"), the Debtor filed a voluntary petition under Chapter 11 of the United States Bankruptcy Code. The Debtor is presently operating its business as a debtor in possession pursuant to the provisions of 11 U.S.C. §§ 1107 and 1108.

8. No official committee of unsecured creditors ("Committee") has been formed in the Bankruptcy Case to date.

#### B. History and Events Leading to the Debtor's Bankruptcy Case

9. The Debtor was incorporated in California on December 16, 2004. It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System. The Debtor provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Debtor's Global Sentinel™ Units ("GSUs") and Device Management Center ("DMC"). The system can ensure continuous tracking and monitoring of customer assets, no matter where they are in the world. The Debtor's GSU

RAF/
C:\Imperada\DIP\RINC DIP Agreement\Motv1.docx     7     MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Case: 10-53056    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:55    Page 7 of 18

incorporates a customizable suite of electronic sensors to monitor the assets' condition and location. It communicates seamlessly worldwide with the Debtor's DMC through multiple wireless technologies, providing immediate secure access via the Internet to data from the asset being tracked, monitored or managed. The DMC can also link to customer data centers through other options including standard XML over a secure network connection. If the asset experiences an abnormal event, the concerned customers and/or appropriate agencies can also be notified within minutes via SMS text messaging and email notification.

10. The Debtor's initial investors included industry investors as well as senior management of the Company through Convertible Notes that were later converted to Series A Preferred Shares of the Company. Following this initial investment, the Company gained other outside investors. The total Series A round was $2,055,418 and was closed in September 2005.

11. In 2005-2008, the Debtor was concerned with building its team, developing and implementing its business plan, developing and deploying its products and attracting further investment. An internal (i.e., current investors were the major investors) Series A-1 Round closed in early 2006 and brought in $2,316,800. In 2006, the Company sought and teamed with ARINC to serve as prime contractor with the Company as subcontractor to compete for a 5-year, $20 million Department of Defense ("DOD") contract (the "NGWC Contract") which called for deployment of mesh net technology products. In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor was awarded the NGWC Contract. By mid-2007, the first tranche of a planned three tranches of Series B financing was closed in the amount of $7 million with Agility Logistics ("Agility") as the major investor.

12. In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor (Agility) monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor on tracking and monitoring strategic assets such as jet engines. The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule. In addition, the second and third tranches of Round B financing were completed in the second half of 2008 to provide the needed funds on a

timely basis with Agility investing an additional $2 million while two other major investors invested an aggregate $1 million. Even before the end of 2008, the Company had begun to identify and negotiate the next round of financing for the total amount of $6 million for receipt in 2009 to start scaling the company, increase sales and to fund further research and development of new products.

13. The Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at the CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility. In early 2009, the candidate informed the Company that it was unable to get approval from its major investor due to its economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

14. By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company. This unanticipated news caused the Company to accelerate its efforts at obtaining the requisite financing. It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "Kims"), agreed to invest under provisions that included discount on the conversion valuations and a ceiling. The Debtor and the Kims also entered into a convertible promissory note that purported to grant Agility and the Kims security interests in the Company's assets. These transactions closed in June of 2009, with Agility contributing $631,507 and the Kims contributing $231,165. Neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later.[6]

15. In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through

---

[6] Agility and the Kims did not file UCC-1 Financing Statements until March 12, 2010. The Debtor believes that these filings are avoidable transfers of an interest of the Debtor under § 547 of the Bankruptcy Code.

Case: 10-53056   Doc# 12   Filed: 03/31/10   Entered: 03/31/10 13:27:55   Page 9 of 18

RAF/
R:\Imperva-Labs\PD\PRINC DIP Agreement\Mot v1.docx   9   MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint Logistics Over-the-Shore). JLOT attracted the attention of the DOD senior officials that opened major opportunities for the Company. The Company continued with its efforts to find new investment and established contact with a Kuwaiti based company as a potential investor as well as a potential major customer. Negotiations and drafting of documents concerning a $6 million investment by this entity in the Company continued through December 3, 2009 and were close to conclusion when the Company received an unexpected Formal Suspension Notice from the Defense Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension list with the DOD and concluded that the Company was an affiliate of Agility subject to the same suspension list. As a result, the negotiations with this potential investor were put on hold.

16. The suspension was extremely detrimental to the Company's business. The Company was not allowed to receive any new DOD contracts or even new task orders under the NGWC Contract. Company management worked diligently, and due to lack of funds, without legal representation, to release the suspension. Finally, through major efforts, Agility gave up their two Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-voting. Agility agreed to the removal of all blocking and control terms from all the investment documents with the Company. Thereafter, DLA released the Company from the suspension on December 31, 2009.

17. Negotiations with the potential investor were resumed; however, this time it decided that any investment would be staged, beginning with an initial $500,000 through a convertible note and which was received on February 16, 2010. Any further investment amounts were to be dependent upon the completion of due diligence and the Company's progress. On February 16, 2010, the Company received $500,000 in proceeds of this convertible note. Following this development, the Company increased its efforts to locate a strategic investor or merger and acquisition candidate, speaking with approximately 12 entities, including both public multinationals and private entities in commercial and DOD-related fields. The Company signed an exclusive letter of intent with a major DOD contractor, which conducted due diligence on the Debtor. However, on

February 11, 2010 this contractor informed the Company that it had decided to forgo the opportunity.

18. The Company continued to investigate strategic alternatives and contacted ARINC, which had previously expressed interest and conducted due diligence on the Company in 2008, to ascertain the level of its interest. Following multiple discussions, ARINC presented a Letter of Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets which was accepted by the Company's board and senior management on February 24, 2010. The LOI provided for a 45 day exclusivity period during which the Company could not enter into a sale, merger, or other business combination with any other party with the proposed Sale to be made in the context of a Chapter 11 case. ARINC provided the Company with a $100,000 advance against work it performed under the NGWC Contract[7] immediately on the execution of the LOI and from which, together with the remaining proceeds from February 16, 2010 convertible note, allowed the Company to make its February payroll.

19. On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a pre-petition secured credit agreement in which ARINC agreed to lend the Debtor the principal amount of $100,000 to fund its Chapter 11 operations, including payment of a retainer to bankruptcy counsel. Contemporaneously with such extension of funds, ARINC filed its UCC-1 Financing Statement on March 19, 2010.

20. The Debtor has agreed to the terms of a definitive Asset Purchase Agreement (the "Purchase Agreement")[8] with ARINC for the Sale of the Purchased Assets, together with the assumption and assignment of certain specified executory contracts and unexpired leases of the Debtor. The aggregate purchase price for the Purchased Assets to be paid by ARINC will be $2,000,000, less any amounts loaned and any unpaid accrued interest thereon pursuant to the Debtor-In-Possession Financing and less the bidder deposit of $50,000, which shall be paid at the closing by wire transfer or the delivery of other immediately available funds. ARINC will also assume performance of certain assumed contracts and cure Debtor defaults by assuming specified liabilities

---

[7] On March 15, 2010, the Company was awarded its sixth delivery order under the NGWC Contract. Under the terms of the LOI, this $100,000 advance was a prepayment of amounts due from ARINC.

[8] Certain schedules to the Purchase Agreement are being finalized as of the date of this DIP Financing Motion.

Case 10-53056 Doc# 12 Filed: 03/31/10 Entered: 03/31/10 13:27:58 Page 11 of 18

11 — MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

not to exceed $1,000,000. A true and correct copy of the Purchase Agreement (excluding exhibits and schedules) is attached as **Exhibit "B"** to the Omnibus Declaration and incorporated herein by reference. The Purchase Agreement is subject to overbid and approval by the Bankruptcy Court.

C. **The Debtor's Chapter 11 Business Plan**

21. In this Bankruptcy Case, the Debtor contemplates that it will continue operations and maintain its going concern value to maximize the value of the Purchased Assets for the benefit of creditors. In that regard, the Debtor has developed the Budget which has been approved by ARINC, and will utilize the proceeds of the DIP Facility in accordance with such Budget (as may be amended from time to time) and which the Debtor seeks to incorporate into the proposed Interim Order and Final Order. A copy of the Budget is attached to the Omnibus Declaration as **Exhibit "C"**.

22. Concurrently with the filing of this Motion, the Debtor will be filing, among other motions, a motion to approve sales procedures, seeking approval of certain expense reimbursement and overbid procedures (the "<u>Sale Procedures Motion</u>"). The Debtor intends to file the Sale Motion as soon as possible following entry of the Court's order on the Sale Procedures Motion. The Debtor anticipates that other entities may emerge to bid on the assets and contemplates a hearing on the Sale Motion by April 30, 2010 or as soon thereafter as practicable. Following the Sale, the Debtor anticipates that it will propose and confirm a liquidating plan of reorganization.

D. **Assets and Debt Structure**

23. The Debtor's primary assets are its intellectual property, employees, accounts receivable, and trademarks. As noted above, ARINC provided a secured loan of $100,000 on March 19, 2010. Other than a lien on specific equipment of an equipment lessor, the Debtor presently has no other unavoidable secured debt.[9] Priority claims, as set forth in Schedule E, total approximately $272,799.39 and consist primarily of employee wage and benefit claims of which $178,788.87 is priority and $94,010.52 is non-priority. The Debtor's schedule F reflects unsecured debt in the

---

[9] Just prior to the filing of the Bankruptcy Case, Agility Investment Holdings and James J. Kim, among others (collectively, "<u>Agility</u>"), filed UCC-1 financing statements with the Secretary of State purporting to perfect security interests in the Debtor's assets on account of loans made to the Debtor in June 2009. The Debtor believes these liens are avoidable under Bankruptcy Code § 547(b). As of the date of the preparation of this Motion, although not necessary, the Debtor has requested that Agility and the Kims agree to subordinate any alleged security interests to those of the Secured Lender in connection with the DIP Facility, which is essential to the Debtor's ongoing viability.
RAF/Sempevra Lans\RUARINC DIP Agreement2Mot.v.final 12 MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Case 10-53056 Doc# 12 Filed: 03/31/10 Entered: 03/31/10 13:27:58 Page 12 of 18

amount of $1,027,872.50^{10}$ .

24. Recent searches of the records of the California Secretary of State disclose the following liens and security interests on the following pre-petition property under the search name Impeva Labs, Inc.

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Agility Investments Holdings, LLC | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Agnes C. Kim | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Susan Y. Kim Trust | March 12, 2010 | All assets of the Debtor |
| David D. Kim Trust | March 12, 2010 | All assets of the Debtor |
| John T. Kim Trust 12/31/87 | March 12, 2010 | All assets of the Debtor |
| ARINC Incorporated | March 19, 2010 | All assets of the Debtor |
| Dell Financial Services | February 27, 2008 | Equipment Lease assets |

IV. **NECESSITY FOR DIP FINANCING**

25. The Debtor has minimal cash as of the Petition Date and its regular payroll is due on March 31, 2010. To maintain the ongoing concern value of the Debtor, the Debtor will need an infusion of cash to pay its suppliers and employees and other operating expenses, as set forth in the Budget. The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor. The emergency interim relief requested is critical to the success of this case and is imperative to ensure that the Debtor's subcontract and the provision of critical services to the DOD is honored. Without the proposed DIP Financing and the ability to meet its obligations for the next two weeks, the Debtor would be required to immediately cease operations and terminate all of its employees. The Purchased Assets would be reduced to minimal value and provide no return to unsecured creditors. As set forth in the

---

[10] The total unsecured claims listed on Schedule F does not include these non-priority amounts of the employee benefit claims which are included on the total amount listed on Schedule E. Schedule F also does not reflect the claims of Agility and the Kims set forth on Schedule D and which the Debtor believes are avoidable and invalid.

RAF/
Impeva Labs/ARINC DIP Agreement/Mot.v.Final

Case 10-53056    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:58    Page 13 of 18

13    MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Budget, the Debtor anticipates that it will make Borrowing Requests in an aggregate amount up to $500,000 during weeks one, two and three of the term of the DIP Facility. The DIP Facility will be repaid from cash generated from the business, if any, pending the closing of the Sale and shall be satisfied in full from the proceeds of Sale.

26. As set forth above, the Debtor has made numerous and arduous attempts to obtain financing prior to the filing of the case. The Debtor is unable to obtain adequate unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code or pursuant to §§ 364(a) and 364(b) of the Bankruptcy Code. The Debtor has been unable to obtain secured credit allowable under §§ 364(c)(2) or 364(c)(3) of the Bankruptcy Code, except under the terms and conditions set forth in the proposed Interim Order and the Loan Agreement.

27. The Secured Lender is willing to allow the Debtor to obtain financing under the Loan Agreement only upon the terms and conditions set forth therein only upon the following terms and conditions: (a) entry of the Interim Order authorizing the DIP Financing on a interim basis on the terms set forth in the form of Interim Order attached to the Introductory Statement, and (b) subsequent to that, on the terms set forth in the Final Order.

28. The relief requested in the Motion is necessary, essential and appropriate for the continued operations of the Debtor's business and the management and preservation of its property and will maximize the value of the Debtor's assets for the benefit of its creditors. It is in the best interest of the Debtor's estate to be allowed to enter into, and perform under, the Loan Agreement.

## V. THE PROPOSED BORROWING

### A. Amount, Interest Rate, Fees and Other Requirements

29. As set forth in Section III above, subject to the terms and conditions of the Loan Agreement, the Secured Lender has agreed to provide for a post-petition revolving lending facility in the maximum amount of $1.2 million, bearing an interest rate of prime plus 4% per annum and subject to fees totaling $4,000, plus reasonable attorneys fees and expenses. The Debtor shall comply with reporting requirements set forth in the Loan Agreement.

### B. The DIP Lien

30. The obligations of the Debtor under the Loan Agreement shall be secured by the grant

of security interests in the Collateral, subject only to the payment of the U.S. Trustee fees, the Carve-Out and the Chapter 7 Carve-Out:

      (a)      Pursuant to § 364(c)(2) of the Bankruptcy Code, a perfected first priority senior security interest in and lien upon all assets of the Debtor, whether existing on the Petition Date, or thereafter acquired, that, as of the Petition Date are not subject to valid, perfected and non-avoidable liens;

31.      However, the Collateral shall not include any rights of the Debtor or a subsequent chapter 11 or chapter 7 trustee to recover property and to avoid liens or other property interest under the Bankruptcy Code, other than actions initiated under §549 of the Bankruptcy Code, and all property interests recovered or obtained thereby, under §§ 544 through 548, inclusive, of the Bankruptcy Code.

      C.      **The Superpriority Administrative Expense Status**

32.      The Obligations shall have the status in the Case of superpriority administrative expenses under Section 364(c)(1) of the Bankruptcy Code. Such administrative claim shall have priority, subject to the provisions of Section 3.8 of the Loan Agreement, including the Carve-Out and the Chapter 7 Carve-Out, over all other claims, costs and expenses of the kinds specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Company, the Company's estate, and any successor trustee or estate representative in the bankruptcy Case or any subsequent proceeding or case under the Bankruptcy Code.

      D.      **Events of Default**

33.      Events of Default under the Loan Agreement include, but are not limited to (i) failure to pay the Outstanding Principal Balance, accrued interest on the Note, or any other Obligations when due, or failure to pay or reimburse Secured Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Secured Lender's demand for such reimbursement or payment of expenses; or (ii) any representation or warranty made by the Company in any Loan Document proves to have been incorrect when made or deemed made; or (iii) failure by the Company to comply with the Budget within a weekly line item variance of 10% as provided in

the Loan Agreement; (iv) failure by the Company to comply with, or otherwise breach any covenant or other provision of the Loan Agreement, any documents entered into in connection therewith or any order of the Bankruptcy Court, including the Orders approving the financing contemplated hereby; (v) any material provision of any Loan Document or either of the Orders shall, for any reason, cease to be valid and binding on the Company, or the Company shall so assert in any pleading filed in any court; (vi) entry of an order of the Bankruptcy Court appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; (vii) entry of an order of the Bankruptcy Court reversing, amending, supplementing, staying or otherwise modifying either of the Orders (without the prior written consent of Secured Lender); (viii) entry of an order of the Bankruptcy Court dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code; (ix) any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $100,000 in the aggregate or which would operate to divest the Company of any of the Collateral with a value of greater than $100,000 in the aggregate shall be rendered against the Company and the enforcement thereof shall not have been stayed; (x) the Company shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-petition claims against the Company; (xi) authorization by the Bankruptcy Court (or an action by the Company to seek authority) to (a) impose against Secured Lender, or its claims, any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except as otherwise provided in Section 3.8 of the Loan Agreement, or (b) to lend money to the Company post-petition and such financing to be senior to or p*ari passu* with the liens or claims of Secured Lender hereunder; (xii) entry by the Bankruptcy Court of an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Company with a value greater than $100,000 in the aggregate or (y) to the holders of any judgments in excess of $100,000 in the aggregate against the Company to permit enforcement thereof (including by way of injunction); (xiii) failure of the Bankruptcy Court to enter the Final Financing Order, in form and substance satisfactory to Secured Lender and which

RAF/Sempra Lansdown\NC DIP Agreement\Mot.v.Final    16    MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

Case 10-53056-NC    Doc# 12    Filed: 03/31/10    Entered: 03/31/10 13:27:58    Page 16 of 18

permits extensions of credit under the Agreement not to exceed in the aggregate $1,200,000, within 30 days following entry of the Interim Financing Order; (xiv) the filing of any challenge by the Company, an official or unofficial creditors' committee, or any party in interest to the validity, priority, or extent of any liens in favor of Secured Lender or the validity and enforceability of the claims of Secured Lender; (xv) any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any Loan Document or on the condition (financial or otherwise), assets, operations or liabilities of the Company.

### E. **Remedies Upon An Event Of Default**

34. Upon the occurrence of an uncured "Event of Default," the Secured Lender, may declare all of the Obligations to be immediately due and payable, cease advancing money under the Loan Agreement, terminate the Loan Agreement, and upon delivery of a 5-day notice, file and serve a motion, which may be upon shortened time, for relief from the automatic stay in order to enforce all of the Liens and security interests in the Collateral.

### F. **Termination**

35. The Obligations are due and payable on the Maturity Date, defined in the Loan Agreement as the earlier of (i) May 31, 2010, (ii) Lender's decision to accelerate the Loan in accordance with Section 6.2, or (iii) the date of a sale of all or substantially all of Borrower's assets to Lender or a competing bidder under section 363 of the Bankruptcy Code

### VI. **INTERIM APPROVAL SHOULD BE GRANTED**

36. Bankr. R 4001(c) provides that a final hearing on a motion to obtain credit may not be commenced earlier than 15 days after the service of such motion. Upon request, however, the Court is empowered to conduct a preliminary hearing on the motion and authorize the obtaining of credit necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

37. The Debtor requests that the Court conduct an expedited preliminary hearing on the Motion and authorize the Debtor to borrow under the Loan Agreement on an interim basis, pending entry of a final order, in order to (i) maintain and finance the ongoing operations of the Debtor, and (ii) avoid immediate and irreparable harm and prejudice to the estate and all parties in interest, and (iii) schedule a hearing to consider entry of a final order.

Case: 10-53056   Doc# 12   Filed: 03/31/10   Entered: 03/31/10 13:27:58   Page 17 of 18

17   MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING....

38. The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an ongoing basis. Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtor will be immediately and irreparably harmed. It will not be able to fund payroll to its employees or pay key contractors that are vital to the business and the value of the Debtor's assets. Failure to meet these obligations and to provide these assurances likely result in the immediate cessation of operations and negatively impact the value of the Debtor's business, to the detriment of all parties in interest. In practical terms, the Debtor simply needs sufficient funds to meet its obligations in the next two weeks. Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its efforts to maximize the value of its assets for the benefit of its creditors.

39. In this regard, the Debtor and the Secured Lender have worked extensively on the Budget and have identified those expenses and disbursements required to be made on a weekly basis. The Debtor anticipates that it will make Borrowing Requests totaling $500,000 in weeks one, two and three of the Budget. Payment of these expenses and disbursements is necessary to avoid immediate and irreparable harm to the Estate.

WHEREFORE, the Debtor respectfully requests that the Court enter an Interim Order:

1. Granting the Motion and authorizing the Debtor to enter into the Loan Agreement and borrow up to $500,000 from Secured Lender on the terms set forth in the Loan Agreement on an interim basis, pending the entry of a final order;

2. Setting a date and time for a final hearing to consider the Motion; and

3. For such other and further relief as the Court deems just and proper.

Dated: March 31, 2010          **MURRAY & MURRAY**
A Professional Corporation


By: */s/ Robert A. Franklin*
Robert A. Franklin
Attorneys for Debtor