ROBERT A. FRANKLIN (091653)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  rfranklin@murraylaw.com
Email:  dkaelin@murraylaw.com
Email:  thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**IMPEVA LABS, INC.,**<br><br>Debtor.<br><br>2570 West El Camino Real, Suite 100<br>Mountain View, California 94040<br><br>Employer Tax I.D. No.: 20-2084435 | Case No. 10-53056-ASW-11<br><br>Chapter 11<br><br>Date:   April 1, 2010 *[subject to entry of order shortening time]*<br>Time:   10:00 a.m.<br>Place:   United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA  95113<br>Judge:   Honorable Arthur S. Weissbrodt |

### DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF FIRST DAY MOTIONS

I, Randall L. Shepard, declare:

1.      I am the Chief Executive Officer of Impeva Labs, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "Company" or the "Debtor") and am authorized to make this Declaration on its behalf.  I have personal knowledge of the matters stated herein except as to those matters stated on information and belief, and as to those matters I am informed and believe them to be true.  If called as a witness, I could and would testify competently

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:55:46    Page 1 of 25

as to those facts.

2. This Declaration is filed in support of the following motions (collectively, the "First Day Motions") filed concurrently herewith for which the Debtor has requested a hearing on shortened notice to parties through a separate motion to the Court:

    i. MOTION FOR INTERIM AND FINAL ORDERS APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING, FOR ADEQUATE PROTECTION SECURED BY LIEN ON PROPERTY OF THE ESTATE UNDER SECTION 364 AND FOR MODIFICATION OF AUTOMATIC STAY (the "DIP Financing Motion");

    ii. MOTION FOR ORDER AUTHORIZING THE DEBTOR TO HONOR PREPETITION WAGES AND EMPLOYEE OBLIGATIONS (the "Employee Obligations Motion");

    iii. MOTION FOR ORDER (I) PROHIBITING UTILITIES FROM ALTERING, REFUSING, OR DISCONTINUING SERVICE; (II) DEEMING UTILITIES ADEQUATELY ASSURED OF PAYMENT; AND (III) ESTABLISHING PROCEDURES FOR DETERMINING REQUESTS FOR ADDITIONAL ADEQUATE ASSURANCE OF PAYMENT (the "Utilities Motion"); and

    iv. MOTION FOR ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR (the "Sale Procedures Motion"). [1]

A. **BANKRUPTCY FILING**

3. On March 26, 2010, (the "Petition Date"), the Debtor filed a voluntary petition (the "Bankruptcy Case") under Chapter 11 of the United States Bankruptcy Code. The Debtor is presently operating its business as a debtor in possession. No official committee of unsecured creditors (the "Creditors Committee") has been formed in the bankruptcy case to date.

B. **HISTORY AND EVENTS LEADING TO THE DEBTOR'S BANKRUPTCY CASE**

4. The Debtor was incorporated in California on December 16, 2004. It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System. The Debtor provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Debtor's Global Sentinel™ Units ("GSUs") and Device Management Center ("DMC"). The system can ensure continuous tracking and monitoring of customer assets, no matter where they are in the world. The Debtor's GSU incorporates a customizable suite of electronic sensors to monitor the assets' condition and location.

---

[1] Terms not defined herein shall have the meaning ascribed in the particular First Day Motion.

K:\Impeva Labs\Pl\First Day\Omnib dec v6.docx

2

DECLARATION OF RANDALL L. SHEPARD
IN SUPPORT OF FIRST DAY MOTIONS

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:55:46   Page 2 of 25

It communicates seamlessly worldwide with the Debtor's DMC through multiple wireless technologies, providing immediate secure access via the Internet to data from the asset being tracked, monitored or managed. The DMC can also link to customer data centers through other options including standard XML over a secure network connection. If the asset experiences an abnormal event, the concerned customers and/or appropriate agencies can also be notified within minutes via SMS text messaging and email notification.

5. The Debtor's initial investors included industry investors as well as senior management of the Company through Convertible Notes that were later converted to Series A Preferred Shares of the Company. Following this initial investment, the Company gained other outside investors. The total Series A round was $2,055,418 and was closed in September 2005.

6. In 2005-2008, the Debtor was concerned with building its team, developing and implementing its business plan, developing and deploying its products and attracting further investment. An internal (i.e., current investors were the major investors) Series A-1 Round closed in early 2006 and brought in $2,316,800. In 2006, the Company teamed with ARINC Engineering Services, LLC ("ARINC," the "Buyer" or the "Secured Lender") to serve as prime contractor with the Company as subcontractor, to compete for a 5-year, $20 million Department of Defense ("DOD") contract (the "NGWC Contract") to develop and deploy mesh net technology products. In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor, was awarded the NGWC Contract. By mid-2007, the first tranche of a planned three tranches of Series B financing was closed in the amount of $7 million with Agility Logistics ("Agility") as the major investor.

7. In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor (Agility) monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor on tracking and monitoring strategic assets such as jet engines. The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule. In addition, the second and third tranches of Round B financing were completed in the second half of 2008 to provide the needed funds on a

Case: 10-53056     Doc# 14     Filed: 03/31/10     Entered: 03/31/10 13:53:45     Page 3 of 25

timely basis with Agility investing an additional $2 million while two other major investors invested an aggregate $1 million. Even before the end of 2008, the Company had begun to identify and negotiate the next round of financing for the total amount of $6 million for receipt in 2009 to start scaling the company, increase sales and to fund further research and development of new products.

8.     The Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at the CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility. In early 2009, the candidate informed the Company that it was unable to get approval from its major investor due to its economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

9.     By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company. This unanticipated news caused the Company to accelerate its efforts at obtaining the requisite financing. It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "Kims"), agreed to invest under provisions that included discount on the conversion valuations and a ceiling. The Debtor and the Kims also entered into a convertible promissory note that purported to grant Agility and the Kims security interests in the Company's assets. These transactions closed in June of 2009 with Agility contributing $631,507 and the Kims contributing $231,165 on June 11, 2009. Neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later when they filed UCC-1 Financing Statements on March 12, 2010.

10.     In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint

Case: 10-53056     Doc# 14     Filed: 03/31/10     Entered: 03/31/10 13:55:46     Page 4 of 25

Logistics Over-the-Shore).  JLOTS attracted the attention of the DOD senior officials that opened

major opportunities for the Company.  The Company continued with its efforts to find new

investment and established contact with a Kuwaiti based company as a potential investor as well as a

potential major customer.  Negotiations and drafting of documents concerning a $6 million

investment by this entity in the Company continued through December 3, 2009 and were close to

conclusion when the Company received an unexpected Formal Suspension Notice from the Defense

Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and

could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension

list with the DOD and concluded that the Company was an affiliate of Agility subject to the same

suspension list. As a result, the negotiations with this potential investor were put on hold.

      11.    The suspension was extremely detrimental to the Company's business.  The Company

was not allowed to receive any new DOD contracts or even new task orders under the NGWC

Contract.  Company management worked diligently, and due to lack of funds, without legal

representation, to release the suspension.  Finally, through major efforts, Agility gave up their two

Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-

voting. Agility agreed to the removal of all blocking and control terms from all the investment

documents with the Company.  Thereafter, DLA released the Company from the suspension on

December 31, 2009.

      12.    Negotiations with the potential investor were resumed; however, this time it decided

that any investment would be staged, beginning with an initial $500,000 through a convertible note

and which was received on February 16, 2010.  Any further investment amounts were to be

dependent upon the completion of due diligence and the Company's progress.  On February 16,

2010, the Company received $500,000 in proceeds of this convertible note.  Following this

development, the Company increased its efforts to locate a strategic investor or merger and

acquisition candidate, speaking with approximately 12 entities, including both public multinationals

and private entities in commercial and DOD-related fields.  The Company signed an exclusive letter

of intent with a major DOD contractor, which conducted due diligence on the Debtor.  However, on

February 11, 2010 this contractor informed the Company that it had decided to forgo the

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:55:46    Page 5 of 25

1    opportunity.

2        13.    The Company continued to investigate strategic alternatives and contacted ARINC,

3    which had previously expressed interest and conducted due diligence on the Company in 2008, to

4    ascertain the level of its interest.  Following multiple discussions, ARINC presented a Letter of

5    Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets

6    which was accepted by the Company's board and senior management on February 24, 2010.  The

7    LOI provided for a 45 day exclusivity period during which the Company could not enter into a sale,

8    merger, or other business combination with any other party with the proposed Sale to be made in the

9    context of a Chapter 11 case.  ARINC provided the Company with a $100,000 advance against work

10   it performed under the NGWC Contract[2] immediately on the execution of the LOI and from which,

11   together with the remaining proceeds from February 16, 2010 convertible note, allowed the

12   Company to make its February payroll.

13       14.    On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a

14   pre-petition secured credit agreement in which ARINC agreed to lend the Debtor the principal

15   amount of $100,000 to fund its Chapter 11 operations, including payment of a retainer to bankruptcy

16   counsel.  Contemporaneously with such extension of funds, ARINC filed its UCC-1 Financing

17   Statement on March 19, 2010.

18       C.    THE ASSET PURCHASE AGREEMENT AND THE LOAN AGREEMENT

19       15.    The Debtor has agreed to the terms of a definitive Asset Purchase Agreement (the

20   "Purchase Agreement")[3] with ARINC for the sale (the "Sale") of substantially all of the Debtor's

21   assets (the "Purchased Assets"), together with the assumption and assignment of certain specified

22   executory contracts and unexpired leases (the "Assumed Contracts") of the Debtor.  A copy of the

23   Purchase Agreement (excluding exhibits and schedules) in substantially the form to be executed is

24   attached as **Exhibit "B"** hereto and incorporated herein by reference. The Purchase Agreement is

25   subject to overbid and approval by the Bankruptcy Court.

26       16.    The Purchase Agreement provides for a purchase price of $2,000,000, less any

27   _____

28       [2] On March 15, 2010, the Company was awarded its sixth delivery order under the NGWC Contract.
     Under the terms of the LOI, this $100,000 advance was a prepayment of amounts due from ARINC.
         [3] Certain schedules to the Purchase Agreement are being finalized as of the date of this Declaration.

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:55:46    Page 6 of 25

amounts loaned and any unpaid accrued interest thereon pursuant to the DIP financing (discussed below) and less the Bidder Deposit (discussed in the Sale Procedures Motion), which shall be paid at the closing of the Sale by wire transfer or the delivery of other immediately available funds.  In addition, ARINC will assume performance of certain Assumed Contracts and cure Debtor defaults by assuming specified liabilities designated by ARINC not to exceed $1,000,000, which the Debtor presently estimates will be approximately $690,000 (the total consideration set forth herein is hereafter referred to as the "Purchase Price").  The Purchase Agreement also provides for a 60-day period during which the Debtor, subject to the other terms and conditions therein, shall indemnify the Buyer against, and hold the Buyer harmless from, all loss arising out of the failure of any representation or warranty of the Debtor, in an amount up to the amount of the Expense Reimbursement, as the exclusive remedy for such claims in the absence of fraud.  The post-closing performance of certain covenants survive the closing of the Sale and are not subject to the $300,000 cap.

17.    In connection with the Purchase Agreement and the Sale, and pursuant to that certain written SECURED SUPER-PRIORITY AND DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"), a copy of which in substantially the form to be executed is attached as **Exhibit A"** hereto and is incorporated by reference, the Debtor proposes to borrow up to $1.2 million (the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by ARINC to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the Sale of the Purchased Assets to the highest bidder pursuant to the Sale Motion.  The Debtor anticipates that it will exhaust the DIP Financing by the third week of May 2010.  The DIP Financing Motion filed concurrently herewith seeks authority to borrow pursuant to the Loan Agreement.

18.    The Debtor has covenanted under the Loan Agreement to seek entry of a final order approving the Bidding Procedures delineated in the Sale Procedures Motion and identifying ARINC as the stalking horse bidder at the Sale.

19.    In this Bankruptcy Case, the Debtor contemplates that it will continue operations and maintain its going concern value to maximize the value of the Purchased Assets for the benefit of

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:55:40    Page 7 of 25

creditors. In that regard, the Debtor has developed the Budget (as may be amended from time to time and as is defined in the DIP Financing Motion) which has been approved by ARINC and will utilize the proceeds of the DIP Facility in accordance with such Budget, and which the Debtor seeks to incorporate into the proposed Interim Order and Final Order on the DIP Financing Motion. A copy of the Budget is attached hereto as **Exhibit "C"** and is incorporated by reference.

20. The Debtor intends to file its motion to approve the Purchase Agreement (the "Sale Motion") as soon as possible following entry of the Court's order on the Sale Procedures Motion. The Debtor anticipates that other entities may emerge to bid on the assets and contemplates a hearing on the Sale Motion on April 30, 2010 or as soon thereafter as practicable. Following the Sale, the Debtor anticipates that it will propose and confirm a liquidating plan of reorganization.

D. **THE DEBTOR'S ASSETS AND DEBT STRUCTURE**

21. The Debtor's bankruptcy schedules list liabilities in the amount of $2,284,115. As noted above, ARINC will assume certain liabilities in connection with the Sale

22. The Debtor's primary assets are its intellectual property, employees, accounts receivable, and trademarks. As noted above, ARINC provided a secured loan of $100,000 on March 19, 2010. Other than a lien on specific equipment of an equipment lessor, the Debtor presently has no other unavoidable secured debt.

23. Recent searches of the records of the California Secretary of State disclose the following liens and security interests on the following pre-petition property under the search name Impeva Labs, Inc.

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Agility Investments Holdings, LLC | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Agnes C. Kim | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Susan Y. Kim Trust | March 12, 2010 | All assets of the Debtor |
| David D. Kim Trust | March 12, 2010 | All assets of the Debtor |
| John T. Kim Trust 12/31/87 | March 12, 2010 | All assets of the Debtor |

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| ARINC Incorporated | March 19, 2010 | All assets of the Debtor |
| Dell Financial Services | February 27, 2008 | Equipment Lease assets |

24.     As noted earlier, on or about June 11, 2009, Agility and the Kims advanced the sums of $631,507 and $231,165, respectively, to the Debtor pursuant to convertible promissory notes issued by the Debtor.  Agility and the Kims allege that they were granted a security interest in all of the Debtor's assets to secure these advances pursuant to a security agreement.  However, neither Agility nor the Kims filed UCC-1 Financing Statements until March 12, 2010, almost a year after advancing the sums and just prior to the filing of the Bankruptcy Case.  The Debtor believes that the filing of the UCC-1 Financing Statements constitute a transfer of an interest in the Debtor's property on account of antecedent debt within 90 days of the filing of the Bankruptcy Case. If the UCC-1 Financing Statements are not avoided, the Debtor believes that this transfer would enable each respective filing creditor to receive more than such creditor would receive if the Debtor's case were liquidated under chapter 7 of the Bankruptcy Code.  Accordingly, the Debtor believes that these financing statements are avoidable as a preference as defined in the Bankruptcy Code.  As of the date of the preparation of the Motion, although not necessary, the Debtor has requested that Agility and the Kims agree to subordinate any alleged security interests to those of the Secured Lender in connection with the DIP Facility, which is essential to the Debtor's ongoing viability.

25.     Priority claims asserted against the Debtor, as set forth in its Schedule E, total approximately $272,799.39 and consist primarily of employee wage and benefit claims of which $178,788.87 is priority and $94,010.52 is non-priority.  The Debtor's schedule F reflects unsecured debt in the amount of $1,027,872.50[4] .

/ / /

/ / /

---

[4]  The total unsecured claims listed on Schedule F does not include these non-priority amounts of the employee benefit claims which are included on the total amount listed on Schedule E.  Schedule F also does not reflect the claims of Agility and the Kims set forth on Schedule D and which the Debtor believes are avoidable and invalid.

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:55:46    Page 9 of 25

E.    **THE DIP FINANCING MOTION**

**Necessity For DIP Financing**

26.    The Debtor has minimal cash as of the Petition Date, and its regular payroll is due on March 31, 2010.  To maintain the ongoing concern value of the Debtor, the Debtor will need an infusion of cash to pay its suppliers and employees and other operating expenses, as set forth in the Budget.  The ability of the Debtor to obtain sufficient working capital and liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations is vital to the preservation and maintenance of the going concern value of the Debtor.  The emergency interim relief requested is critical to the success of this case and is imperative to ensure that the Debtor's subcontract and the provision of critical services to the DOD is honored.   Without the proposed DIP Financing and the ability to meet its obligations for the next two weeks, the Debtor would be required to immediately cease operations and terminate all of its employees.  The Purchased Assets would be reduced to minimal value and provide no return to unsecured creditors.  As set forth in the Budget, the Debtor anticipates that it will make Borrowing Requests in an aggregate amount up to $500,000 during weeks one, two and three of the term of the DIP Facility.  The DIP Facility will be repaid from cash generated from the business, if any, pending the closing of the Sale and shall be satisfied in full from the proceeds of Sale.

27.    As set forth above, the Debtor has made numerous and arduous attempts to obtain financing prior to the filing of the case.  The Debtor is unable to obtain adequate unsecured credit allowable under § 503(b)(1) of the Bankruptcy Code or pursuant to §§ 364(a) and 364(b) of the Bankruptcy Code.  The Debtor has been unable to obtain secured credit allowable under §§ 364(c)(2) or 364(c)(3) of the Bankruptcy Code, except under the terms and conditions set forth in the proposed Interim Order and the Loan Agreement.

28.    The Secured Lender is willing to allow the Debtor to obtain financing under the Loan Agreement only upon the terms and conditions set forth therein only upon the following terms and conditions: (a) entry of the Interim Order authorizing the DIP Financing on a interim basis on the terms set forth in the form of Interim Order attached to the Introductory Statement, and (b)

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:53:46   Page 10 of
25

subsequent to that, on the terms set forth in the Final Order.

29. The relief requested in the Motion is necessary, essential and appropriate for the continued operations of the Debtor's business and the management and preservation of its property and will maximize the value of the Debtor's assets for the benefit of its creditors. It is in the best interest of the Debtor's estate to be allowed to enter into, and perform under, the Loan Agreement.

**The Loan Agreement**

30. Subject to the terms and conditions of the Loan Agreement, the Secured Lender has agreed to provide for a post-petition revolving lending facility in the maximum amount of $1.2 million containing, *inter alia*, the following terms and conditions:

(a) **Maximum Borrowing Available Under Revolver.** Subject to the conditions set forth in the Loan Agreement and/or the Loan Agreement, the Debtor may borrow up to $500,000 on an initial and interim basis and in an aggregate amount of up to $1,200,000.00 under the DIP Credit Facility.

(b) **Advances.** Subject to the conditions set forth in the Loan Agreement and/or the Loan Agreement, the Company may submit a Borrowing Request in the form attached as **Exhibit "D"** to the Loan Agreement to fund disbursements as set forth in the Budget (as may be amended from time to time) attached as **Exhibit "A"** to the Loan Agreement.

(c) **Interest Rate.** The Company agrees to pay to Lender interest on the Outstanding Principal Balance at an annual rate equal to the prime rate, as published in the Wall Street Journal's "Consumer Money Rates" column, plus four percent (4%), which interest shall be payable on the Maturity Date. All interest on the Loan shall be computed on the basis of a three hundred sixty (360) day year and the actual number of days elapsed. Upon the occurrence and during the continuance of any defaults in the payment of principal, interest or other amounts due under the Agreement or the Note, interest on such defaulted payments shall be payable at an annual rate equal to ten percent (10%), which interest shall be payable monthly in arrears on the last

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:15:46   Page 11 of 25

Business Day of each month.

(d) **Maturity Date**. The "Maturity Date" shall mean the earlier of (i) May 31, 2010, (ii) Lender's decision to accelerate the Loan in accordance with Section 6.2, or (iii) the date of a sale of all or substantially all of the Company's assets to Lender or a competing bidder under section 363 of the Bankruptcy Code.

(e) **Fees.** The Company shall pay to Lender a facility fee equal to $4,000, which shall be payable at the Closing.

**The DIP Lien**

31. The obligations of the Debtor under the Loan Agreement shall be secured by the grant of security interests in the Collateral, subject only to the payment of the U.S. Trustee fees, the Carve-Out and the Chapter 7 Carve-Out:

(a) Pursuant to § 364(c)(2) of the Bankruptcy Code, a perfected first priority senior security interest in and lien upon all assets of the Debtor, whether existing on the Petition Date, or thereafter acquired, that, as of the Petition Date are not subject to valid, perfected and non-avoidable liens;

32. However, the Collateral shall not include any rights of the Debtor or a subsequent chapter 11 or chapter 7 trustee to recover property and to avoid liens or other property interest under the Bankruptcy Code, other than actions initiated under §549 of the Bankruptcy Code, and all property interests recovered or obtained thereby, under §§ 544 through 548, inclusive, of the Bankruptcy Code.

33. The Loan Agreement and the extension of credit pursuant to the DIP Facility have been negotiated at arms length and are the products of good faith negotiations between the Debtor and the Secured Lender.

**The Superpriority Administrative Expense Status**

34. The Obligations shall have the status in the Case of superpriority administrative expenses under Section 364(c)(1) of the Bankruptcy Code. Such administrative claim shall have priority, subject to the provisions of Section 3.8 of the Loan Agreement, including the Carve-Out and the Chapter 7 Carve-Out, over all other claims, costs and expenses of the kinds specified in, or

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:53:06    Page 12 of 25

ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provision of the Bankruptcy Code and shall at all times be senior to the rights of the Company, the Company's estate, and any successor trustee or estate representative in the bankruptcy Case or any subsequent proceeding or case under the Bankruptcy Code.

**Events of Default**

35.     Events of Default under the Loan Agreement include, but are not limited to (i) failure to pay the Outstanding Principal Balance, accrued interest on the Note, or any other Obligations when due, or failure to pay or reimburse Secured Lender for any expense reimbursable hereunder or under any other Loan Document within ten (10) days following Secured Lender's demand for such reimbursement or payment of expenses; or (ii) any representation or warranty made by the Company in any Loan Document proves to have been incorrect when made or deemed made; or (iii) failure by the Company to comply with the Budget within a weekly line item variance of 10% as provided in the Loan Agreement; (iv) failure by the Company to comply with, or otherwise breach any covenant or other provision of the Loan Agreement, any documents entered into in connection therewith or any order of the Bankruptcy Court, including the Orders approving the financing contemplated hereby; (v) any material provision of any Loan Document or either of the Orders shall, for any reason, cease to be valid and binding on the Company, or the Company shall so assert in any pleading filed in any court; (vi) entry of an order of the Bankruptcy Court appointing a trustee or an examiner with enlarged powers under Section 1104 of the Bankruptcy Code; (vii) entry of an order of the Bankruptcy Court reversing, amending, supplementing, staying or otherwise modifying either of the Orders (without the prior written consent of Secured Lender); (viii) entry of an order of the Bankruptcy Court dismissing the Chapter 11 Case or converting the Chapter 11 Case to one under Chapter 7 of the Bankruptcy Code; (ix) any postpetition judgments or orders as to a liability or debt for the payment of money in excess of $100,000 in the aggregate or which would operate to divest the Company of any of the Collateral with a value of greater than $100,000 in the aggregate shall be rendered against the Company and the enforcement thereof shall not have been stayed; (x) the Company shall make any payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of any pre-petition indebtedness or trade payables or other pre-

petition claims against the Company; (xi) authorization by the Bankruptcy Court (or an action by the Company to seek authority) to (a) impose against Secured Lender, or its claims, any costs or expenses, whether of the type described in Section 506(c) of the Bankruptcy Code or otherwise, except as otherwise provided in Section 3.8 of the Loan Agreement, or (b) to lend money to the Company post-petition and such financing to be senior to or p*ari passu* with the liens or claims of Secured Lender hereunder; (xii) entry by the Bankruptcy Court of an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to (x) the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Company with a value greater than $100,000 in the aggregate or (y) to the holders of any judgments in excess of $100,000 in the aggregate against the Company to permit enforcement thereof (including by way of injunction); (xiii) failure of the Bankruptcy Court to enter the Final Financing Order, in form and substance satisfactory to Secured Lender and which permits extensions of credit under the Agreement not to exceed in the aggregate $1,200,000, within 30 days following entry of the Interim Financing Order; (xiv) the filing of any challenge by the Company, an official or unofficial creditors' committee, or any party in interest to the validity, priority, or extent of any liens in favor of Secured Lender or the validity and enforceability of the claims of Secured Lender; (xv) any event occurs which has or could reasonably be expected to have a material adverse effect on the validity or enforceability of any Loan Document or on the condition (financial or otherwise), assets, operations or liabilities of the Company.

### **Remedies Upon An Event Of Default**

36. Upon the occurrence of an uncured "Event of Default," the Secured Lender, may declare all of the Obligations to be immediately due and payable, cease advancing money under the Loan Agreement, terminate the Loan Agreement, and upon delivery of a 5-day notice, file and serve a motion, which may be upon shortened time, for relief from the automatic stay in order to enforce all of the Liens and security interests in the Collateral..

### **The Debtor's Need For The Interim Order**

37. The Debtor has an urgent and immediate need for cash to continue to operate. Currently, the Debtor does not have sufficient funds with which to operate its business on an

ongoing basis.  Absent authorization from the Court to obtain secured credit, as requested, on an interim basis pending a final hearing on the Motion, the Debtor will be immediately and irreparably harmed. It will not be able to fund payroll to its employees or pay key contractors that are vital to the business and the value of the Debtor's assets.  Failure to meet these obligations and to provide these assurances likely result in the immediate cessation of operations and negatively impact the value of the Debtor's business, to the detriment of all parties in interest.  In practical terms, the Debtor simply needs sufficient funds to meet its obligations in the next two weeks.  Accordingly, the interim relief requested is critical to preserving and maintaining the going concern value of the Debtor and facilitating its efforts to maximize the value of its assets for the benefit of its creditors.

38.     In this regard, the Debtor and the Secured Lender have worked extensively on the Budget and have identified those expenses and disbursements required to be made on a weekly basis. The Debtor anticipates that it will make Borrowing Requests totaling $500,000 in weeks one, two and three of the Budget.  Payment of these expenses and disbursements is necessary to avoid immediate and irreparable harm to the Estate.

F.     **THE EMPLOYEE OBLIGATIONS MOTION**

**The Debtor's Workforce**

39.     The Debtor's workforce currently includes twenty-three (23) full-time employees and two (2) full-time contractors.  Of those, eight (8) employees and one (1) contractor are located in the Debtor's headquarters in Mountain View, California, and thirteen (13) employees and one (1) contractor are located in its development and test facility in Panama City, Florida.  The Debtor also has two (2) off-site employees serving as sales directors: one (1) in Beirut, Lebanon and one (1) in Tampa, Florida.  Employees located at its headquarters include the Debtor's Chief Executive Officer, Chief Financial Officer, VP of Software Solutions, VP of Engineering, Director of Firmware, Senior Firmware Developer, Manufacturing Engineer and bookkeeper.

40.     The Debtor anticipates that most, if not all, of its current employees will remain as full-time employees on an as-needed basis through the Sale.  Subsequent to the Sale, the Debtor is informed that ARINC will retain approximately fifteen (15) employees if it is the successful

Case: 10-53056     Doc# 14     Filed: 03/31/10     Entered: 03/31/10 13:55:46     Page 15 of
25

purchaser.[5]  Retention of the Company's employees is critical to the Sale.  Certain employees have been asked to sign contingent offer letters with ARINC.

41.     The Debtor's workforce is critical to and has extensive knowledge of its business operations.  Each of the Debtor's employees is essential not only to the continued, uninterrupted operation of the Debtor's business, but to effectuating the orderly administration of the Debtor's bankruptcy case through the Sale.  Specifically, the employees have unique experience and domain expertise in one or more areas, including the development, integration, testing, production, configuration, deployment, and life-cycle support of the Debtor's unique devices and related system components as well as with the marketing, sales, and system operations for the related services.  Because of financial constraints, the Debtor has reduced its staff over the past year, leaving the Debtor less than one-deep in many critical positions.  As a result, most staff members perform more than one critical function

42.     The Debtor believes that its failure to satisfy outstanding obligations to its employees will create concern and discontent among its employees, and adversely affect the employees' esprit de corps.  Moreover, it would undermine the Debtor's ability to retain its employees.  If the Debtor cannot promptly assure its employees that their wages will be paid and their accrued PTO will be honored, immediate and irreparable harm may result due to the employees' relocating or resigning prior to the consummation of a successful reorganization.  The Debtor's ability to honor payroll and accrued PTO is integral to maintaining continuity and order to the Debtor's business activities through the retention of its employees.  At this critical state of the case, the Debtor cannot risk a significant disruption in its operations caused by low employee morale and the loss of key employees.  The Debtor's remaining employees have unique experience and domain expertise in several areas that are vital to the Debtor's operations.

43.     The Debtor believes that under the Budget, it will have sufficient operating cash to satisfy its obligations to employees, including both the Prepetition Wages and post-petition salaries, as they come due in the ordinary course of the Debtor's business.  Moreover, under the Budget, the

---

[5]  Pursuant to the Purchase Agreement, ARINC will assume accrued PTO and vacation of certain retained employees.

Debtor will be able to honor Prepetition Wages and accrued vacation and PTO for all employees up to the $10,950.00 per employee in the ordinary course of business. In addition, the Debtor submits that the relevant time periods for which payment is requested fall within the 180 days prior to the Petition Date. As its employees are necessary to maintain the value of the Debtor as a going concern, the Debtor believes that the relief requested herein is modest in light of the perceived benefit to the bankruptcy estate.

**Outstanding Wages**

44. On February 26, 2010, the Debtor funded payroll through its payroll processor, Quickbooks Payroll Processing, for its existing employees' salaries for the pay period of February 1, 2010 through February 28, 2010. The Debtor typically pays its employees on a monthly basis. The next payroll is scheduled on March 31, 2010. The Debtor distributes payroll through check or direct deposit upon the employee's election. Quickbooks Payroll Processing directly accesses the Debtor's account for all payroll and payroll tax expenses.

45. The Debtor believes that the aggregate amount of the Prepetition Wages is $188,898.09. The Debtor believes there may be six (6) employees who are owed more than $10,950 in wages which was earned within 180 days of the Petition Date. If applicable, any amount owed above the statutory priority limit of $10,950 will not be paid, but will instead be treated as a general unsecured claim in the Debtor's bankruptcy case.

**Prepetition Vacation and PTO**

46. In the ordinary course, the Debtor provides allotted vacation and PTO days to its employees. The Debtor requests authority to continue to honor vacation and PTO earned by current employees and allow such employees to use prepetition accrued vacation and PTO in the ordinary course of business.

47. Vacation accrues at a rate of 80 hours per year with a maximum accrual of 80 hours. Through the Petition Date, the Debtor's employees have accrued an aggregate of approximately 1,250 days vacation which amounts to approximately $70,800 in value.

48. PTO accrues at 24 hours per year with a maximum accrual of 24 hours. Through the Petition Date, the Debtor's employees have accrued an aggregate of approximately 480 hours of

PTO which amounts to approximately to $26,500 in value.

49.     The Debtor does not intend to "cash out" vacation or PTO benefits to current employees at this time but only intends to honor such benefits by allowing employees to use vacation and PTO in the ordinary course.  The Debtor does not believe that any current employee has accrued vacation and PTO within 180 days of the bankruptcy filing which exceeds in amount $10,950.  However, when combined with Prepetition Wages, the Debtor believes that at least seven (7) employees exceed the limit set forth by § 507(a)(4).  In any event, the Debtor seeks authority only to honor, and not to pay, PTO in the ordinary course.

50.     In the event of a post-petition termination, if applicable, employees will be entitled to a pre-petition priority claim up to $10,950.00, earned within 180 days of the bankruptcy filing, with the balance being a general unsecured claim.

G.     **THE UTILITIES MOTION**

51.     Preserving the Utility Services on an uninterrupted basis is essential to the Debtor's ongoing operations, and, therefore, to the success of its reorganization.  Indeed, any disruption of the Utility Services, even for a brief period of time, would disrupt the Debtor's ability to operate and maintain its business.  As described in the Omnibus Declaration, the Debtor supplies global asset management optimization (tracking, monitoring and security) solutions to its customers.  Therefore, its systems, customers and entire operations rely heavily on telecommunications and other utilities.  Any interruption in its utilities would severely and negatively impact the Debtor's operations.  Such a result could seriously jeopardize the Debtor's reorganization efforts, and ultimately, the Debtor's value and creditors' recoveries.  It is therefore critical that the Utility Services continue uninterrupted during this Chapter 11 case.

**The Utility Companies**

52.     In connection with the operation of its business, the Debtor uses the Utility Services from the Utility Companies, which are vital to its operations.

53.     Historically, the Debtor has consistently paid all invoices to the Utility Companies when due in the ordinary course of its business.  However, due to the Debtor's financial condition, it has missed certain recent payments and is in default by one month with nine (9) Utility Companies,

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:55:46   Page 18 of 25

all of which are indicated on the Debtor's Schedule F filed at the commencement of its case. To the best of the Debtor's knowledge, there are no other defaults or arrearages of any significance with respect to any utility invoices.

54. If the DIP Financing Motion is approved, with the contemplated DIP Facility provided by ARINC, the Debtor will have sufficient cash resources to meet its post-petition obligations in the ordinary course of business, including payments to the Utility Companies as they become due.

**Adequate Assurance**

55. The Debtor proposes to make the Adequate Assurance Deposits with each of the Utility Companies identified in the below table, equal to the highest monthly utility cost incurred by the Debtor in any service period within the twelve (12) months immediately prior to the Petition Date:

| *Provider* | *Service* | *Proposed Deposit* |
|---|---|---|
| Iridium | Global Data Telecommunications | $9,700.00 |
| Sensor logic | Global Data Telecommunications | $2,300.00 |
| T-Mobil | Global Data Telecommunications | $1,420.00 |
| DMC-Colo service | Network Server Hosting | $2,750.00 |
| Kore Telematics | Global Data Telecommunications | $700.00 |
| Wiline | Telephone and Internet Services | $950.00 |
| Gulf Power | Gas and Electricity | $300.00[6] |
| City of Panama City | Water and Garbage Services | $0.00[7] |
| Knology | Telephone and Internet Services | $2,400.00 |
| AT &T PC | Global Data Telecommunications | $400.00 |

---

[6] The Debtor has already provided a deposit to Gulf Power in the amount of $650 and proposes an additional $300 deposit which, when combined, will exceed the highest monthly utility cost incurred by the Debtor in any service period within the previous 12 months (for which such amount is $925).

[7] The Debtor has already provided a deposit to the City of Panama City in the amount of $308.70 which the Debtor believes constitutes sufficient adequate assurance. In this instance, the highest monthly utility cost incurred by the Debtor in any service period within the previous 12 months is $146.

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:15:06    Page 19 of 25

| | | |
|---|---|---:|
| AT &T CA | Global Data Telecommunications | $200.00 |
| Verizon | Global Data Telecommunications | $200.00 |
| Verio, Inc | Web Hosting Services | $350.00 |
| **Total** | | $22,970.00 |

56.     The Debtor submits that the Adequate Assurance Deposits, in conjunction with the Debtor's ability to pay for future Utility Services in the ordinary course of business, constitutes sufficient adequate assurance to the Utility Companies.  If any Utility Company believes additional assurance is required, it may request such assurance pursuant to the procedures set forth in the Utilities Motion.

57.     The Debtor believes that providing the Utility Companies a cash deposit, equivalent to the respective highest monthly payment incurred within the twelve (12) months prior to the Petition Date, is consistent with what a Utility Company would expect from any similarly situated non-debtor entity who has failed to pay its utility bills.  In consideration with (a) the historical absence of any material prepetition defaults or arrearages (with the exception of the defaults in some instances for the most recent invoice) and (b) the inclusion in the Approved Budget for the Adequate Assurance Deposits as well as ongoing monthly charges for Utility Services, the Utility Companies should be assured that the Debtor has the capacity to meet its post-petition obligations.

**Objection Procedures**

58.     The Debtor believes that the Adequate Assurance Procedures detailed in the Utilities Motion are not prejudicial to the rights of any Utility Company and are in the best interest of the Debtor's estate and its creditors.  The Debtor submits that the Adequate Assurance Procedures, if approved, will ensure that the Debtor's business operations are not jeopardized by any disruption in Utility Service while promoting judicial economy.

H.     **The Sale Procedures Motion**

59.     The Debtor believes that the Sale pursuant to the Bidding Procedures will allow the Debtor to maximize the value of the Purchased Assets.  The Debtor further believes that the scheduling of the Sale Hearing for April 30, 2010 or as soon thereafter as practicable will provide

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:15:46   Page 20 of 25

sufficient opportunity for other interested persons to submit a competing bid and participate in the auction. A closing by mid-May is critical in that the Company is unlikely to have adequate financing or resources to sustain operations beyond the third week of May when the DIP Financing is estimated to be fully used. Because the DIP Financing reduces the net proceeds received by the Debtor, the earliest possible closing benefits creditors (i.e., if less of the DIP Financing is utilized, more cash will be payable to the Debtor at closing).

60. By the Sale Procedure Motion, the Debtor seeks approval of certain sale procedures including the terms and conditions of any competing bids and the payment of an expense reimbursement for actual out-of-pocket expenses incurred by the Buyer, not to exceed $300,000 as discussed below, in the event that the Debtor's assets are sold to another party following an auction.

61. Pursuant to the Sale Procedure Motion, the Debtor also requests that the Court specially set the Sale Hearing on the Sale Motion to approve the sale of the Purchased Assets free and clear of all liens and encumbrances on April 30, 2010 or as soon thereafter as practicable (on regular notice) so that the Sale may close by mid-May. In connection with the Sale, the Debtor also requests that the Court specially set for the same date and time the hearing on the Debtor's motion to approve the assumption and assignment of the Assumed Contracts to be included in the transaction.

**The Necessity For A High-Speed Sale**

62. The Company has minimal cash and does not have sufficient resources to sustain its business operations at the level necessary to preserve its going concern value through the projected close of the Sale. As set forth above, the Debtor has covenanted under the Loan Agreement to seek entry of a final order approving the Bidding Procedures.

63. If the proposed Sale is not consummated quickly, the Company may lose both the ability to preserve its intellectual property and the ability to retain its employees whose services are essential to the Company but who may pursue alternative employment opportunities, thereby diminishing the Company's value. As noted above, the Company has limited resources to maintain its operations, and to pay its suppliers, employees and expenses, and its going concern value may be completely lost if it is unable to maintain its operations and complete the Sale to ARINC on the proposed terms.

Case: 10-53056    Doc# 14    Filed: 03/31/10    Entered: 03/31/10 13:15:46    Page 21 of
25

64.     Given the Debtor's distressed financial condition, time is of the essence for the Sale. The Debtor cannot continue to operate for an extended period of time, even with the DIP Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially reducing the net cash to be received at the closing of the Sale (due to the depletion of the DIP Facility) and the return to creditors.

**The Bidding Procedures**

65.     As an inducement to the Buyer to agree to enter into the Purchase Agreement subject to third party diligence and bidding, and in order that the sale process will not be delayed by last minute offers, the Debtor believes that the Court should establish a competing bid procedure concerning bids by any other prospective buyers.  The Debtor submits that the proposed competing bid procedure described in the Sale Procedures Motion is reasonable and necessary under the circumstances and will facilitate the consummation of an orderly sale and maximize the value of the Purchased Assets for the Debtor's Chapter 11 estate.

66.     The Bidding Procedures will help the Debtor obtain the highest and best possible price for the Purchased Assets.  The Minimum Initial Bid requirement protects the estates from the $300,000 Expense Reimbursement and costs associated with the transaction.  The Bidding Procedures also require $50,000 cash increments at the Auction (the Overbid Increment under the Bidding Procedures).  The Debtor believes the Overbid Increment is appropriate for this case and will encourage meaningful overbids.

**The Expense Reimbursement**

67.     The Debtor believes that the Bidding Procedures and the Expense Reimbursement are fair, reasonable, and are appropriately structured to ensure that the Debtor will obtain the best offer for the Purchased Assets.  The proposed overbid procedures allow the Debtor to maximize the value of the Purchased Assets while also ensuring that (a) only legitimate overbids are received from entities interested in purchasing the Debtor's interest in the Purchased Assets; and (b) any overbid is sufficient to cover the Expense Reimbursement required to be paid to the Buyer if an overbid is accepted and the sale consummated.  The Debtor further believes, in its reasoned business judgment, that the proposed Sale (subject to the Bidding Procedures) is in the best interests of the estate and

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:55:46   Page 22 of
25

creditors because it will maximize the value of the Debtor's assets.

68. The Debtor believes that it has formulated a bidding process that is fair and reasonable in view of the transaction size and type and which the Debtor believes will induce prospective competing bidders to present a bid. The Debtor believes the Expense Reimbursement is reasonable relative to the nature and size of the transaction. The Debtor is informed that ARINC has incurred approximately $180,000 in out of pocket expenses to date. Here, because the Debtor provides products and services, which are licensed by the Department of State, in connection with the performance of a contract with the United States Department of Defense, more extensive due diligence was required than would otherwise be required if the Debtor simply engaged in commercial work. Additionally, the Expense Reimbursement functions to (i) attract and retain ARINC's proposal and (ii) establish a standard against which the Debtor can evaluate other proposals. As discussed above, the Debtor has explored various strategic alternatives ranging from raising new investment to a merger and acquisition transaction. ARINC's proposal as a baseline bid represents at minimum a desirable result for this bankruptcy case which the Debtor wishes to retain.

69. The Debtor believes (i) that the Expense Reimbursement not to exceed $300,000 is reasonable given the amount of the Purchase Price, the benefits to the estate of having a definitive agreement, and the risk to the Buyer that a third-party offer ultimately may be accepted, and (ii) that the Expense Reimbursement and Bidding Procedures are necessary to preserve and enhance the value of the Debtor's estate.

70. The Expense Reimbursement is the product of good faith, arm's-length negotiations between the Debtor and ARINC. While ARINC and the Debtor have maintained a business relationship, that relationship is limited strictly to one between customer and vendor. Given the complexity and specialized nature of the Debtor's business, this relationship led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets. No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa. While ARINC may retain some of the Debtor's key employees, including insiders, this will only occur if the Sale is consummated to ARINC (it is contemplated that other bidders may also require that certain key employees accept employment as a condition of the purchase). Other than the customer-vendor relationship, the

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:55:16   Page 23 of 25

Purchase Agreement and DIP Loan Agreement, there is no material relationship between the Debtor and ARINC.

71. The Expense Reimbursement is also fair and reasonable in amount in view of ARINC's efforts to date and the risks associated with being a "stalking horse." The Debtors are informed that ARINC's out-of-pocket costs and expenses for negotiating, drafting and implementing the Purchase Agreement and the DIP Loan Agreement, and for conducting the extensive due diligence in connection thereto, combined with additional expenses incurred in contemplation of the pending Sale may equal the amount of the Expense Reimbursement (as noted above, the Debtor is informed and believes that ARINC's out-of-pocket expenses to-date are approximately $180,000). Notably, before it may receive the Expense Reimbursement, the Bidding Procedures require ARINC to file a declaration setting forth the expenses incurred and the asserted amount, which shall be reviewed and may be contested by counsel for the Creditor's Committee (if any) and the Office of the United States Trustee.

72. The Debtor believes that the Expense Reimbursement benefits the estate because it assists in maximizing the value to the estates by facilitating a sale of the Debtors' business assets as a going concern rather than in a "fire sale" liquidation which might occur in the absence of ARINC's offer.

73. The Debtor does not believe that the amount of the Expense Reimbursement is so substantial so as to chill other potential bidders from submitting competing bids. The capped amount will only be paid if the assets are sold to a bidder other than ARINC necessarily providing greater value for the Purchased Assets. Even in the absence of the Expense Reimbursement, an incremental amount would be appropriate to assure that the Debtor is dealing with only serious bidders with the financial ability to complete a transaction without delay.

74. The Debtor's ability to offer the Expense Reimbursement enables it to ensure the sale of the Debtor's assets to a contractually-committed bidder. Under the circumstances, the Debtor believes the Expense Reimbursement (capped at $300,000) is reasonable.

///

///

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief, and that this Declaration was executed on this 31th day of March, 2010.


*/s/ Randall L. Shepard*
Randall L. Shepard

Case: 10-53056   Doc# 14   Filed: 03/31/10   Entered: 03/31/10 13:15:46   Page 25 of
25