STEPHEN T. O'NEILL (115132)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: soneill@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

In re:

**IMPEVA LABS, INC.,**

Debtor.

2570 West El Camino Real, Suite 100
Mountain View, California 94040

Employer Tax I.D. No.: 20-2084435

Case No. 10-53056-ASW-11

Chapter 11

Date: May 4, 2010
Time: 10:00 a.m.
Place: United States Bankruptcy Court
280 S. First St., Room 3020
San Jose, CA 95113
Judge: Honorable Arthur S. Weissbrodt

**NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS, ESTABLISHMENT OF SALE OVERBID PROCEDURES AND OPPORTUNITY FOR OVERBID AT AUCTION**

**Proposed Purchaser:** ARINC Engineering Services, LLC and ARINC Acquisition, LLC or their designated affiliate (collectively referred to as "**ARINC**").

**Potentially Affected Lien, Claim, and Interest Holders:** [1]

---

[1] The sale of assets (the "Sale") will be free and clear of all liens, claims, encumbrances and other interests in or to the Purchased Assets (as defined below) as provided by that certain ASSET PURCHASE AGREEMENT between ARINC and the Debtor (the "Purchase Agreement"). All such liens, claims, encumbrances and other interests will attach to the proceeds of the Sale with the same priority, validity, force

**ALL PERSONS PROVIDED NOTICE OF THE SALE, INCLUDING, BUT NOT LIMITED TO, PERSONS LISTED AS CREDITORS ON THE DEBTOR'S SCHEDULES OR WHO HAVE FILED A PROOF OF CLAIM OR REQUEST FOR NOTICE IN THE DEBTOR'S CASE.**

*(IF YOU DO NOT KNOW IF YOU WERE LISTED AS A CREDITOR IN THE DEBTOR'S SCHEDULES YOU MAY ASK THE DEBTOR'S ATTORNEYS: Doris A. Kaelin or Thomas T. Hwang, via telephone at (650) 852-9000 or email at dkaelin@murraylaw.com or thwang@murraylaw.com.)*

**AGILITY INVESTMENTS HOLDINGS, LLC**

**AGNES C. KIM**

**ARINC INCORPORATED**

**DAVID D. KIM TRUST**

**DELL FINANCIAL SERVICES**[2]

**JAMES J. KIM**

**JOHN T. KIM TRUST 12/31/87**

**SUSAN Y. KIM TRUST**

**All Parties to Executory Contracts and Unexpired Leases Subject to Assumption and Assignment:**

**See separate** NOTICE OF HEARING ON MOTION TO AUTHORIZE DEBTOR TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF CERTAIN OF ITS ASSETS (11 U.S.C. § § 363 AND 365)**.**[3]

PLEASE TAKE NOTICE of the following:

/ / /

---

and effect, if any, as exist as of the closing, in or against the Debtor's Purchased Assets, subject to all claims and defenses the Debtor may possess with respect thereto. The Debtor does not seek to sell free and clear of any liens, claims encumbrances and other interests against those assets excluded from the Sale (i.e., the "Excluded Assets" as defined under the Purchase Agreement).

Terms not separately defined herein shall have the meaning ascribed to them in the Purchase Agreement. A copy of the Purchase Agreement is attached as Exhibit "B" to the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF FIRST DAY MOTIONS (Docket number 14). A copy of the Purchase Agreement will also be filed with the Bankruptcy Court at the time the Sale Motion (defined below) is filed.

[2] Although the Dell Financial Services Lease for Computer Equipment is among the executory contracts to be assumed by ARINC and cured by the Debtor pursuant to the Purchase Agreement, out of an abundance of caution, the Debtor includes Dell's secured claim as a potentially affected lien, claim or interest.

[3] The MOTION TO AUTHORIZE DEBTOR TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF CERTAIN OF ITS ASSETS (11 U.S.C. § § 363 AND 365) is herein referred to as the "Assumption Motion."

DAK
C:\Imperia\DaS\PDSale\NOH Sale v5.doc x

Case: 10-53056   Doc# 44   Filed: 04/06/10   Entered: 04/06/10 15:59:18   Page 2 of 13

2

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

## CASE BACKGROUND

1. On March 26, 2010 (the "Petition Date"), Impeva Labs, Inc. (the "Company" or the "Debtor") filed for bankruptcy relief under chapter 11 of the Bankruptcy Code in this judicial district. The Debtor is presently operating its business as a debtor in possession under 11 U.S.C. §§ 1107 and 1108. No official committee of unsecured creditors has been formed in the bankruptcy case to date.

2. The Company was incorporated in California on December 16, 2004. It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System. The Company provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Debtor's Global Sentinel™ Units and Device Management Center.

3. Additional background information including events leading up to the execution of a Letter of Intent with ARINC in February 2010 is set forth below commencing at Paragraph 21.

4. On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a pre-petition secured credit agreement in which ARINC agreed to lend the Debtor the principal amount of $100,000 to fund its Chapter 11 operations, including payment of a retainer to bankruptcy counsel. Contemporaneously with such extension of funds, on March 19, 2010, ARINC filed its UCC-1 Financing Statement. Soon thereafter, the Debtor and ARINC finalized the terms of an Asset Purchase Agreement.

5. The Debtor has agreed upon the terms of a definitive Asset Purchase Agreement (as defined above, the "Purchase Agreement") with ARINC for the Sale of certain of the assets of the Debtor, including its intellectual property (the "Purchased Assets"), together with the assumption and assignment of certain specified executory contracts and unexpired leases of the Debtor. The Purchase Agreement is subject to Court approval and allows for the submission of higher and better bids pursuant to certain bid procedures approved by the Court (discussed commencing at Paragraph 43 below). A summary of certain terms of the Purchase Agreement is provided commencing at Paragraph 11 below.

6. In connection with the Purchase Agreement and the Sale, and pursuant to that certain written SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"), the Debtor proposes to borrow up to $1.2 million (the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by ARINC to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the Sale of the Purchased Assets to the highest bidder pursuant to the Sale Motion (defined below). The Debtor anticipates that it will exhaust the DIP Financing by the third week of May 2010. Following a hearing on April 1, 2010, the Court authorized the Debtor to borrow $500,000 on the DIP Facility. A final hearing will be held on April 16, 2010, at which time the Debtor will seek to borrow up to a maximum of $1.2 million on the DIP Facility so that the Debtor can continue to operate until the close of the Sale. The DIP Facility will be utilized pursuant to a budget approved by ARINC and as approved by the Bankruptcy Court.

7. If the proposed Sale is not consummated quickly, the Company may lose both the ability to preserve its intellectual property and the ability to retain its employees whose services are

DAK
R:\Impeva Labs\PO\Sale\NOH Sale v5.doc

Case: 10-53056   Doc# 44   Filed: 04/06/10   Entered: 04/06/10 15:59:18   Page 3 of 13

3

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

essential to the Company but who may pursue alternative employment opportunities, thereby diminishing the Company's value.

8. Time is of the essence to close the Sale. The Debtor cannot continue to operate for an extended period of time, even with the DIP Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially reducing the net cash to be received at the closing of the Sale (due to the depletion of the DIP Facility) and the return to creditors. As set forth more fully in the Sale Motion (defined below), the Debtor believes the acquisition opportunity has been well-marketed. The proposed Sale is also subject to overbid by Qualified Bidders (as discussed below) pursuant to bid procedures established by the Bankruptcy Court. The Debtor believes that an expedited sale process is necessary to realize the highest value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtor's customers, partners, vendors and employees.

9. The Debtor believes that the Sale to ARINC is in the best interest of creditors in that it allows the Debtor's assets to be sold as a going concern and the bid procedures established by the Court will allow other persons wishing to bid on the Company's assets the opportunity to do so.

### PROPOSED SALE AND ASSIGNMENT TO BUYER[4]

10. The Debtor intends to file a MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Sale Motion"). Pursuant to the Sale Motion, the Debtor will request the Court's approval of the sale of the Debtor's intellectual property and certain other assets of the Debtor to ARINC (i.e., the Purchased Assets as described more fully in the Purchase Agreement). Such Sale excludes, among other things, cash, accounts receivable, the stock of the Debtor's wholly-owned subsidiary in Armenia, certain avoidance claims and causes of action, and other assets as specified in the Purchase Agreement, and will be subject to overbid pursuant to the terms and conditions set forth in the Purchase Agreement (the successful purchaser is referred to herein as the "Buyer"). Except as provided by the Purchase Agreement, the Sale will be free and clear of all liens, claims, encumbrances and other interests to the fullest extent permitted by law. **Without limiting the scope of the foregoing, the Sale Motion will include a request that the Sale be approved free and clear of all debts scheduled by the Debtor, all proofs of claim filed against the Debtor in this bankruptcy case, and all persons provided this notice. Any person who opposes this relief must file a timely objection (see "Hearing And Opposition Deadlines" section below).**

11. The Purchase Agreement provides for a purchase price of $2,000,000, less any amounts loaned and any unpaid accrued interest thereon pursuant to the DIP Financing (discussed above) and less the Bidder Deposit (defined below), which shall be paid at the Closing by wire transfer or the delivery of other immediately available funds. In addition, ARINC will assume performance of certain Assumed Contracts and cure Debtor defaults by assuming specified liabilities designated by ARINC not to exceed $1,000,000, which the Debtor presently estimates will be

---

[4] In the event of any inconsistency between the description provided herein and the Purchase Agreement, unless otherwise indicated the Purchase Agreement shall control. The within description is an abbreviated summary of certain terms of the Purchase Agreement. It is recommended that the Purchase Agreement be reviewed to gain a full and complete understanding of its contents.

DAK
R:\Imperial\aDAK\PDSale\NOH Sale v5.doc

4

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

Case: 10-53056    Doc# 44    Filed: 04/06/10    Entered: 04/06/10 15:59:18    Page 4 of 13

approximately $818,923$[5] (the total consideration set forth herein is hereafter referred to as the "Purchase Price"). The Purchase Agreement also provides for a 60-day period during which the Debtor, subject to the other terms and conditions therein, shall indemnify Buyer against, and hold Buyer harmless from, all loss arising out of the failure of any representation or warranty of the Debtor, in an amount up to $300,000, as the exclusive remedy for such claims in the absence of fraud. The post-closing performance of certain covenants survive the closing of the Sale and are not subject to the $300,000 cap.

12. The Purchase Agreement includes non-compete and non-solicitation provisions applicable to both the Company and to certain stockholders of the Company.

13. The Buyer is responsible for any excise, value added, registration, stamp, property, documentary, transfer, sales, use and similar taxes, levies, charges and fees incurred, or that may be payable to any taxing authority, in connection with the sale, transfer, and delivery of the Purchased Assets. With respect to Purchased Assets acquired by the Buyer, the Debtor and the Buyer will share a proportionate responsibility for personal property taxes and ad valorem taxes for the current year tax periods that include, but do not begin or end on, the Closing Date (as defined in the Purchase Agreement). The Debtor believes these amounts will be nominal.

14. The Buyer will assume certain liabilities only as expressly provided by the Purchase Agreement. These include, *inter alia,* certain liabilities to critical vendors and unpaid obligations to employees who are hired by Buyer (not to exceed $1,000,000), and liabilities arising from and after the Closing Date from the ownership or operation of the business and Purchased Assets by the Buyer from and after the Closing (as defined in the Purchase Agreement).

15. It is anticipated that a number of the Debtor's executory contracts and unexpired leases will be assumed by the Debtor and assigned to ARINC (the "Assumed Contracts"). With respect to any executory contracts that are assigned to ARINC, the Debtor shall be responsible for any cure amount due to the non-debtor contracting party. Based on the Assumed Contracts currently identified in the Purchase Agreement which may be assumed by the Debtor and assigned to the Buyer, the total cure amounts are estimated at approximately $28,772. However, the actual cure amounts might vary significantly based on the actual executory contracts and unexpired leases assumed by the Buyer and the cure amounts for such contracts and leases established by the Bankruptcy Court.

16. The Sale is expressly subject to Bankruptcy Court approval and certain bid procedures (including an opportunity to overbid). Various deadlines and procedures to qualify as a "Qualified Bidder" are set forth below and in the order by the Bankruptcy Court entered on or about April 2, 2010 (the "Bidding Procedures Order"). Interested bidders are cautioned to pay careful attention to all dates and procedures established by the Bidding Procedures Order.[6]

17. Pursuant to the Purchase Agreement, the closing (the "Closing") is to occur on the

---

[5] The assumed liabilities include two pre-paid deposits on accounts receivable which total $190,000 that may be substantially reduced or eliminated prior to the date competing bids are due. If the assumed liabilities are reduced or eliminated by the bid deadline, the amount of assumed liabilities by ARINC and Qualified Bidders would be accordingly reduced. The Debtor will provide an updated assumed liabilities number to potential bidders prior to the bid deadline.

[6] A copy of the Bidding Procedures Order has been included with the service of this Notice.

DAK
R:\Imperial\abk\PDSale\NOH Mot v5.4.bck

Case: 10-53056   Doc# 44   Filed: 04/06/10   Entered: 04/06/10 15:59:18   Page 5 of 13

5

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

first business day after the satisfaction or waiver of the conditions to Closing set forth in the Purchase Agreement (see Paragraph 33, below). Additionally, certain employees are to accept employment with the Buyer (to become effective on the Closing Date). All specified employees have accepted employment with ARINC.

18. Pursuant to the separate Assumption Motion, the Debtor seeks authority to assume and assign various executory contracts and unexpired leases to the Buyer. A separate notice has been mailed to all persons receiving this notice with respect to the Assumption Motion. The actual contracts assumed and assigned will be determined by the Buyer, subject to approval of the Bankruptcy Court.

19. The Sale Motion and the Assumption Motion request that the orders entered by the Court provide that the provisions of Federal Rules of Bankruptcy Procedure 6004(h) and 6006(d), which would otherwise stay the Sale and assumption orders until the expiration of fourteen (14) days after entry thereof, be deemed inapplicable. The Sale Motion and the Assumption Motion also request that the Court determine that the Buyer is a good faith purchaser of the Debtor's assets such that section 363(m) of the Bankruptcy Code will be applicable in the event of a closing of the Sale. The evidence required by the Court for such a finding is set forth at Paragraph 49 below.

<u>ADDITIONAL INFORMATION PERTAINING TO PROPOSED SALE</u>

20. The following information is provided to assist creditors and other parties in interest in evaluating the proposed Sale.

<u>Alternatives to Sale and Auction; Marketing of Purchased Assets; Designation of Stalking Horse</u>

21. The Debtor's initial investors included industry investors as well as senior management of the Company through Convertible Notes that were later converted to Series A Preferred Shares of the Company. Following this initial investment, the Company gained other outside investors. The total Series A round was $2,055,418 and was closed in September 2005.

22. An internal (i.e., current investors were the major investors) Series A-1 Round closed in early 2006 and brought in $2,316,800. In 2006, the Company teamed with ARINC Engineering Services, LLC to serve as prime contractor with the Company as subcontractor, to compete for a 5-year, $20 million Department of Defense ("<u>DOD</u>") contract (the "<u>NGWC Contract</u>") to develop and deploy mesh net technology products. In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor, was awarded the NGWC Contract. By mid-2007, the first tranche of a planned three tranches of Series B financing was closed in the amount of $7 million with Agility Logistics ("<u>Agility</u>") as the major investor.

23. In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor (Agility) monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor on tracking and monitoring strategic assets such as jet engines. The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule. In addition, the second and third tranches of Round B financing were completed in the second half of 2008 to provide the needed funds on a timely basis with Agility investing an additional $2 million while two other major investors invested

6

DAK
R:\Impera\DAB\PDSale\NOH Mot v5.doc

Case: 10-53056    Doc# 44    Filed: 04/06/10    Entered: 04/06/10 15:59:18    Page 6 of 13

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

24. The Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at the CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility. In early 2009, the candidate informed the Company that it was unable to get approval from its major investor due to its economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

an aggregate $1 million. Even before the end of 2008, the Company had begun to identify and negotiate the next round of financing for the total amount of $6 million for receipt in 2009 to start scaling the company, increase sales and to fund further research and development of new products.

25. By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company. This unanticipated news caused the Company to accelerate its efforts at obtaining the requisite financing. It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "Kims"), agreed to invest under provisions that included discount on the conversion valuations and a ceiling. The Debtor and the Kims also entered into a convertible promissory note that purported to grant Agility and the Kims security interests in the Company's assets. These transactions closed in June of 2009 with Agility contributing $631,507 and the Kims contributing $231,165 on June 11, 2009. Neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later when they filed UCC-1 Financing Statements on March 12, 2010.

26. In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint Logistics Over-the-Shore). JLOTS attracted the attention of the DOD senior officials that opened major opportunities for the Company. The Company continued with its efforts to find new investment and established contact with a Kuwaiti based company as a potential investor as well as a potential major customer. Negotiations and drafting of the final documents concerning a $6 million investment by this entity in the Company were agreed upon and the Company signed and returned the documents for counter signing by late November 2009. In the beginning of December 2009, the Company received an unexpected Formal Suspension Notice from the Defense Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension list with the DOD and concluded that the Company was an affiliate of Agility subject to the same suspension list. As a result, the Company notified the potential investor, and the execution of the investment documents was stalled.

27. The suspension was extremely detrimental to the Company's business. The Company was not allowed to receive any new DOD contracts or even new task orders under the NGWC Contract. Company management worked diligently, and due to lack of funds, without legal representation, to release the suspension. Finally, through major efforts, Agility gave up their two Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-

voting. Agility agreed to the removal of all blocking and control terms from all the investment documents with the Company. Thereafter, DLA released the Company from the suspension on December 31, 2009.

28. Negotiations with the potential investor were resumed; however, this time, the potential investor decided to reduce its investment substantially from $6 million to $1 million during 2010, and, aside from an initial $500,000 investment through a convertible note which was received by the Company on February 16, 2010, the potential investor required that any additional investment be staged and be contingent upon further due diligence. In parallel with this development, the Company increased its efforts to locate a strategic investor or merger and acquisition candidate, speaking with approximately 12 entities, including both public multinationals and private entities in commercial and DOD-related fields. The Company signed an exclusive letter of intent with a major DOD contractor in late January 2010, which conducted due diligence on the Debtor. However, on February 11, 2010 this contractor informed the Company that it had decided to forgo the opportunity.

29. The Company continued to investigate strategic alternatives and contacted ARINC, which had previously expressed interest and conducted due diligence on the Company in 2008, to ascertain the level of its interest. Following multiple discussions, ARINC presented a Letter of Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets which was accepted by the Company's board and senior management on February 24, 2010. The LOI provided for a 45 day exclusivity period during which the Company could not discuss or enter into a sale, merger, or other business combination with any other party with the proposed Sale to be made in the context of a Chapter 11 case. ARINC provided the Company with a $100,000 advance against work it performed under the NGWC Contract[7] immediately on the execution of the LOI and from which, together with the remaining proceeds from February 16, 2010 convertible note, allowed the Company to make its February payroll.

30. Subsequent to the Petition Date, Impeva has had discussions with potentially interested bidders and responded to requests for information. Following entry of the Bidding Procedures Order, Impeva emailed a list of over 40 potentially interested persons of the opportunity. A press release was also generated following entry of the Bidding Procedures Order regarding the proposed sale to ARINC and the opportunity for overbid.

**Asset Valuation**

31. The Debtor has not had a formal valuation prepared of the Company. As of March 26, 2010, the book value of the Company's total assets was $1,308,120. The book value of the Company's liabilities was $2,738,090 million based on U.S. GAAP.

**Debt Structure**

32. As noted above, ARINC provided a secured loan of $100,000 on March 19, 2010 and the DIP Loan. Other than a lien on specific equipment of an equipment lessor, the Debtor presently

---

[7] On March 15, 2010, the Company was awarded its sixth delivery order under the NGWC Contract. Under the terms of the LOI, this $100,000 advance was a prepayment of amounts due from ARINC.

Case: 10-53056   Doc# 44   Filed: 04/06/10   Entered: 04/06/10 15:59:18   Page 8 of 13

DAK
C:\Impeva\Data\PDSale\NOH Mar05.doc

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

8

has no other unavoidable secured debt.[8] Pursuant to the Debtor's first day motions, the Court has authorized the Debtor to pay the priority amount of employee claims (i.e., up to $10,950 per employee). As noted above, ARINC has agreed to assume certain liabilities currently estimated at $818,923 which reduces the total claims against the Debtor. Following the Closing, the Debtor estimates that remaining general unsecured claims against the Company will be approximately $1.6 million.

**Sale Contingencies**

33. The Closing is subject to certain closing deliverables and conditions, which may be waived by Buyer. Specifically, at the Closing, as provided by the Purchase Agreement, the Debtor is required to deliver, or cause to be delivered: a Bill of Sale and Assignment Agreement; the Purchased Assets; a receipt for the Closing Day Cash Payment; Assignment Agreements for any and all patents, patent applications, registered and unregistered copyrights; and trademarks; copies of current business proposals; specified consents, waivers and approvals of third parties; a Closing Date Certification; and an agreement with Impeva Labs Joint Close Joint Stock Company to supply certain software engineering services.

**Relationship to Buyer/Post-Sale Relationship with Buyer**

34. While ARINC and the Debtor have maintained a business relationship, that relationship has historically been limited strictly to one between customer and vendor. As noted above, just prior to the filing of this bankruptcy case, ARINC provided a $100,000 loan to the

---

[8] Just prior to the filing of the Bankruptcy Case, Agility Investment Holdings and James J. Kim, among others (hereafter, collectively "Agility") filed UCC-1 financing statements with the Secretary of State purporting to perfect security interests in the Debtor's assets on account of loans made to the Debtor in June 2009. The Debtor believes these liens are avoidable under Bankruptcy Code § 547(b).

Recent searches of the records of the California Secretary of State disclose the following liens and security interests on the following pre-petition property under the search name Impeva Labs, Inc.

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Agility Investments Holdings, LLC | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Agnes C. Kim | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Susan Y. Kim Trust | March 12, 2010 | All assets of the Debtor |
| David D. Kim Trust | March 12, 2010 | All assets of the Debtor |
| John T. Kim Trust 12/31/87 | March 12, 2010 | All assets of the Debtor |
| ARINC Incorporated | March 19, 2010 | All assets of the Debtor |
| Dell Financial Services | February 27, 2008 | Equipment Lease assets |

DAK
C:\Impeva Labs\PDSale\NOH Motn v5.doc

9

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

Case: 10-53056    Doc# 44    Filed: 04/06/10    Entered: 04/06/10 15:59:18    Page 9 of 13

Company, on a secured basis, and therefore ARINC is also a creditor of the Debtor. Given the complexity and specialized nature of the Debtor's business, the existing business relationship merely led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets. No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa. While ARINC may retain some of the Debtor's key employees, including insiders, this will only occur if the Sale is consummated to ARINC (it is contemplated that other bidders may also require that certain key employees accept employment as a condition of the purchase). Other than the customer-vendor relationship, pre-petition loan, the Purchase Agreement and Loan Agreement, there is no material relationship between the Debtor and ARINC.

**Relationship with Secured Creditors**

35. The lien searches performed reveal UCC filings by Agility (as noted above, the Debtor believes these filings are avoidable and that the underlying obligations are therefore unsecured obligations), by Dell (specific equipment included in the Sale), and ARINC (blanket lien based on pre-petition loan to the Company of $100,000). Upon Closing, it is anticipated that ARINC will offer employment to certain employees of the Debtor including certain officers of the Debtor.

**Insider Compensation**

36. For the period March 26, 2010 through May 14, 2010 (by which date the Sale is anticipated to close), officers, directors, key employees and other insiders will continue to receive their regular salaries as follows:

| Anthony Moroyan | Director | $27,840[9] |
|---|---|---|
| Rassam, George | CFO | $20,923 |
| Shepard, Randall | CEO | $26,808 |

37. Other key employees totaling 17, will receive an aggregate of $234,044 for the same period (i.e., March 26, 2010 through May 14, 2010).

Estimated Distribution of Proceeds

38. Based on the Purchase Agreement with ARINC, the Debtor currently estimates net proceeds of the Sale of approximately $671,228 calculated as follows: $2,000,000 cash purchase price, less $1,200,000 of maximum DIP Financing, less any amounts that remain due on account of the Loan Agreement, including, but not limited to, the Facility Fee and allowed costs and expenses pursuant to Section 5.15 of the Loan Agreement, less $28,772 in estimated cure amounts with respect to Assumed Contracts, less $100,000 payable to ARINC on its pre-petition secured loan (with interest and other amounts that may be owing pursuant to the subject promissory note). The Purchase Agreement includes a 60 day period following the Closing during which ARINC may make a claim for indemnification (if any) under the Purchase Agreement, up to a maximum of $300,000. Certain covenants in the Purchase Agreement also survive the Closing and are not subject to the $300,000 cap. If any such claims are made and are determined to be valid claims, the cash realized from the Sale would be reduced accordingly.

---

[9] Amount listed is through April 30, 2010.

Case: 10-53056 Doc#: 44 Filed: 04/06/10 Entered: 04/06/10 15:59:18 Page 10 of 13

DAK
Scimpeva-LoanSaleNOH.Saledocs 10 NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

39. Other than the outstanding fees and expenses owing to the professionals employed by the Debtor, the Debtor anticipates that all other administrative expenses will have been paid as of the Closing from the DIP Financing. Based on the Debtor's estimates, the Debtor believes unpaid professional fees owing as of the Closing (net of any retainers) will total approximately $100,000. The actual amount may be higher or lower based on the actual fees and expenses incurred by the Court-approved professionals as approved by the Bankruptcy Court. These amounts will be paid from the proceeds of the Sale upon approval of the requested fees and expenses by the Bankruptcy Court.

40. Based on the foregoing estimates, upon payment of valid secured claims and estimated administrative claims through the Closing (anticipated to occur shortly after the Sale Hearing), and assuming no claims for indemnity are made by ARINC, approximately $570,000 will remain of the Sale proceeds. The above estimates may be higher or lower depending on a number of factors: for example, the net cash received at Closing may be higher (i) based on revenues generated pending the Closing which may allow the Debtor to borrow less on the DIP Facility (and therefore more cash would be received at Closing) or (ii) in the event Qualified Bids are received resulting in an Auction with overbids. The estimates may be lower based on higher than estimated amounts owing on claims senior to general unsecured claims. These estimates do not include amounts realized by the Company from the liquidation of the Debtor's stock in its wholly-owned subsidiary in Armenia or recoveries on potential avoidance actions; however it is premature to estimate the potential range of recoveries on such matters.

41. Distributions on account of allowed claims will occur either through a plan of liquidation or by a trustee if the Debtor converts the case to Chapter 7. Additional expenses of administration will be incurred under both of these options which are currently unknown. The Debtor's current estimate is that the remaining general unsecured claims following the Closing (i.e., the liabilities not assumed by ARINC) will be approximately $1.6 million.

<u>Communications with Creditors and Shareholders</u>

42. Prior to the Petition Date, the Company had communications with its major shareholders by phone, email and in-person meetings. The primary means of communication was through board meetings and associated minutes as certain shareholders had a representative on the board (either a board member or an observer) or they received periodic updates through an advisor who was provided updates. Following the filing of the bankruptcy case, the Company had telephone conversations with certain critical vendors regarding ARINC's commitment to assume the liability to such vendors and the Company's intent to provide for such vendors for post-petition payables via the DIP Facility.

OVERBID PROCEDURES

43. The Sale is subject to overbid pursuant to certain sale procedures approved by the Bankruptcy Court on April 1, 2010 (the "<u>Bid Procedures</u>") as set forth in the Bidding Procedures Order. Persons interested in submitting a bid on the Purchased Assets should immediately contact the Company (information provided below) to obtain additional information.

44. Interested bidders are required to sign a confidentiality agreement and furnish proof of their financial ability to perform. In order to be considered a Qualified Bidder, bidders are required to submit their competing bid that contain all of the information and satisfy the

DAK
Sampeva Landis Sale NOH Sale Order.doc
Case: 10-53056  Doc#: 44  Filed: 04/06/10  Entered: 04/06/10 15:59:18  Page 11 of 13

11

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

requirements of the Bid Procedures **no later than 4:00 p.m. (Pacific Time) on April 28, 2010**.

45. Among other things, the Bid Procedures have an initial minimum bid requirement equal to the sum of: (i) the Purchase Price (as defined in the Purchase Agreement); (ii) $150,000 (the Expense Reimbursement – see Paragraph 50 below); and (iii) the Overbid Increment in the amount of $50,000.00 (the aggregate of such amounts is referred to as the "<u>Minimum Initial Bid</u>"). The bidding increments at the Sale Hearing must be not less than $50,000 cash.

46. A bid must be accompanied by a good faith cash deposit in the amount of 50,000 of the cash consideration in each bid.

47. Interested bidders are referred to the Bid Procedures and the Bid Procedures Order for additional information.

48. All Qualified Bidders must attend the hearing on the Sale Motion, when the Auction of the Purchased Assets will take place.

**PERSONS WISHING TO PRESENT A COMPETING BID OR WHO DESIRE FURTHER INFORMATION ON THE SALE MOTION OR THE PURCHASED ASSETS SHOULD CONTACT RANDALL L. SHEPARD VIA EMAIL AT CHAPTER11@IMPEVA.COM.**

<u>PROCEDURE FOR GOOD FAITH FINDING APPLICABLE UPON APPROVAL OF SALE</u>

49. Any bidder that intends to request that the Court make a finding under section 363(m) of the Bankruptcy Code that such bidder's purchase of the assets or the assignment to it of an executory contract or unexpired lease is in good faith, shall, in advance of the Sale Hearing, file with the court and serve on the persons identified in the Bid Procedures, a written declaration of a competent witness demonstrating (1) the bidder's good faith and (2) the absence of fraud or collusion between the bidder and any other bidder or between the bidder and the Debtor's or the estate's agents or employees. The declaration must also disclose any facts material to the good faith determination, including:

    A. The bidder's pre- and post-petition relationships with (i) any other bidder, (ii) the Debtor or the Debtor's current or former officers, directors, agents or employees and (iii) any of the Debtor's major creditors or equity security holders;

    B. The bidder's anticipated relationship after the Sale with any of the Debtor's current or former officers, directors, agents or employees;

    C. Whether any offers of employment or compensation have been or will be made to any of the Debtor's current or former officers, directors, agents or employees; and

    D. Whether the bidder has paid or contemplates paying consideration in connection with the Sale to any person other than the Debtor.

<u>EXPENSE REIMBURSEMENT</u>

50. The Bidding Procedures Order entitles ARINC to be reimbursed for all actual, reasonable out-of-pocket costs and expenses (including fees to professionals) incurred by the Buyer

12

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….

Case: 10-53056  Doc# 44  Filed: 04/06/10  Entered: 04/06/10 15:59:18  Page 12 of 13

in connection with the Purchase Agreement, up to a cap of $150,000 (the "Expense Reimbursement").  Specifically, the Purchase Agreement provides that the Expense Reimbursement shall become payable to ARINC upon the occurrence of the following:  (a) entry of a final order approving the sale of the Purchased Assets to another bidder; (b) close of a sale to another bidder; and (c) approval by the Bankruptcy Court.  No Expense Reimbursement shall be payable to the Buyer if it breaches its obligations under the Purchase Agreement without having its performance excused under the terms of the Purchase Agreement.

51. In the event that the Buyer is entitled to the Expense Reimbursement, the Purchase Agreement further provides that such obligation will constitute allowed administrative expense of the Debtor's bankruptcy estate pursuant to section 503(b)(1)(A) of the Bankruptcy Code and entitled to the priority set forth in section 507(a)(2) of the Bankruptcy Code.

## HEARING AND OPPOSITION DEADLINES

52. Pursuant to the Bidding Procedures Order, a hearing to consider approval of the Sale Motion and the Assumption Motion will be held on **May 4, 2010 at 10:00 a.m.** before the Honorable Arthur S. Weissbrodt, United States Bankruptcy Judge, at 280 S. First St., Room 3020, San Jose, CA 95113.

53. Pursuant to Bidding Procedures Order, any objections to the Sale must:  (a) be in writing; (b) comply with the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules; (c) be filed with the Clerk of the Bankruptcy Court for the Northern District of California, San Jose Division, 280 South First Street, Room 3020, San Jose, California 95113, on or before **April 27, 2010**, and (d) be served no later than **April 27, 2010** upon (1) Debtor's counsel, Doris A. Kaelin of Murray & Murray, A Professional Corporation, 19400 Stevens Creek Boulevard, Suite 200, Cupertino, California 95014, facsimile (650) 852-9244, email: dkaelin@murraylaw.com; (2) counsel for the Creditors' Committee (if any); (3) counsel for ARINC, Judith B. Kassel, Mary-Joanne Dowd, and Katie A. Lane of Arent Fox LLP, 1050 Connecticut Avenue, N.W., Washington, DC 20036, Fax: (202) 857-6395, email: dowd.mary@arentfox.com; kassel.judith@arentfox.com; lane.katie@arentfox.com; and (4) the Office of the United States Trustee, Attn:  John Wesolowski, 280 South First Street, Room 268, San Jose, California 95113, facsimile (408) 535-5532.

54. Failure to file and serve a timely opposition to the Sale Motion will bar the assertion at the Sale Hearing or thereafter of any objection to the Sale Motion and the Debtor's consummation and performance of the Purchase Agreement.

55. Questions regarding the Bid Procedures, the Sale Motion and/or the Assumption Motion, or requests for copies of any of the pleadings filed in relation thereto, should be directed to the attorneys for the Debtor, Doris A. Kaelin or Thomas T. Hwang, via telephone at (650) 852-9000 or email at dkaelin@murraylaw.com or thwang@murraylaw.com.  Persons interested in participating in the auction should contact the Company via email at Chapter11@Impeva.com

Dated:  April 6, 2010          **MURRAY & MURRAY**
                               A Professional Corporation

                               By: */s/ Doris A.Kaelin*
                               Doris A. Kaelin
                               Attorneys for Debtor

DAK
S:\Impeva Labs\PSA\NOH Sale Order.docx

Case: 10-53056   Doc# 44   Filed: 04/06/10   Entered: 04/06/10 15:59:18   Page 13 of 13

13

NOTICE OF HEARING ON PROPOSED SALE OF CERTAIN ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES….