STEPHEN T. O'NEILL (115132)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone:  (650) 852-9000; (408) 907-9200
Facsimile:  (650) 852-9244
Email:  soneill@murraylaw.com
Email:  dkaelin@murraylaw.com
Email:  thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

In re:

**IMPEVA LABS, INC.,**

Debtor.

2570 West El Camino Real, Suite 100
Mountain View, California 94040

Employer Tax I.D. No.: 20-2084435

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 10-53056-ASW-11

Chapter 11

Date:     May 4, 2010
Time:     10:00 a.m.
Place:    United States Bankruptcy Court
          280 S. First St., Room 3020
          San Jose, CA  95113
Judge:    Honorable Arthur S. Weissbrodt

## MOTION BY DEBTOR TO SELL CERTAIN ASSETS
## FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Case: 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 10:08:42   Page 1 of 30

# TABLE OF CONTENTS

Page

I.    Summary of Relief Requested ................................................................. 2

II.   Background ............................................................................................ 3

III.  Proposed Sale ........................................................................................ 5

      A.    Summary of Proposed Sale ................................................... 5

      B.    Additional Information Pertaining To Proposed Sale ................... 8

      Alternatives to Sale and Auction; Marketing of Purchased Assets; ........................ 8

      Asset Valuation ........................................................................................ 11

      Debt Structure ........................................................................................ 12

      Relationship to Buyer/Post-Sale Relationship with ARINC ................ 12

      Relationship with Secured Creditors ......................................... 13

      Insider Compensation ........................................................... 13

      Estimated Distribution of Proceeds ............................................ 13

      Communications with Creditors and Shareholders............................ 15

      Closing Conditions................................................................ 15

IV.   Argument .............................................................................................. 16

      A.    The Sale Should Be Approved as Fair, Reasonable and in the Best Interest of
            Creditors and the Bankruptcy Estate................................................... 16

            i)    There Is a Valid Business Justification and Good Business Reason to Support
                  the Sale. .......................................................................... 17

            ii)   The Proposed Sale Is in Good Faith and ARINC or the Successful Overbidder
                  Should Be Afforded the Protections of 11 U.S.C. § 363(m) ................ 18

            iii)  The Purchase Price Is Fair and Reasonable. .................................. 20

      B.    The Bid Procedures Established by the Court Will Encourage Meaningful Overbids
            on the Purchased Assets................................................................... 21

      C.    The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale
            of the Estate's Assets Free and Clear of Liens, Claims, Encumbrances, and Other
            Interests ........................................................................................ 22

      D.    Accurate and Reasonable Notice Has Been Provided. ............................ 24

      E.    Waiver of Federal Rule of Bankruptcy Procedure 6004(h) ....................... 25

# TABLE OF AUTHORITIES

Page(s)

CASES

240 North Brand Partners, Ltd. v. Colony GFP Partners, L.P.
(In re 240 North Brand Partners, Ltd.), 200 B.R. 653 (9th Cir. B.A.P. 1996)........................16

Arnold & Baker Farms v. United States,
85 F.3d 1415 (9th Cir. 1996) ...........................................................................................20

In re Abbotts Dairies,
788 F.2d 143 (3rd Cir. 1986) ...................................................................... , 18, 20

In re Apex Oil Co.,
92 B.R. 847 (Bankr. E.D. Mo. 1988) ........................................................................19

In re Curlew Valley Assocs.,
14 B.R. 506 (Bankr. D. Utah 1981) ..........................................................................18

In re Gulf States Steel, Inc. of Ala.,
285 B.R. 497 (Bankr. N.D. Ala. 2002) ................................................................ , 20

In re Lionel Corp.,
722 F.2d .......................................................................................................................17

In re Southern Biotech, Inc.,
37 B.R. 318 (Bankr. M.D. Fla. 1983) ........................................................................18

In re Wilde Horse Enterprises, Inc.,
136 B.R. 830 (Bankr. C.D. Cal. 1991).......................................................................16

Institutional Creditors of Continental Air Lines, Inc. v. Continental Air Lines, Inc. (In re
Continental Air Lines, Inc.),
780 F.2d 1223 (5th Cir. 1986) ...................................................................................17

Otto Preminger Films, Ltd. v. Qintex Entertainment, Inc.(In re Qintex Entertainment, Inc.),
950 F.2d 1492 (9th Cir. 1991) ...................................................................................16

T.C. Investors v. Joseph (In re M Capital Corp.),
290 B.R. 743 (9th Cir. B.A.P. 2003)...........................................................................19

Thomas v. Namba (In re Thomas),
287 B.R. 782 (9th Cir. B.A.P. 2002)...........................................................................19

Walter v. Sunwest Bank (In re Walter),
83 B.R. 14 (9th Cir. B.A.P. 1988) ..................................................................... , 18

STATUTES

11 U.S.C. Sections 363 .................................................................................................2, 20

Case: 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 3 of 30
K:\Impeva Labs\reSale\mot v3.docx

11 U.S.C. §§ 363 AND 365 ....................................................................................2

11 U.S.C. § 363(m) ...............................................................................18, 20, 26

11 U.S.C. §§ 1107 and 1108 ................................................................................3

11 U.S.C. § § 363 AND 365 ..................................................................................2

28 U.S.C. Sections 157, 157(b)(2) and 1334 ......................................................2

28 U.S.C. Sections 1408 and 1409 ......................................................................2

Bankruptcy Code Section 363(b) .................................................................16, 17

Bankruptcy Code Section 363(f) .................................................................22, 26

Bankruptcy Code Section 364(c)(1) .............................................................23, 24

Bankruptcy Code Section 503(b)(1)(A), 507(a)(2) .............................................21

Bankruptcy Code Section 547(b) .................................................................12, 23

OTHER AUTHORITIES

3 Collier on Bankruptcy ¶ 363.02[1][f] (15th ed. rev. 2009) .............................16

Federal Rules of Bankruptcy Procedure Sections 363(b) and (f) .........................2

Federal Rules of Bankruptcy Procedure 6004(f)(1) ............................................16

Federal Rule of Bankruptcy Procedure 6004(h) ......................................3, 25, 26

Federal Rules of Bankruptcy Procedure Rule 6004 ...........................................16

Local Rule 6004-1 .................................................................................................2

K:\Impeva Labs\PtSale\mot v3.docx

iii

MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS

**Proposed Purchaser:**     **ARINC Engineering Services, LLC and ARINC Acquisition, LLC or their designated affiliate (collectively referred to as "ARINC").**

**Potentially Affected Lien, Claim, and Interest Holders:** [1]

ALL PERSONS PROVIDED NOTICE OF THE SALE, INCLUDING, BUT NOT LIMITED TO, PERSONS LISTED AS CREDITORS ON THE DEBTOR'S SCHEDULES OR WHO HAVE FILED A PROOF OF CLAIM OR REQUEST FOR NOTICE IN THE DEBTOR'S CASE.

*(IF YOU DO NOT KNOW IF YOU WERE LISTED AS A CREDITOR IN THE DEBTOR'S SCHEDULES YOU MAY ASK THE DEBTOR'S ATTORNEYS: Doris A. Kaelin or Thomas T. Hwang, via telephone at (650) 852-9000 or email at dkaelin@murraylaw.com or thwang@murraylaw.com.)*

AGILITY INVESTMENTS HOLDINGS, LLC

AGNES C. KIM

ARINC INCORPORATED

DAVID D. KIM TRUST

DELL FINANCIAL SERVICES[2]

JAMES J. KIM

JOHN T. KIM TRUST 12/31/87

SUSAN Y. KIM TRUST

**All Parties to Executory Contracts and Unexpired Leases Subject to Assumption and Assignment:**

---

[1] The sale of assets (the "Sale") will be free and clear of all liens, claims, encumbrances and other interests in or to the Purchased Assets (as defined below) as provided by that certain ASSET PURCHASE AGREEMENT between ARINC and the Debtor (the "Purchase Agreement"). All such liens, claims, encumbrances and other interests will attach to the proceeds of the Sale with the same priority, validity, force and effect, if any, as exist as of the closing, in or against the Debtor's Purchased Assets, subject to all claims and defenses the Debtor may possess with respect thereto. The Debtor does not seek to sell free and clear of any liens, claims encumbrances and other interests against those assets excluded from the Sale (i.e., the "Excluded Assets" as defined under the Purchase Agreement).

Terms not separately defined herein shall have the meaning ascribed to them in the Purchase Agreement. A copy of the Purchase Agreement (excluding exhibits and schedules), in substantially the form to be executed, is attached as **Exhibit "A"** to the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Shepard Declaration"). This form of Purchase Agreement differs from the copy filed in connection with the Debtor's first day motions with respect to non-material revisions in the nature of nits and other clean-up items.

[2] Although the Dell Financial Services Lease for Computer Equipment is among the executory contracts to be assumed by ARINC and cured by the Debtor pursuant to the Purchase Agreement, out of an abundance of caution, the Debtor includes Dell's secured claim as a potentially affected lien, claim or interest.

See separate MOTION TO AUTHORIZE DEBTOR TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF CERTAIN OF ITS ASSETS (11 U.S.C. §§ 363 AND 365)[3] and notice of hearing thereon.

Impeva Labs, Inc., the debtor and debtor-in-possession herein (the "Company" or the "Debtor"), hereby submits its MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Sale Motion"). The Sale Motion requests that the Court enter an order (the "Sale Order") approving the sale of certain of the Company's assets (the "Purchased Assets") to ARINC subject to the submission of higher and better bids (the successful purchaser is hereinafter referred to as the "Buyer").

The Court has jurisdiction over these matters pursuant to 28 U.S.C. Sections 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. Section 157(b)(2). The statutory predicate for the relief sought herein is 11 U.S.C. Sections 363. Venue is proper in this Court pursuant to 28 U.S.C. Sections 1408 and 1409.

The Sale Motion is made pursuant to Sections 363(b) and (f), Federal Rules of Bankruptcy Procedure 2002 and 6004 and Bankruptcy Local Rule 6004-1. The Sale Motion is based on the memorandum of points and authorities below, the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Shepard Declaration") and the DECLARATION OF DORIS A. KAELIN IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Kaelin Declaration"), both filed concurrently herewith, on the DECLARATION OF ARINC IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "ARINC Declaration") to be filed prior to the hearing on the Sale Motion (the "Sale Hearing"), and on such other evidence and argument as may be submitted prior to or at the Sale Hearing.

## I.  **SUMMARY OF RELIEF REQUESTED**

1.  The Debtor requests approval of the Sale of certain of its assets to the Buyer, subject to overbid, pursuant to the terms and conditions set forth in the Purchase Agreement.

---

[3]  The MOTION TO AUTHORIZE DEBTOR TO ASSUME AND ASSIGN EXECUTORY CONTRACTS AND UNEXPIRED LEASES IN CONNECTION WITH THE SALE OF CERTAIN OF ITS ASSETS (11 U.S.C. § § 363 AND 365) is herein referred to as the "Assumption Motion."

2.      The Sale is conditioned upon the assumption and assignment of certain executory contracts and unexpired leases of the Debtor (the "Assumed Contracts").  Additional details regarding the Assumed Contracts are set forth in the separate Assumption Motion which is scheduled for hearing on the same date and time as this Sale Motion.

3.      The Debtor requests that the Sale be free and clear of liens, claims, encumbrances and other interests, as provided in the Purchase Agreement, with any such liens, claims, encumbrances or interests to attach to the proceeds of the Sale.

4.      The Debtor also requests that the provision of Federal Rule of Bankruptcy Procedure 6004(h) which would otherwise stay any order approving the Sale as requested herein, be waived under the circumstances.

## II.      **BACKGROUND**

5.      On March 26, 2010 (the "Petition Date"), the Debtor filed for bankruptcy relief under chapter 11 of the Bankruptcy Code in this judicial district.  The Debtor is presently operating its business as a debtor in possession under 11 U.S.C. §§ 1107 and 1108.

6.       No official committee of unsecured creditors has been formed in the bankruptcy case to date.

7.      The Company was incorporated in California on December 16, 2004.  It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System.  The Company provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Company's Global Sentinel™ Units ("GSUs") and Device Management Center ("DMC"). The system can ensure continuous tracking and monitoring of customer assets, no matter where they are in the world.  The Company's GSU incorporates a customizable suite of electronic sensors to monitor the assets' condition and location. It communicates seamlessly worldwide with the Company's DMC through multiple wireless technologies, providing immediate secure access via the Internet to data from the asset being tracked, monitored or managed. The DMC can also link to customer data centers through other options including standard XML over a secure network connection. If the asset experiences an

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 15:06:43   Page 7 of 30

abnormal event, the concerned customers and/or appropriate agencies can also be notified within minutes via SMS text messaging and email notification.

8.     On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a pre-petition secured credit agreement (the "ARINC Pre-Petition Loan") in which ARINC agreed to lend the Debtor the principal amount of $100,000 to fund its Chapter 11 filing, including payment of a retainer to bankruptcy counsel.  Contemporaneously with such extension of funds, on March 19, 2010, ARINC filed its UCC-1 Financing Statement (the "ARINC Pre-Petition Lien").  Soon thereafter, the Debtor and ARINC finalized the terms of the Purchase Agreement which sets forth the terms of the proposed Sale.

9.     The Purchase Agreement is subject to Court approval and allows for the submission of higher and better bids pursuant to certain bid procedures (the "Bid Procedures") established and approved by the Court pursuant to the ORDER APPROVING OVERBID PROCEDURES AND RELATED MATTERS RE SALE OF CERTAIN ASSETS OF THE DEBTOR entered on April 2, 2010 (the "Bidding Procedures Order").  A copy of the Bidding Procedures Order which sets forth the Bid Procedures is attached to the Kaelin Declaration as its **Exhibit "A."**  If there are Qualified Bidders (as defined in the Bidding Procedures Order), an auction (the "Auction") will be held at the Sale Hearing.  A summary of certain terms of the Purchase Agreement is provided commencing at Paragraph 14 below.

10.     In connection with the Purchase Agreement and the Sale, and pursuant to that certain written SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"),[4] the Debtor proposes to borrow up to $1.2 million (the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by ARINC to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the Sale of certain of the Debtor's assets to the highest bidder pursuant to the Sale Motion.  The Debtor anticipates that it will exhaust the DIP Financing by the third week of May 2010.  Following a hearing on April 1, 2010, the Court authorized the Debtor to borrow $500,000 on the DIP Facility.  A final hearing will be

---

[4]  A copy of the Loan Agreement is attached to the DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF FIRST DAY MOTIONS (Docket No. 14) (the "Omnibus Declaration") as its **Exhibit "A."**

MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

held on April 16, 2010, at which time the Debtor will seek to borrow up to a maximum of $1.2 million on the DIP Facility so that the Debtor can continue to operate until the close of the Sale. The DIP Facility is being and will be utilized pursuant to a budget approved by ARINC and as approved by the Court.

11.     If the proposed Sale is not consummated quickly, the Company may lose both the ability to preserve its intellectual property and the ability to retain its employees whose services are essential to the Company but who may pursue alternative employment opportunities, thereby diminishing the Company's value.

12.     Time is of the essence to close the Sale. The Debtor cannot continue to operate for an extended period of time, even with the DIP Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially reducing the net cash to be received at the Closing (defined below) of the Sale (due to the depletion of the DIP Facility) and the return to creditors. The Debtor believes the acquisition opportunity has been well-marketed. The proposed Sale is also subject to overbid by Qualified Bidders (as discussed below) pursuant to bid procedures established by the Bankruptcy Court. The Debtor believes that an expedited sale process is necessary to realize the highest value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtor's customers, partners, vendors and employees.

13.     The Debtor believes that the Sale to ARINC is in the best interest of creditors in that it allows the Debtor's assets to be sold as a going concern, and the Bid Procedures established by the Court will allow other persons wishing to bid on the Company's assets the opportunity to do so.

III.     **PROPOSED SALE**

A.     **Summary of Proposed Sale**

14.     The following is a general description of the key points contained in the Purchase Agreement by and between ARINC and the Debtor. This description is offered for the convenience of the parties, potential overbidders and the Court. It is recommended that all parties review the Purchase Agreement to gain a full and complete understanding of its contents.[5]

---

[5] In the event of any inconsistency between the description provided herein and the Purchase Agreement, the Purchase Agreement and any and all exhibits thereto shall control. This description is offered as an aid to permit

- The Purchased Assets include all of the Debtor's intellectual property, among other assets. Excluded Assets include, among other things, cash, accounts receivable, the stock of the Debtor's wholly-owned subsidiary in Armenia, certain avoidance claims and causes of action, and other assets as specified in the Purchase Agreement.

- The Purchase Agreement provides for a purchase price of $2,000,000, less: (i) any amounts loaned and any unpaid accrued interest thereon pursuant to the DIP Financing[6], and (ii) the Bidder Deposit (defined below), which shall be paid at the Closing by wire transfer or the delivery of other immediately available funds.

- In addition, ARINC will assume performance of certain Assumed Contracts and cure Debtor defaults by assuming specified liabilities designated by ARINC not to exceed $1,000,000, which the Debtor presently estimates will be approximately $718,923[7] (the total consideration set forth herein is hereafter referred to as the "Purchase Price")[8]. The Purchase Agreement also provides for a 60-day period during which the Debtor, subject to the other terms and conditions therein, shall indemnify Buyer against, and hold Buyer harmless from, all loss arising out of the failure of any representation or warranty of the Debtor, in an amount up to $300,000, as the exclusive remedy for such claims in the absence of fraud. The post-closing performance of certain

---

interested parties and potential overbidders a convenient place to review the key terms contained in the Purchase Agreement.

[6] The Loan Agreement provides for payment of reasonable attorneys' fees and costs incurred by ARINC in connection thereto. Prior to the Sale Hearing, ARINC will file a statement which sets forth the actual amount of the DIP Financing to be repaid, any unpaid portion of the Facility Fee, as well as the accrued attorneys' fees and costs related thereto. The amount owing may be used as a credit bid by ARINC at the Auction; however, the Debtor, the Office of the United States Trustee and any other party in interest may challenge any amounts claimed owing as properly included and reasonable pursuant to the terms of the Loan Agreement. In the event of a dispute of the balance owing that is not resolved by the Sale Hearing, the Debtor and ARINC will attempt to reach agreement of the estimated amount to be included for purposes of the credit bid, with reservation of the right to seek a subsequent Court determination of the amount payable pursuant to the Loan Agreement. In the absence of such an agreement prior to the start of the Sale Hearing, the Court will be asked to determine the amount to be included for purposes of any credit bid by ARINC. If there are no competing bidders and ARINC is approved as the successful purchaser, the amount to be credited against the Purchase Price on account of the Loan Agreement shall be subject to review and approval by the Debtor, and any dispute will be set for hearing.

[7] The Assumed Liabilities (as defined by the Purchase Agreement) include, *inter alia,* certain liabilities to critical vendors and unpaid obligations to employees who are hired by Buyer (not to exceed $1,000,000), and liabilities arising from and after the Closing Date from the ownership or operation of the business and Purchased Assets by the Buyer from and after the Closing.

The current estimate of the Assumed Liabilities used here of $718,923 is $100,000 less than the amount included in the Notice of Hearing on this Sale Motion based on the pre-paid deposit on the ARINC accounts receivable in the amount of $100,000 which is no longer outstanding. A similar pre-paid deposit on an accounts receivable (of Horizon Lines, LLC) in the amount of $90,000 is still listed as an Assumed Liability. This amount may be substantially reduced or eliminated prior to the date competing bids are due. If the assumed liabilities are reduced or eliminated by the bid deadline, the amount of assumed liabilities by ARINC and Qualified Bidders would be accordingly reduced. The Debtor will provide an updated assumed liabilities number to potential bidders prior to the bid deadline.

[8] The term "Purchase Price" is defined in the Purchase Agreement to include only the $2,000,000 cash component. However, "Purchase Price" defined herein includes the total consideration to be received by the Debtor (including the cash component and liabilities to be assumed by the Buyer).

DAK
Sample... prmot                     6     MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:58:42   Page 10 of 30

covenants survive the Closing (defined below) of the Sale and are not subject to the $300,000 cap.

- The Purchase Agreement includes non-compete and non-solicitation provisions applicable to both the Company and to certain stockholders of the Company.

- The Buyer is responsible for any excise, value added, registration, stamp, property, documentary, transfer, sales, use and similar taxes, levies, charges and fees incurred, or that may be payable to any taxing authority, in connection with the sale, transfer, and delivery of the Purchased Assets. With respect to Purchased Assets acquired by the Buyer, the Debtor and the Buyer will share a proportionate responsibility for personal property taxes and ad valorem taxes for the current year tax periods that include, but do not begin or end on, the Closing Date (as defined in the Purchase Agreement). The Debtor believes these amounts will be nominal.

- It is anticipated that a number of the Debtor's executory contracts and unexpired leases (i.e., the Assumed Contracts) will be assumed by the Debtor and assigned to ARINC. With respect to any executory contracts that are assigned to ARINC, the Debtor shall be responsible for any cure amount due to the non-debtor contracting party. Based on the Assumed Contracts currently identified in the Purchase Agreement which may be assumed by the Debtor and assigned to the Buyer, the total cure amounts are estimated at approximately $28,772. However, the actual cure amounts might vary significantly based on the actual executory contracts and unexpired leases assumed by the Buyer and the cure amounts for such contracts and leases established by the Bankruptcy Court. Pursuant to the separate Assumption Motion, the Debtor seeks authority to assume and assign the Assumed Contracts to the Buyer. The actual contracts assumed and assigned will be determined by the Buyer, subject to approval of the Bankruptcy Court.

- The Sale is expressly subject to Bankruptcy Court approval and certain bid procedures (including an opportunity to overbid). Various deadlines and procedures to qualify as a "Qualified Bidder" are in the Bidding Procedures Order. Interested bidders are cautioned to pay careful attention to all dates and procedures established by the Bidding Procedures Order. **Among other important dates and deadlines, competing bids must be received by 4:00 p.m. (PDT) on April 28, 2010 in order to be considered.**

- Pursuant to the Purchase Agreement, the closing (the "Closing") is to occur on the first business day after the satisfaction or waiver of the conditions to Closing set forth in the Purchase Agreement and discussed below. Additionally, certain employees are to accept employment with the Buyer (to become effective on the Closing Date). All specified employees have accepted employment with ARINC.

- The Closing is subject to certain closing deliverables and conditions, which may be waived by the Buyer. Specifically, at the Closing, as provided by the Purchase Agreement, the Debtor is required to deliver, or cause to be delivered: a Bill of Sale and Assignment Agreement; the Purchased Assets; a receipt for the Closing Day Cash Payment; Assignment Agreements for any and all patents, patent applications, registered and unregistered copyrights; and trademarks; copies of current business proposals; specified consents, waivers and approvals of third parties; a Closing Date Certification; and an agreement with Impeva Labs Closed Joint Stock Company to supply certain software engineering services.

///

DAK
sale.impeva.assets.mot

MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

## B. Additional Information Pertaining To Proposed Sale

15. The following information is provided to assist creditors and other parties in interest in evaluating the proposed Sale in accordance with the Court's GUIDELINES FOR EARLY DISPOSITION OF ASSETS IN CHAPTER 11 CASES.

### Alternatives to Sale and Auction; Marketing of Purchased Assets; Designation of Stalking Horse

16. The Debtor's initial investors included industry investors as well as senior management of the Company through Convertible Notes that were later converted to Series A Preferred Shares of the Company. Following this initial investment, the Company gained other outside investors. The total Series A round was $2,055,418 and was closed in September 2005.

17. An internal (i.e., current investors were the major investors) Series A-1 Round closed in early 2006 and brought in $2,316,800. In 2006, the Company teamed with ARINC Engineering Services, LLC to serve as prime contractor with the Company as subcontractor, to compete for a 5-year, $20 million Department of Defense ("DOD") contract (the "NGWC Contract") to develop and deploy mesh net technology products. In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor, was awarded the NGWC Contract. By mid-2007, the first tranche of a planned three tranches of Series B financing was closed in the amount of $7 million with Agility Logistics ("Agility") as the major investor.

18. In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor (Agility) monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor on tracking and monitoring strategic assets such as jet engines. The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule. In addition, the second and third tranches of Round B financing were completed in the second half of 2008 to provide the needed funds on a timely basis with Agility investing an additional $2 million while two other major investors invested an aggregate $1 million. Even before the end of 2008, the Company had begun to identify and negotiate the next round of financing for the total amount of $6 million for receipt in 2009 to start

DAK
...impt...sale.mot
8
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 12 of 30

scaling the company, increase sales and to fund further research and development of new products.

19.     The Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at the CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility.  In early 2009, the candidate informed the Company that it was unable to get approval from its major investor due to its economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

20.     By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company.  This unanticipated news caused the Company to accelerate its efforts at obtaining the requisite financing.  It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "Kims"), agreed to invest under provisions that included discount on the conversion valuations and a ceiling.  The Debtor and the Kims also entered into a convertible promissory note that purported to grant Agility and the Kims security interests in the Company's assets.  These transactions closed in June of 2009 with Agility contributing $631,507 and the Kims contributing $231,165 on June 11, 2009.  Neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later when they filed UCC-1 Financing Statements on March 12, 2010.

21.     In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint Logistics Over-the-Shore).  JLOTS attracted the attention of the DOD senior officials that opened major opportunities for the Company.  The Company continued with its efforts to find new investment and established contact with a Kuwaiti based company as a potential investor as well as a

potential major customer.  Negotiations and drafting of the final documents concerning a $6 million investment by this entity in the Company were agreed upon, and the Company signed and returned the documents for counter-signing by late November 2009.  In the beginning of December 2009, the Company received an unexpected Formal Suspension Notice from the Defense Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension list with the DOD and concluded that the Company was an affiliate of Agility subject to the same suspension list. As a result, the Company notified the potential investor, and the execution of the investment documents was stalled.

22.     The suspension was extremely detrimental to the Company's business.  The Company was not allowed to receive any new DOD contracts or even new task orders under the NGWC Contract.  Company management worked diligently, and due to lack of funds, without legal representation, to release the suspension.  Finally, through major efforts, Agility gave up their two Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-voting. Agility agreed to the removal of all blocking and control terms from all the investment documents with the Company.  Thereafter, DLA released the Company from the suspension on December 31, 2009.

23.     Negotiations with the potential investor were resumed; however, this time, the potential investor decided to reduce its investment substantially from $6 million to $1 million during 2010, and, aside from an initial $500,000 investment through a convertible note which was received by the Company on February 16, 2010, the potential investor required that any additional investment be staged and be contingent upon further due diligence.  In parallel with this development, the Company increased its efforts to locate a strategic investor or merger and acquisition candidate, speaking with approximately 12 entities, including both public multinationals and private entities in commercial and DOD-related fields.  The Company signed an exclusive letter of intent with a major DOD contractor in late January 2010, which conducted due diligence on the Debtor.  However, on February 11, 2010 this contractor informed the Company that it had decided to forgo the opportunity.

DAK
...impl...t+...530056...mot...
10
Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 14 of
30
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS

24. The Company continued to investigate strategic alternatives and contacted ARINC, which had previously expressed interest and conducted due diligence on the Company in 2008, to ascertain the level of its interest. Following multiple discussions, ARINC presented a Letter of Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets which was accepted by the Company's board and senior management on February 24, 2010. The LOI provided for a 45-day exclusivity period during which the Company could not discuss or enter into a sale, merger, or other business combination with any other party, with the proposed Sale to be made in the context of a Chapter 11 case. ARINC provided the Company with a $100,000 advance against work it performed under the NGWC Contract immediately upon the execution of the LOI which, together with the remaining proceeds from February 16, 2010 convertible note, allowed the Company to make its February payroll.

25. As discussed in paragraph 10 above, ARINC agreed to provide the DIP Facility pursuant to the Loan Agreement. The Debtor covenanted under the Loan Agreement to seek entry of a final order approving the Bid Procedures and identifying ARINC as the stalking horse bidder. The Bidding Procedures Order approves ARINC as the stalking horse bidder.

26. Subsequent to the Petition Date, the Company has had discussions with potentially interested bidders and responded to requests for information. Following entry of the Bidding Procedures Order, the Company emailed a list of over 40 potentially interested persons of the opportunity. A press release was also generated following entry of the Bidding Procedures Order regarding the proposed sale to ARINC and the opportunity for overbid.

27. On April 8, 2010, the Company held a non-proprietary webinar for potential bidders to provide non-proprietary information about the business. For those persons who had executed NDAs, a proprietary webinar was held on Monday, April 12, 2010. A number of potentially interested parties have participated and due diligence continues as of the date of this Sale Motion.

**Asset Valuation**

28. The Debtor has not had a formal valuation prepared of the Company. As of March 26, 2010, the book value of the Company's total assets was $1,308,120. The book value of the Company's liabilities was $2,738,090 million based on U.S. GAAP.

DAK
...imp...c...530556...mot...
11
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES, AND OTHER INTERESTS

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 15 of 30

**Debt Structure**

29.     As noted above, ARINC provided a secured loan of $100,000 on March 19, 2010 and the DIP Financing pursuant to the Loan Agreement.  Other than a lien on specific equipment of an equipment lessor, the Debtor presently has no other unavoidable secured debt.[9]  Pursuant to the Debtor's "first day motions," the Court has authorized the Debtor to pay the priority amount of employee claims (i.e., up to $10,950 per employee).  Also as noted above, ARINC has agreed to assume certain liabilities currently estimated at $718,923[10] which reduces the total claims against the Debtor.  Following the Closing, the Debtor estimates that remaining general unsecured claims against the Company will be approximately $1.6 million.

**Relationship to Buyer/Post-Sale Relationship with ARINC**

30.     While ARINC and the Debtor have maintained a business relationship, that relationship has historically been limited strictly to one between customer and vendor.  As discussed above, just prior to the filing of this bankruptcy case, ARINC provided the ARINC Pre-Petition Loan to the Company, on a secured basis, and therefore ARINC is also a creditor of the Debtor.  Given the complexity and specialized nature of the Debtor's business, the existing business relationship merely led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets.  No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa.  While ARINC may retain some of the Debtor's key employees, including insiders, this will only occur if the Sale is consummated to ARINC (it is contemplated that other bidders may also require that certain key employees accept employment as a condition of the purchase).  The insiders who it is contemplated will have a future relationship with ARINC are Randall Shepard (current CEO of the Company, anticipated to be hired as an employee by ARINC effective as of the Closing) and Anthony Moroyan (current Director and former officer of the Company, anticipated to be retained on a consulting basis by ARINC after Closing.  Other than the customer-vendor relationship, ARINC

---

[9]  In addition to the ARINC Pre-Petition Lien, two UCC-1 financing statements were filed with the Secretary of State prior to the Petition Date which the Debtor believes are avoidable under Bankruptcy Code § 547(b).  A summary of all liens and security interests asserted against the Debtor are discussed more fully below at Article IV, Section C.

[10]  As noted at Footnote 7 above, this number may change between now and the bid deadline.

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:38:42   Page 16 of

MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

Pre-Petition Loan, the Purchase Agreement and the Loan Agreement, there is no material relationship between the Debtor and ARINC.

### Relationship with Secured Creditors

31.     Lien searches performed by the Debtor reveal UCC filings by Agility and the Kims (as discussed below, the Debtor believes these are avoidable and the underlying obligations are therefore unsecured obligations), by Dell Equipment Financing (specific equipment included in the Sale), and ARINC (blanket lien based on the ARINC Pre-Petition Loan of $100,000). Upon the Closing, it is anticipated that ARINC will offer employment to certain employees of the Debtor including certain officers of the Debtor.

### Insider Compensation

32.     For the period March 26, 2010 through May 14, 2010 (by which date the Sale is anticipated to close), officers, directors, key employees and other insiders will continue to receive their salaries or other compensation as follows:

| Name | Title | Salary |
|------|-------|--------|
| Anthony Moroyan | Director | $27,840[11] |
| Rassam, George | CFO | $20,923 |
| Shepard, Randall | CEO | $26,808 |

33.     Other key employees totaling 17, will receive an aggregate of $234,044 for the same period (i.e., March 26, 2010 through May 14, 2010).

### Estimated Distribution of Proceeds

34.     Based on the Purchase Agreement with ARINC, the Debtor currently estimates net proceeds of the Sale of approximately $671,228 calculated as follows: $2,000,000 cash purchase price, less $1,200,000 of maximum DIP Financing, less any amounts that remain due on account of the Loan Agreement, including, but not limited to, the Facility Fee (as set forth in the Loan Agreement) and allowed costs and expenses pursuant to Section 5.15 of the Loan Agreement[12], less

---

[11]   Amount listed is through April 30, 2010 for services to be provided on a contract basis.

[12]   As set forth above, reasonable attorneys' fees and costs incurred by ARINC in connection with the DIP Financing are subject to the Debtor's review and shall be included in the Purchase Price only upon the Debtor's satisfaction as to their reasonableness. ARINC has provided the Debtor and the United States Trustee with a summary of

$28,772 in estimated cure amounts with respect to Assumed Contracts, less $100,000 payable to ARINC on the ARINC Pre-Petition Loan (with interest and other amounts that may be owing pursuant to the subject promissory note). The Purchase Agreement includes a 60-day period following the Closing during which ARINC may make a claim for indemnification (if any) under the Purchase Agreement, up to a maximum of $300,000. Certain covenants in the Purchase Agreement also survive the Closing and are not subject to the $300,000 cap. If any such claims are made and are determined to be valid claims, the cash realized from the Sale would be reduced accordingly.

35.     Other than the outstanding fees and expenses owing to the professionals employed by the Debtor, the Debtor anticipates that all other administrative expenses will have been paid as of the Closing from the DIP Financing. Based on the Debtor's estimates, the Debtor believes unpaid professional fees owing as of the Closing (net of any retainers) will total approximately $100,000. The actual amount may be higher or lower based on the actual fees and expenses incurred by the Court-approved professionals as approved by the Bankruptcy Court. These amounts will be paid from the proceeds of the Sale upon approval of the requested fees and expenses by the Bankruptcy Court.

36.     Based on the foregoing estimates, upon payment of valid secured claims and estimated administrative claims through the Closing (anticipated to occur shortly after the Sale Hearing), and assuming no claims for indemnity are made by ARINC, approximately $570,000 will remain of the Sale proceeds. The above estimates may be higher or lower depending on a number of factors: for example, the net cash received at Closing may be higher (i) based on revenues generated pending the Closing which may allow the Debtor to borrow less on the DIP Facility (and therefore more cash would be received at Closing) or (ii) in the event bids from Qualified Bidders (each, a "Qualified Bid") are received resulting in an Auction with overbids. The estimates may be lower based on higher than estimated amounts owing on claims senior to general unsecured claims. These estimates do not include amounts realized by the Company from the liquidation of the Debtor's stock in its wholly-owned subsidiary in Armenia or recoveries on potential avoidance actions;

---

such attorneys' fees, which amount to approximately $38,000. Prior to the Sale Hearing, ARINC will file a statement which sets forth the actual amount of the DIP Financing to be repaid as well as the accrued attorneys' fees and costs related thereto.

1 however it is premature to estimate the potential range of recoveries on such matters.

2      37.    Distributions on account of allowed claims will occur either through a plan of

3 liquidation or by a trustee if the Debtor converts the case to Chapter 7. Additional expenses of

4 administration will be incurred under both of these options which are currently unknown. The

5 Debtor's current estimate is that the remaining general unsecured claims following the Closing (i.e.,

6 the liabilities not assumed by ARINC) will be approximately $1.6 million.

7      38.    Pursuant to this Sale Motion, the Debtor requests authority to pay from the proceeds

8 of the Sale the following: (a) the cure amounts owing by the Debtor pursuant to the Assumption

9 Motion or as ordered by the Bankruptcy Court (currently estimated at $28,772); (b) the Expense

10 Reimbursement (defined below) owing to ARINC, if applicable (i.e., if the Debtor sells the

11 Purchased Assets to someone other than ARINC); (c) the amount owing to ARINC on the Loan

12 Agreement;[13] and (d) the amount owing to ARINC on the ARINC Pre-Petition Loan.

13      **Communications with Creditors and Shareholders**

14      39.    Prior to the Petition Date, the Company had communications with its major

15 shareholders by phone, email and in-person meetings. The primary means of communication was

16 through board meetings and associated minutes as certain shareholders had a representative on the

17 board (either a board member or an observer) or they received periodic updates through an advisor

18 who was provided updates. Following the filing of the bankruptcy case, the Company had telephone

19 conversations with certain critical vendors regarding ARINC's commitment to assume the liability to

20 such vendors and the Company's intent to provide for such vendors for post-petition payables via the

21 DIP Facility.

22      40.    Following the entry of the Bidding Procedures Order, the Debtor disseminated a press

23 release regarding the proposed Sale to ARINC and the opportunity for overbid.

24      **Closing Conditions**

25      41.    The conditions precedent to the Closing by the Buyer are summarized above at

26

27     [13]   The amount claimed owing by ARINC on the Loan Agreement and the ARINC Pre-Petition Loan is subject to review by the Debtor with any disputed amounts to be determined by the Court. If any amount is in

28 dispute, the Debtor will pay only the undisputed portion but shall reserve sufficient funds to pay the disputed portion pending resolution between the Debtor and ARINC or order of this Court.

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 19 of 30

1  Paragraph 14 and are set forth at Section 2.06 of the Purchase Agreement.  The Buyer may waive

2  any closing condition of the Purchase Agreement in its sole discretion.

3                                    IV.      **ARGUMENT**

4      A.      **The Sale Should Be Approved as Fair, Reasonable and in the Best Interest of
               Creditors and the Bankruptcy Estate.**

5

6          42.      Bankruptcy Code Section 363(b) and Rule 6004 of the Federal Rules of Bankruptcy

7  Procedure ("Fed. R. Bankr. P.") authorize a debtor to sell assets of the estate other than in the

8  ordinary course of business, after notice and a hearing.  See, e.g., Otto Preminger Films, Ltd. v.

9  Qintex Entertainment, Inc.(In re Qintex Entertainment, Inc.), 950 F.2d 1492, 1495 (9th Cir. 1991).  In

10 accordance with Fed. R. Bankr. P. 6004(f)(1), sales of property outside of the ordinary course of

11 business may be by private sale or public auction.  See Fed. R. Bankr. P. 6004(f)(1).  One of the

12 most obvious business justifications in any sale of estate assets is the ultimate purpose of obtaining

13 the highest price for the property sold.  In re Wilde Horse Enterprises, Inc., 136 B.R. 830, 841

14 (Bankr. C.D. Cal. 1991).  "In approving any sale outside the ordinary course of business, the court

15 must not only articulate a sufficient business reason for the sale, it must further find it is in the best

16 interest of the estate, i.e., it is fair and reasonable, that it has been given adequate marketing, that it

17 has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and

18 that it is an 'arms-length' transaction." Id.  Here, the Debtor believes that its ability to select the

19 highest and best bidder at a Court-supervised auction enhances and benefits the marketing process

20 by providing a motivation for bidders to submit a Qualified Bid with a high market value.

21         43.      Although Section 363(b) does not provide an express standard for determining

22 whether a court should approve a particular proposed sale, courts have examined (i) whether the

23 proposed transaction has a valid business justification or good business reason, (ii) whether the sale

24 is the result of good faith negotiations, and (iii) whether the proposed purchase price is fair and

25 reasonable. See, e.g., In re Abbotts Dairies, 788 F.2d 143, 1146, 149-50 (3rd Cir. 1986); 240 North

26 Brand Partners, Ltd. v. Colony GFP Partners, L.P. (In re 240 North Brand Partners, Ltd.), 200 B.R.

27 653, 659 (9th Cir. B.A.P. 1996); 3 Collier on Bankruptcy ¶ 363.02[1][f] (15th ed. rev. 2009)

28 ("[C]ourts generally apply standards that, although stated variously [sic] ways, represent essentially

1    a business judgment test.").  All three of these factors are satisfied in this case.

2            i)     **There Is a Valid Business Justification and Good Business Reason to Support the Sale.**

3

4      44.     The Ninth Circuit Bankruptcy Appellate Panel in <u>Walter v. Sunwest Bank (In re</u>

5 <u>Walter)</u>, 83 B.R. 14, 15-16 (9th Cir. B.A.P. 1988) applied a flexible, case-by-case test to determine

6 whether a sound business purpose justifies a proposed sale under Section 363(b).  Adopting the

7 reasoning of the Fifth Circuit in <u>Institutional Creditors of Continental Air Lines, Inc. v. Continental</u>

8 <u>Air Lines, Inc. (In re Continental Air Lines, Inc.)</u>, 780 F.2d 1223, 1226 (5th Cir. 1986) and the

9 Second Circuit in <u>In re Lionel Corp.</u>, 722 F.2d at 1071, the Panel noted that whether a proffered

10 justification is sufficient will depend on the specifics of the case.  The Court should consider all

11 salient factors pertaining to the case and act to further the diverse interests of the debtor and creditors

12 alike.  <u>Id</u>.

13      45.     The facts pertaining to this Sale amply justify and substantiate the Debtor's business

14 judgment that the proposed Sale is in the best interest of its creditors and the Bankruptcy Estate.  As

15 set forth in the Shepard Declaration, the Company explored a number of strategic alternatives and

16 made numerous and arduous attempts to obtain financing prior to the filing of the case.  Based on the

17 extensive marketing of the Company over the past months and its financial condition, the Debtor

18 does not believe that additional time will yield any additional bids than may be presented pursuant to

19 the Bid Procedures.

20      46.     The Company's financial situation also requires that the Sale close as soon as

21 possible.  The Debtor cannot continue to operate for an extended period of time, even with the DIP

22 Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially

23 reducing the net cash to be received at the closing of the Sale (due to the depletion of the DIP

24 Facility) and the return to creditors.  As already noted, the Debtor anticipates that it will exhaust the

25 DIP Financing by the third week of May 2010.  The Company may lose both the ability to preserve

26 its intellectual property and the ability to retain its employees whose services are essential to the

27 Company but who may pursue alternative employment opportunities, thereby diminishing the

28 Company's value.

47.     The Sale allows the Estate to realize a going concern value for the Purchased Assets without risk of future reduction in value and is anticipated to provide employment to many of the Debtor's employees and relieve the Debtor of certain liabilities, including those under the Assumed Contracts, following the Closing.  Moreover, the disposition of the Purchased Assets as proposed herein, with the submission of a stalking horse bid and the implementation of a Court-approved Auction and Bid Procedures, affords additional assurance that the highest and best price will be realized for the Purchased Assets.  Notice of the proposed Sale has been provided to all persons the Debtor believes may have an interest in the Purchased Assets.  The Debtor believes that notice to such parties will encourage overbids for the Purchased Assets

48.     The courts have long recognized that where a sale is made in good faith and upon a reasonable basis – as the proposed sale is here – "[t]he court will not entertain objections to a trustee's [debtor in possession's] conduct of the estate."  In re Curlew Valley Assocs., 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); *see also* In re Southern Biotech, Inc., 37 B.R. 318, 322-23 (Bankr. M.D. Fla. 1983).  This is because it is the "Trustee [debtor in possession], not the Court, [that] is selling [the] property."  In re Gulf States Steel, Inc. of Ala., 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002).  In accordance with Walter and the foregoing cases, the Debtor submits that there is valid business justification and good business reason for the proposed Sale of the Purchased Assets on the terms contained in the Purchase Agreement and in the manner provided in the Bidding Procedures Order.  As such, the Debtor believes the Court should approve the Sale and allow it to move forward expeditiously.

ii)     **The Proposed Sale Is in Good Faith and ARINC or the Successful Overbidder Should Be Afforded the Protections of 11 U.S.C. § 363(m)**

49.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

50.     Although the Bankruptcy Code does not define "good faith," courts have found that the good faith requirement focuses principally on the disclosure of all material sale terms and

absence of fraud or collusion between bidders. *See, e.g.*, In re Abbotts Dairies, 788 F.2d at 147-48; *see also*, In re Apex Oil Co., 92 B.R. 847, 869-71 (Bankr. E.D. Mo. 1988). It is typically only "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that leads to a determination that a sale proceeding lacks good faith. T.C. Investors v. Joseph (In re M Capital Corp.), 290 B.R. 743, 748 n.3 (9th Cir. B.A.P. 2003) (*quoting* Community Thrift & Loan v. Suchy (In re Suchy), 786 F.2d 900, 902 (9th Cir. 1985)).

51. While the Ninth Circuit does not require a finding of good faith be made by the Court at the time of the Sale,[14] it is clear under the circumstances of this case that the Sale of the Debtor's assets to ARINC or a competing bidder as contemplated by the Purchase Agreement is proposed in good faith. As supported by the Shepard Declaration, the Debtor and ARINC have at all times acted in good faith. The Purchase Agreement was negotiated between the Debtor and ARINC at arms-length without collusion or fraud of any kind. The Purchase Price contemplated by the Purchase Agreement was not limited or controlled by an agreement among potential bidders at the Sale.

52. While ARINC and the Debtor have maintained a business relationship, that relationship is limited strictly to one between customer and vendor. Given the complexity and specialized nature of the Debtor's business, this relationship merely led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets. ARINC is not an "insider" or "affiliate" of the Debtor (as such terms are defined in the Bankruptcy Code). No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa. While ARINC may retain some of the Debtor's key employees, including insiders, this will only occur if the Sale is consummated to ARINC. Other than the customer-vendor relationship, the Purchase Agreement and Loan Agreement, there is no material relationship between the Debtor and ARINC.

53. The Purchase Agreement specifically provides for overbids at the Sale Hearing. The proposed Sale to ARINC is nothing more than a public auction. Finally, full disclosure of the terms of the proposed Sale transaction has been afforded to creditors and potential bidders pursuant to the notice on the Sale (the "Sale Notice") filed and served by the Debtor on April 2, 2010, which

---

[14] *See* Thomas v. Namba (In re Thomas), 287 B.R. 782, 785 (9th Cir. B.A.P. 2002) ("[T]he Ninth Circuit does not require that a finding of 'good faith' be made at the time of sale." (internal citations omitted).

1 describes the material terms of the proposed Sale, the Purchase Agreement and the Bid Procedures.[15]

2     54.    Prospective bidders will be required to provide evidence in support of a finding of

3 good faith with a showing to include those matters set forth at item 5 of the Court's promulgated

4 GUIDELINES RE SALE ORDERS. The Bid Procedures also set forth the evidence required by Qualified

5 Bidders for a good faith finding.

6     55.    Based on the foregoing, the Buyer should be deemed a good faith purchaser within

7 the meaning of Section 363(m).

8         iii)    **The Purchase Price Is Fair and Reasonable.**

9     56.    An auction sale is generally considered to be "[s]ufficient to establish that one has

10 paid 'value' for the assets of a bankruptcy." *See* <u>In re Abbotts Dairies,</u> 788 F.2d at 149. In other

11 words, the mere fact that other parties can come forward to bid at an auction that has been noticed

12 can satisfy the fair and reasonable price requirement of a Section 363 sale.

13     57.    The Debtor believes that the Sale will result in the highest purchase price for the

14 assets being sold. The Company's assets have been marketed both prior to the Petition Date and

15 during the bankruptcy case. The Debtor has provided notice of the Sale to all known potential

16 bidders, thereby maximizing the possibility that competing bidders will come forward to pay a

17 higher cash price for the Purchased Assets than offered by ARINC in the Purchase Agreement. In

18 essence, ARINC has set the floor for the bidding at the Auction. As reasoned by the Ninth Circuit in

19 <u>Arnold & Baker Farms</u>, the precise value of the Purchased Assets being sold in this instance will

20 only be recognized at – and as a result of – the Sale of the Purchased Assets. <u>Arnold & Baker Farms</u>

21 <u>v. United States</u>, 85 F.3d 1415, 1421 (9th Cir. 1996) ("Because each parcel of real property is

22 unique, the precise value of land is difficult, if not impossible, to determine until it is actually

23 sold.").

24     58.    Finally, courts have recognized that a debtor is entitled to "'great judicial deference'

25 in deciding which bid to accept as the best and highest bid." <u>Gulf States Steel</u>, 285 B.R. at 516

26 (citation omitted). Here, too, the Debtor is entitled to deference in determining not only the manner

27

28        [15] A copy of the Bidding Procedures Order, providing the full Bid Procedures, was included with the mailing of the Sale Notice.

in which the assets are to be sold, but how the value of those assets is to be maximized. Based on the history of the Company and circumstances of this case, the Debtor believes that ARINC's offer (subject to overbid at the Sale Hearing) satisfies the requirement that the price paid for the Purchased Assets be fair and reasonable.

**B.**   **The Bid Procedures Established by the Court Will Encourage Meaningful Overbids on the Purchased Assets.**

59.   **Overbid Procedures.**   As an inducement to ARINC to agree to enter into the Purchase Agreement on the terms set forth therein and subject to third party diligence and bidding, and in order that the Sale process will not be delayed by last-minute offers, the Debtor previously requested that the Court establish certain bid procedures concerning bids by other prospective buyers. A hearing was held on April 1, 2010 on the Debtor's motion to establish these procedures, resulting in the Court's entry of the Bidding Procedures Order. The Bid Procedures will apply to any person wishing to present a competing bid with respect to the Purchased Assets.

60.   **Expense Reimbursement.**   As set forth in the Bidding Procedures Order, in the event that ARINC is not the winning bidder at the Auction, then it shall be entitled to a reimbursement (the "Expense Reimbursement") for its actual and reasonable costs and expenses, not to exceed $150,000, including fees to professionals, incurred in connection with the Purchase Agreement and the Transactions (as defined in the Purchase Agreement). Pursuant to the declaration filed on behalf of ARINC in connection with the hearing to approve the Bid Procedures, as of March 31, 2010, ARINC had incurred $180,000 in out of pocket costs.

61.   The Expense Reimbursement is payable to ARINC upon the occurrence of the following: (a) entry of a final order approving the sale of the Purchased Assets to another bidder; (b) close of a sale to another bidder; and (c) approval by the Court pursuant to the procedures established in the Bidding Procedures Order.

62.   In the event ARINC is entitled to the Expense Reimbursement, it will constitute an allowed administrative expense of the Debtor's Bankruptcy Estate pursuant to section 503(b)(1)(A) of the Bankruptcy Code and entitled to the priority set forth in section 507(a)(2) of the Bankruptcy Code. No other bidder shall be entitled to any expense reimbursement, break-up fee, termination or

similar fee or payment.

    C.    **The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, Encumbrances, and Other Interests**

    63.    Pursuant to Bankruptcy Code Section 363(f), the Sale of the Purchased Assets will be free and clear of all liens, claims, encumbrances and other interests. Any such liens, claims, encumbrances and interests not satisfied prior to or currently with the Closing shall attach to the portion of the Debtor's proceeds from the Sale allocable to the property which was subject to the lien, claim, encumbrance or interest in the same priority, validity and extent as such lien, claim or interest has at the time of the Closing.

    64.    Pursuant to a recent search of the public records of the California and Delaware Secretary of State offices through March 18, 2010, the following is a summary of all filings against the Debtor:

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Agility Investments Holdings, LLC | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Agnes C. Kim | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Susan Y. Kim Trust | March 12, 2010 | All assets of the Debtor |
| David D. Kim Trust | March 12, 2010 | All assets of the Debtor |
| John T. Kim Trust 12/31/87 | March 12, 2010 | All assets of the Debtor |
| ARINC Incorporated | March 19, 2010 | All assets of the Debtor |
| Dell Financial Services | February 27, 2008 | Equipment Lease assets |

    65.    James J. Kim, Agnes C. Kim, Susan Y. Kim Trust, David D. Kim Trust, and John T. Kim Trust 12/31/87 (i.e., the Kims, as defined above) filed their liens just prior to the Petition Date. Similarly, Agility Investment Holdings, LLC[16] filed its lien just prior to the Petition Date. As

_____

[16]   Agility Investment Holdings is a related entity and collateral agent to Agility and the Kims and is hereafter referred to collectively with Agility, as "Agility."

Case 10-53056 Doc# 57 Filed: 04/13/10 Entered: 04/13/10 16:38:42 Page 26 of 30
MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS

discussed above, the liens of both the Kims and Agility purport to perfect security interests in the Debtor's assets on account of loans made to the Company in June 2009. The Debtor believes these liens are avoidable under Bankruptcy Code § 547(b) as they were filed within ninety (90) days of the Petition Date. If these liens are not released by the Sale Hearing, the Debtor will request consent from the Kims and Agility to the Sale (which will allow the Sale to occur pursuant to Section 363(f)(2)).[17] Alternatively, the Debtor may sell free and clear of these liens pursuant to Section 363(f)(4) (interest in bona fide dispute).

66. Dell Financial Services ("<u>Dell</u>") filed a UCC-1 Financing Statement based on its equipment lease (the "<u>Dell Lease Agreement</u>") of specific equipment to the Debtor. The equipment subject to the Dell Lease Agreement is included in the Purchased Assets of the Sale. To the extent the Dell Lease Agreement is a true lease for equipment between the Debtor and Dell, it may be assumed and assigned to the Buyer. The Assumption Motion designates the Dell equipment lease as an Assumed Contract that ARINC has identified to be assumed and assigned as part of the Sale. It is contemplated that Dell will support the assignment to the Buyer. To the extent the Dell Lease Agreement constitutes a conditional sales contract, the Debtor intends to sell free and clear of the underlying equipment lien. The Debtor anticipates that Dell will consent to the Sale with its lien attaching to proceeds in the same priority, validity and extent as it has at the time of the Closing (allowing the Sale to occur pursuant to section 363(f)(2)).

67. With respect to the ARINC Pre-Petition Lien, the Debtor may sell free and clear of such lien pursuant to section 363(f)(2) because ARINC will consent to the Sale. ARINC's Pre-Petition Lien shall attach to the proceeds of the Sale at Closing in the same priority, validity and extent as it has at the time of the Closing.

68. As discussed above, the Debtor has borrowed funds from ARINC pursuant to the DIP Facility. ARINC was granted a senior security interest in the Debtor's assets and a super-priority

---

[17] As set forth in the INTERIM ORDER APPROVING AGREEMENT TO PROVIDE POST-PETITION FINANCING, FOR ADEQUATE PROTECTION SECURED BY LIEN ON PROPERTY OF THE ESTATE UNDER SECTION 364 AND FOR MODIFICATION OF AUTOMATIC STAY (the "<u>Interim DIP Financing Order</u>") entered by the Court on April 2, 2010 in connection with the Debtor's request for approval of the DIP Financing, Agility agreed to subordinate its liens to the lien securing advances made by ARINC under the DIP Facility and the superpriority administrative claim under Bankruptcy Code § 364(c)(1) granted to ARINC under the terms of the Interim DIP Financing Order. The final hearing on the Debtor's request for approval of the DIP Financing is scheduled for April 16, 2010.

administrative expense claim under section 364(c)(1) of the Bankruptcy Code. By its first day

motion, the Debtor requests authority to borrow up to $1.2 million under the DIP Facility. The final

hearing on the motion is scheduled for April 16, 2010. The amount owing under the DIP Facility

will be credited against the Purchase Price if ARINC is the successful purchaser, or paid from the

proceeds of the Sale at the Closing if ARINC is not the successful purchaser.

69.     In addition to the above persons asserting a lien, claim or interest, the Debtor requests

by this Sale Motion that the Court approve the Sale free and clear of all persons scheduled by the

Debtor or who have filed a Proof of Claim or Request for Notice in this case. Since the claims bar

date has not yet run, the Debtor does not know who may assert a lien, claim or interest with respect

to the Purchased Assets. The Debtor has caused notice to be provided to all persons who were

scheduled by the Debtor or who have filed a Proof of Claim, among others. The Sale Notice

specified that such relief would be requested. To the extent any person not listed herein asserts that

it has a lien, claim or interest in or to the Purchased Assets, such lien, claim or interest is in bona fide

dispute, and the Sale may occur pursuant to section 363(f)(4).

### D.     Accurate and Reasonable Notice Has Been Provided.

70.     In accordance with the Bidding Procedures Order, on April 6, 2010, the Debtor

caused both the Sale Notice (including the Bidding Procedures Order) and the notice on the

Assumption Motion (including a schedule setting forth the cure amounts as determined by the

Debtor) (the "Assumption Notice"), to be served on the following by first class mail or Federal

Express:[18] all known creditors, all non-Debtor parties to the Assumed Contracts, the Office of the

United States Trustee (the "UST"), counsel for ARINC, all parties (the "Interested Bidders")

identified by the Debtor as a potentially interested competing bidder, and all persons who have filed

requests for Special Notice in this case.

71.     The Sale Notice sets forth a summary of the Bid Procedures and the terms of the

Purchase Agreement and directs individuals to Debtor's counsel for additional information. The

Assumption Notice provides the other parties to contracts with the proposed "cure" amounts, the

---

[18]   The Debtor caused those persons with international addresses to be served via Federal Express or Express Mail (for P.O. Boxes) to ensure timely delivery. All other persons were served via first class mail.

DAK
simpkp-2-s3055.mot

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 28 of
30

24   MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND
CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS

1  date by which objections to the proposed assumption and assignment of their contracts must be filed

2  and the consequences of the failure to file an objection.

3      72.     Evidence of service of all Sale-related pleadings in accordance with the Court's

4  Bidding Procedures Order will be filed in advance of the Sale Hearing to demonstrate that all

5  creditors and other parties-in-interest were afforded proper notice.

6      E.     **Waiver of Federal Rule of Bankruptcy Procedure 6004(h)**

7      73.     As a final matter, the Debtor requests that the stay imposed by Federal Rule of

8  Bankruptcy Procedure 6004(h) upon orders authorizing the use, sale or lease of property, be waived

9  under the circumstances of these cases.  It is in the interest of the Debtor's creditors and Estate that

10  the Sale be consummated as quickly as possible without any stay pending appeal in light of Debtor's

11  financial condition.  A delay of the Closing of the Sale may severely hinder the Debtor's operations

12  and reduce its value to the detriment of the Estate.  On the other hand, expedited consummation of

13  the Sale will preserve the maximum going concern value for the Purchased Assets and will

14  substantially reduce the Debtor's ongoing operational costs to the benefit of the Estate.

15      74.     The Debtor has noticed the hearing on this Sale Motion to all of its creditors and other

16  parties-in-interest, and therefore any person having any objection to the Sale Motion has been

17  afforded a reasonable opportunity to voice any objections or concerns.  Accordingly, the Debtor is

18  aware of no prejudice that would be caused by the Court's waiver of Federal Rule of Bankruptcy

19  Procedure 6004(h).

20      **WHEREFORE**, the Debtor respectfully requests that the Court enter its order as follows:

21      1.     Subject to any limitations or modifications contained in the Court's order, without

22  need for any further Court order, (a) granting the Sale Motion and approving the Purchase

23  Agreement and the transactions contemplated thereby; (b) authorizing the Debtor to execute the

24  Purchase Agreement and to consummate and carry out the transactions described in this Sale Motion

25  and the Purchase Agreement, and to undertake the obligations and other matters imposed, required

26  or provided for therein such that, among other things, the Debtor, subject thereto, may sell assets,

27  and grant or exchange releases as provided for in the Sale Motion or the Purchase Agreement or

28  required thereby;

Case 10-53056   Doc# 57   Filed: 04/13/10   Entered: 04/13/10 16:08:12   Page 29 of
30

2.      Under Section 363(f) and without further order of the Court, approving the Sale of the Purchased Assets to the Buyer free and clear of all liens, claims, encumbrances and interests, with any such liens, claims, encumbrances or interests not satisfied prior to or concurrently with the Closing attaching to the portion of the Debtor's proceeds of the Sale allocable to the property which was subject to the particular encumbrance in the same order and priority as such lien, claim, encumbrance or interest had as of the Closing;

3.      Determining that the Buyer is a good faith purchaser of the Debtor's Purchased Assets such that 11 U.S.C. § 363(m) will be applicable in the event of a Closing;

4.      Determining that Buyer is not a successor to the Company or otherwise liable for any of the Excluded Liabilities (as defined in the Purchase Agreement) or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, clause of action or Encumbrance against Buyer or the Purchased Assets related thereto;

5.      Finding that the Purchase Price (as may be increased in the event of an Auction) represents the highest and best offer received for the Purchased Assets;

6.      Finding that the Sale is in the best interests of Debtor's estate and creditors;

7.      Waiving the stay imposed by Federal Rule of Bankruptcy Procedure 6004(h) and authorizing the parties to hold the Closing immediately;

8.      Retaining jurisdiction for, among other things, the purpose of enforcing the provisions of the Order on this Sale Motion, including, without limitation, compelling delivery of the Purchased Assets to Buyer and protecting Buyer against any Encumbrances against Debtor or the Purchased Assets; and

9.      For such other and further relief as the Court deems appropriate.

Dated:  April 13, 2010                    **MURRAY & MURRAY**
                                          A Professional Corporation


                                          By: */s/ Doris A. Kaelin*
                                              Doris A. Kaelin
                                              Attorneys for Debtor

DAK
...simple...t...53056...mot Doc...
Case: 10-53056    Doc# 57    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 30 of
30
26    MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND
CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES AND OTHER
INTERESTS