STEPHEN T. O'NEILL (115132)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: soneill@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT
# NORTHERN DISTRICT OF CALIFORNIA
# SAN JOSE DIVISION

| | |
|---|---|
| In re:<br><br>**IMPEVA LABS, INC.,**<br><br>Debtor.<br><br>2570 West El Camino Real, Suite 100<br>Mountain View, California 94040<br><br>Employer Tax I.D. No.: 20-2084435 | Case No. 10-53056-ASW-11<br><br>Chapter 11<br><br>Date: May 4, 2010<br>Time: 10:00 a.m.<br>Place: United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA 95113<br>Judge: Honorable Arthur S. Weissbrodt |

**DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS**

I, Randall L. Shepard, declare:

1. I am the Chief Executive Officer of Impeva Labs, Inc., the debtor and debtor in possession in the above-captioned bankruptcy case (the "Company" or the "Debtor") and am authorized to make this Declaration on its behalf. I have personal knowledge of the matters stated herein except as to those matters stated on information and belief, and as to those matters I am informed and believe them to be true. If called as a witness, I could and would testify competently

as to those facts.

2. This Declaration is filed in support of the MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS (the "Sale Motion").[1]

**Background**

3. The Company was incorporated in California on December 16, 2004. It is a leading supplier of global asset management optimization (tracking, monitoring and security) solutions that enable the most efficient transportation of goods by providing a Continuous Chain of Custody (C-3) Shipping System. The Company provides global monitoring of the security, condition and location of assets and intermodal shipping containers through the Company's Global Sentinel™ Units ("GSUs") and Device Management Center ("DMC"). The system can ensure continuous tracking and monitoring of customer assets, no matter where they are in the world. The Company's GSU incorporates a customizable suite of electronic sensors to monitor the assets' condition and location. It communicates seamlessly worldwide with the Company's DMC through multiple wireless technologies, providing immediate secure access via the Internet to data from the asset being tracked, monitored or managed. The DMC can also link to customer data centers through other options including standard XML over a secure network connection. If the asset experiences an abnormal event, the concerned customers and/or appropriate agencies can also be notified within minutes via SMS text messaging and email notification.

4. On March 19, 2010, the Company, as borrower, and ARINC as lender, entered into a pre-petition secured credit agreement (the "ARINC Pre-Petition Loan") in which ARINC agreed to lend the Debtor the principal amount of $100,000 to fund its Chapter 11 filing, including payment of a retainer to bankruptcy counsel. Soon thereafter, the Debtor and ARINC finalized the terms of the Purchase Agreement which sets forth the terms of the proposed Sale. A copy of the Purchase Agreement (excluding exhibits and schedules), in substantially the form to be executed, is attached as **Exhibit "A"** hereto and incorporated herein by reference.

5. In connection with the Purchase Agreement and the Sale, and pursuant to that certain

---

[1] Terms not separately defined herein shall have the meaning ascribed to them in the Sale Motion.

DAK
I:\ImpeVr\Plds\PSale\motdecShepard v5.docx

Case 10-53056    Doc# 57-1    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 2 of 14

2   DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

written SECURED SUPER-PRIORITY DEBTOR-IN-POSSESSION LOAN AGREEMENT (the "Loan Agreement"), the Debtor proposes to borrow up to $1.2 million (the "DIP Financing") in a DIP credit facility (the "DIP Facility") provided by ARINC to provide ongoing working capital to fund the Debtor's operations and Chapter 11 administrative expenses pending the Sale of certain of the Debtor's assets to the highest bidder pursuant to the Sale Motion. The Debtor anticipates that it will exhaust the DIP Financing by the third week of May 2010.

6. If the proposed Sale is not consummated quickly, the Company may lose both the ability to preserve its intellectual property and the ability to retain its employees whose services are essential to the Company but who may pursue alternative employment opportunities, thereby diminishing the Company's value.

7. Time is of the essence to close the Sale. The Debtor cannot continue to operate for an extended period of time, even with the DIP Financing, and it will burn through more cash and resources as the case proceeds, thereby potentially reducing the net cash to be received at the Closing (defined below) of the Sale (due to the depletion of the DIP Facility) and the return to creditors. The Debtor believes the acquisition opportunity has been well-marketed. The proposed Sale is also subject to overbid by Qualified Bidders (as discussed below) pursuant to Bid Procedures established by the Bankruptcy Court. The Debtor believes that an expedited sale process is necessary to realize the highest value for the Purchased Assets and that the Sale is in the best long-term interest of the Debtor's customers, partners, vendors and employees.

8. The Debtor believes that the Sale to ARINC is in the best interest of creditors in that it allows the Debtor's assets to be sold as a going concern, and the Bid Procedures established by the Court will allow other persons wishing to bid on the Company's assets the opportunity to do so.

**Sale Closing**

9. Pursuant to the Purchase Agreement, the closing (the "Closing") is to occur on the first business day after the satisfaction or waiver of the conditions to Closing set forth in the Purchase Agreement and discussed below. Additionally, certain employees are to accept employment with the Buyer (to become effective on the Closing Date). All specified employees

DAK
I:\mjc\Impeva Labs\PLSale\mot.dec.shepard.v5.docx

Case: 10-53056   Doc# 57-1   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 3 of 14

3   DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

have accepted employment with ARINC.

**Sale Contingencies**

10. The Closing is subject to certain closing deliverables and conditions, which may be waived by the Buyer. Specifically, at the Closing, as provided by the Purchase Agreement, the Debtor is required to deliver, or cause to be delivered: a Bill of Sale and Assignment Agreement; the Purchased Assets; a receipt for the Closing Day Cash Payment; Assignment Agreements for any and all patents, patent applications, registered and unregistered copyrights; and trademarks; copies of current business proposals; specified consents, waivers and approvals of third parties; a Closing Date Certification; and an agreement with Impeva Labs Closed Joint Stock Company to supply certain software engineering services.

**Alternatives to Sale and Auction; Marketing of Purchased Assets; Designation of Stalking Horse**

11. The Debtor's initial investors included industry investors as well as senior management of the Company through Convertible Notes that were later converted to Series A Preferred Shares of the Company. Following this initial investment, the Company gained other outside investors. The total Series A round was $2,055,418 and was closed in September 2005.

12. An internal (i.e., current investors were the major investors) Series A-1 Round closed in early 2006 and brought in $2,316,800. In 2006, the Company teamed with ARINC Engineering Services, LLC to serve as prime contractor with the Company as subcontractor, to compete for a 5-year, $20 million Department of Defense ("DOD") contract (the "NGWC Contract") to develop and deploy mesh net technology products. In July 2006, and after competing against several multi-national consortiums, ARINC, with the Debtor as subcontractor, was awarded the NGWC Contract. By mid-2007, the first tranche of a planned three tranches of Series B financing was closed in the amount of $7 million with Agility Logistics ("Agility") as the major investor.

13. In 2008, the Company successfully started deployments with both commercial and DOD customers. Deployments also started with a major investor (Agility) monitoring trucks and trailers. The Company was able to successfully complete evaluation by a multi-national contractor

Case: 10-53056  Doc# 57-1  Filed: 04/13/10  Entered: 04/13/10 16:08:42  Page 4 of 14

DAK
\Impeva Labs\PSale\mot.dec.Shepard v5.docx

4

DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

on tracking and monitoring strategic assets such as jet engines. The Company successfully demonstrated its mesh net technology by producing 200 newly designed and manufactured devices enabled by the mesh technology ahead of schedule. In addition, the second and third tranches of Round B financing were completed in the second half of 2008 to provide the needed funds on a timely basis with Agility investing an additional $2 million while two other major investors invested an aggregate $1 million. Even before the end of 2008, the Company had begun to identify and negotiate the next round of financing for the total amount of $6 million for receipt in 2009 to start scaling the company, increase sales and to fund further research and development of new products.

14. The Company was also in talks concerning potential mergers and acquisition with multinational companies and had significant discussions at the CEO and executive level with one candidate. After multiple such discussions, the Company believed that a M&A transaction was a real possibility. In early 2009, the candidate informed the Company that it was unable to get approval from its major investor due to its economic condition and its own efforts to complete an initial public offering. However, the candidate informed the Company that its Board and investor group was very interested in investing $3 million in the Company. The Company then began to look for other investors for the remaining $3 million the Company anticipated it would need to continue with its business plan and complete the $6 million financing that was necessary to bring the Company into a cash positive state.

15. By late February 2009, contrary to expectations of the Company, the candidate announced that it would not participate in investing into the Company. This unanticipated news caused the Company to accelerate its efforts at obtaining the requisite financing. It offered convertible notes to current investors, two of which, Agility and James J. Kim and related persons and entities (the "<u>Kims</u>"), agreed to invest under provisions that included discount on the conversion valuations and a ceiling. The Debtor and the Kims also entered into a convertible promissory note that purported to grant Agility and the Kims security interests in the Company's assets. These transactions closed in June of 2009 with Agility contributing $631,507 and the Kims contributing $231,165 on June 11, 2009. I am informed and believe and on that basis allege that neither the Kims nor Agility perfected any security interest in the Company's assets until almost a year later when

DAK
L:\Impev\r Labs\PLS\dec_mot_dec_shepard v5.docx

Case 10-53056    Doc# 57-1    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 5 of 14

5    DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR FOR ORDER THAT ASSET IS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

they filed UCC-1 Financing Statements on March 12, 2010.

16. In June 2009, the Company successfully demonstrated the full capabilities of the mesh net technology by continuously tracking DOD vehicles and cargo from origination, through ship transport and beach landing during a high-fidelity Navy-Army exercise called JLOTS (Joint Logistics Over-the-Shore). JLOTS attracted the attention of the DOD senior officials that opened major opportunities for the Company. The Company continued with its efforts to find new investment and established contact with a Kuwaiti based company as a potential investor as well as a potential major customer. Negotiations and drafting of the final documents concerning a $6 million investment by this entity in the Company were agreed upon, and the Company signed and returned the documents for counter-signing by late November 2009. In the beginning of December 2009, the Company received an unexpected Formal Suspension Notice from the Defense Logistics Agency ("DLA") notifying the Company that it was being placed on a suspension list and could do no further work with the DOD until cleared. The DLA had placed Agility on the suspension list with the DOD and concluded that the Company was an affiliate of Agility subject to the same suspension list. As a result, the Company notified the potential investor, and the execution of the investment documents was stalled.

17. The suspension was extremely detrimental to the Company's business. The Company was not allowed to receive any new DOD contracts or even new task orders under the NGWC Contract. Company management worked diligently, and due to lack of funds, without legal representation, to release the suspension. Finally, through major efforts, Agility gave up their two Board seats and voluntarily converted their Preferred stock (the majority of these stocks) to non-voting. Agility agreed to the removal of all blocking and control terms from all the investment documents with the Company. Thereafter, DLA released the Company from the suspension on December 31, 2009.

18. Negotiations with the potential investor were resumed; however, this time, the potential investor decided to reduce its investment substantially from $6 million to $1 million during 2010, and, aside from an initial $500,000 investment through a convertible note which was received by the Company on February 16, 2010, the potential investor required that any additional investment

Case 10-53056    Doc# 57-1    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 6 of 14

6    DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

be staged and be contingent upon further due diligence. In parallel with this development, the Company increased its efforts to locate a strategic investor or merger and acquisition candidate, speaking with approximately 12 entities, including both public multinationals and private entities in commercial and DOD-related fields. The Company signed an exclusive letter of intent with a major DOD contractor in late January 2010, which conducted due diligence on the Debtor. However, on February 11, 2010 this contractor informed the Company that it had decided to forgo the opportunity.

19. The Company continued to investigate strategic alternatives and contacted ARINC, which had previously expressed interest and conducted due diligence on the Company in 2008, to ascertain the level of its interest. Following multiple discussions, ARINC presented a Letter of Intent (the "LOI") to the Company setting forth the outline of the Sale of the Purchased Assets which was accepted by the Company's board and senior management on February 24, 2010. The LOI provided for a 45-day exclusivity period during which the Company could not discuss or enter into a sale, merger, or other business combination with any other party, with the proposed Sale to be made in the context of a Chapter 11 case. ARINC provided the Company with a $100,000 advance against work it performed under the NGWC Contract immediately upon the execution of the LOI which, together with the remaining proceeds from February 16, 2010 convertible note, allowed the Company to make its February payroll.

20. As discussed above, ARINC agreed to provide the DIP Facility pursuant to the Loan Agreement. The Debtor covenanted under the Loan Agreement to seek entry of a final order approving the Bid Procedures and identifying ARINC as the stalking horse bidder. The Bidding Procedures Order approves ARINC as the stalking horse bidder.

21. Subsequent to the Petition Date, the Company has had discussions with potentially interested bidders and responded to requests for information. Following entry of the Bidding Procedures Order, the Company emailed a list of over 40 potentially interested persons of the opportunity. A press release was also generated following entry of the Bidding Procedures Order regarding the proposed sale to ARINC and the opportunity for overbid.

22. On April 8, 2010, the Company held a non-proprietary webinar for potential bidders

to provide non-proprietary information about the business. For those persons who had executed NDAs, a proprietary webinar was held on Monday, April 12, 2010. A number of potentially interested parties have participated and due diligence continues as of the date of this Sale Motion.

**Asset Valuation**

23. The Debtor has not had a formal valuation prepared of the Company. As of March 26, 2010, the book value of the Company's total assets was $1,308,120. The book value of the Company's liabilities was $2,738,090 million based on U.S. GAAP.

**Debt Structure**

24. As noted above, ARINC provided a secured loan of $100,000 on March 19, 2010 and the DIP Financing pursuant to the Loan Agreement. Other than a lien on specific equipment of an equipment lessor, the Debtor presently has no other unavoidable secured debt.[2] Pursuant to the Debtor's "first day motions," the Court has authorized the Debtor to pay the priority amount of employee claims (i.e., up to $10,950 per employee). Also as noted above, ARINC has agreed to assume certain liabilities currently estimated at $718,923[3] which reduces the total claims against the Debtor. Following the Closing, the Debtor estimates that remaining general unsecured claims against the Company will be approximately $1.6 million.

**Relationship to Buyer/Post-Sale Relationship with ARINC**

25. While ARINC and the Debtor have maintained a business relationship, that relationship has historically been limited strictly to one between customer and vendor. As noted above, just prior to the filing of this bankruptcy case, ARINC provided the ARINC Pre-Petition Loan to the Company, on a secured basis, and therefore ARINC is also a creditor of the Debtor. Given the complexity and specialized nature of the Debtor's business, the existing business relationship merely led the Debtor to ARINC as one logical, potential purchaser of the Purchased Assets. No director or officer of the Debtor is or was a director or officer of ARINC or vice-versa. While ARINC may retain some of the Debtor's key employees, including insiders, this will only

---

[2] In addition to the ARINC Pre-Petition Lien, two UCC-1 financing statements were filed with the Secretary of State prior to the Petition Date. The Debtor is informed and believes such liens are avoidable under the Bankruptcy Code.

[3] As noted in the Sale Motion, this number may change between now and the bid deadline.

Case: 10-53056 Doc# 57-1 Filed: 04/13/10 Entered: 04/13/10 16:08:42 Page 8 of 14

DAK
\\Imper-Dms\PSdc\mot.dec.sheppard.v5.docx

8  DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

occur if the Sale is consummated to ARINC (it is contemplated that other bidders may also require that certain key employees accept employment as a condition of the purchase). The insiders who it is contemplated will have a future relationship with ARINC are me (current CEO of the Company, anticipated to be hired as an employee by ARINC effective as of the Closing) and Anthony Moroyan (current Director and former officer of the Company, anticipated to be retained on a consulting basis by ARINC after Closing. Other than the customer-vendor relationship, the ARINC Pre-Petition Loan, the Purchase Agreement and the Loan Agreement, there is no material relationship between the Debtor and ARINC.

**Relationship with Secured Creditors**

26. Pursuant to a recent search of the public records of the California and Delaware Secretary of State offices through March 18, 2010 requested by Debtor's counsel, I am informed and on that basis believe that the following is a summary of all filings against the Debtor:

| NAME | DATE OF FILING | COLLATERAL COVERAGE |
|---|---|---|
| Agility Investments Holdings, LLC | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Agnes C. Kim | March 12, 2010 | All assets of the Debtor |
| James J. Kim | March 12, 2010 | All assets of the Debtor |
| Susan Y. Kim Trust | March 12, 2010 | All assets of the Debtor |
| David D. Kim Trust | March 12, 2010 | All assets of the Debtor |
| John T. Kim Trust 12/31/87 | March 12, 2010 | All assets of the Debtor |
| ARINC Incorporated | March 19, 2010 | All assets of the Debtor |
| Dell Financial Services | February 27, 2008 | Equipment Lease assets |

27. James J. Kim, Agnes C. Kim, Susan Y. Kim Trust, David D. Kim Trust, and John T. Kim Trust 12/31/87 (i.e., the Kims, as defined above) filed their liens just prior to the Petition Date. Similarly, Agility Investment Holdings, LLC[4] filed its lien just prior to the Petition Date. The Debtor is informed and believes these liens are avoidable under the Bankruptcy Code. If these liens

---

[4] Agility Investment Holdings is a related entity and collateral agent to Agility and the Kims and is hereafter referred to collectively with Agility, as "Agility."

Case: 10-53056   Doc# 57-1   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 9 of 14

DAK
C:\Impevr Lias\PISale\motdecShepard v5.docx

DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR FOR CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

9

are not released by the Sale Hearing, the Debtor will request consent from the Kims and Agility to the Sale.

28. Dell Financial Services ("<u>Dell</u>") filed a UCC-1 Financing Statement based on its equipment lease (the "<u>Dell Lease Agreement</u>") of specific equipment to the Debtor. The equipment subject to the Dell Lease Agreement is included in the Purchased Assets of the Sale. The Assumption Motion designates the Dell equipment lease as an Assumed Contract that ARINC has identified to be assumed and assigned as part of the Sale.

29. Upon the Closing, it is anticipated that ARINC will offer employment to certain employees of the Debtor including certain officers of the Debtor. ARINC's Pre-Petition Lien shall attach to the proceeds of the Sale at Closing in the same priority, validity and extent as it has at the time of the Closing.

30. As discussed above, the Debtor has borrowed funds from ARINC pursuant to the DIP Facility. ARINC was granted a senior security interest in the Debtor's assets and a super-priority administrative expense claim. By its first day motion, the Debtor requests authority to borrow up to $1.2 million under the DIP Facility. The amount owing under the DIP Facility will be credited against the Purchase Price if ARINC is the successful purchaser, or paid from the proceeds of the Sale at the Closing if ARINC is not the successful purchaser.

**Insider Compensation**

31. For the period March 26, 2010 through May 14, 2010 (by which date the Sale is anticipated to close), officers, directors, key employees and other insiders will continue to receive their salaries or other compensation as follows:

| Name | Title | Salary |
|---|---|---|
| Anthony Moroyan | Director | $27,840[5] |
| Rassam, George | CFO | $20,923 |
| Shepard, Randall | CEO | $26,808 |

32. Other key employees totaling 17, will receive an aggregate of $234,044 for the same period (i.e., March 26, 2010 through May 14, 2010).

---

[5] Amount listed is through April 30, 2010 for services to be provided on a contract basis.

### Estimated Distribution of Proceeds

33. Based on the Purchase Agreement with ARINC, the Debtor currently estimates net proceeds of the Sale of approximately $671,228 calculated as follows: $2,000,000 cash purchase price, less $1,200,000 of maximum DIP Financing, less any amounts that remain due on account of the Loan Agreement, including, but not limited to, the Facility Fee (as set forth in the Loan Agreement) and allowed costs and expenses pursuant to Section 5.15 of the Loan Agreement[6], less $28,772 in estimated cure amounts with respect to Assumed Contracts, less $100,000 payable to ARINC on the ARINC Pre-Petition Loan (with interest and other amounts that may be owing pursuant to the subject promissory note). The Purchase Agreement includes a 60-day period following the Closing during which ARINC may make a claim for indemnification (if any) under the Purchase Agreement, up to a maximum of $300,000. Certain covenants in the Purchase Agreement also survive the Closing and are not subject to the $300,000 cap. If any such claims are made and are determined to be valid claims, the cash realized from the Sale would be reduced accordingly.

34. Other than the outstanding fees and expenses owing to the professionals employed by the Debtor, the Debtor anticipates that all other administrative expenses will have been paid as of the Closing from the DIP Financing. Based on the Debtor's estimates, the Debtor believes unpaid professional fees owing as of the Closing (net of any retainers) will total approximately $100,000. The actual amount may be higher or lower based on the actual fees and expenses incurred by the Court-approved professionals as approved by the Bankruptcy Court. These amounts will be paid from the proceeds of the Sale upon approval of the requested fees and expenses by the Bankruptcy Court.

35. Based on the foregoing estimates, upon payment of valid secured claims and estimated administrative claims through the Closing (anticipated to occur shortly after the Sale Hearing), and assuming no claims for indemnity are made by ARINC, approximately $570,000 will remain of the Sale proceeds. The above estimates may be higher or lower depending on a number of

---

[6] Reasonable attorneys' fees and costs incurred by ARINC in connection with the DIP Financing are subject to the Debtor's review and will be included in the Purchase Price only upon the Debtor's satisfaction as to their reasonableness. Prior to the Sale Hearing, the Debtor is informed and believes that ARINC will file a statement which sets forth the actual amount of the DIP Financing to be repaid as well as the accrued attorneys' fees and costs related thereto.

DAK
Ampava-Labs-PO-Sale-mot dec-Shepard 57.docx

Case: 10-53056   Doc# 57-1   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 11 of 14

11   DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

factors: for example, the net cash received at Closing may be higher (i) based on revenues generated pending the Closing which may allow the Debtor to borrow less on the DIP Facility (and therefore more cash would be received at Closing) or (ii) in the event bids from Qualified Bidders (each, a "Qualified Bid") are received resulting in an Auction with overbids. The estimates may be lower based on higher than estimated amounts owing on claims senior to general unsecured claims. These estimates do not include amounts realized by the Company from the liquidation of the Debtor's stock in its wholly-owned subsidiary in Armenia or recoveries on potential avoidance actions; however it is premature to estimate the potential range of recoveries on such matters.

36. Distributions on account of allowed claims will occur either through a plan of liquidation or by a trustee if the Debtor converts the case to Chapter 7. Additional expenses of administration will be incurred under both of these options which are currently unknown. The Debtor's current estimate is that the remaining general unsecured claims following the Closing (i.e., the liabilities not assumed by ARINC) will be approximately $1.6 million.

**Communications with Creditors and Shareholders**

37. Prior to the Petition Date, the Company had communications with its major shareholders by phone, email and in-person meetings. The primary means of communication was through board meetings and associated minutes as certain shareholders had a representative on the board (either a board member or an observer) or they received periodic updates through an advisor who was provided updates. Following the filing of the bankruptcy case, the Company had telephone conversations with certain critical vendors regarding ARINC's commitment to assume the liability to such vendors and the Company's intent to provide for such vendors for post-petition payables via the DIP Facility.

38. Following the entry of the Bidding Procedures Order, the Debtor disseminated a press release regarding the proposed Sale to ARINC and the opportunity for overbid.

**Closing Conditions**

39. The conditions precedent to the Closing by the Buyer are summarized above at Paragraph 10 above and are set forth at Section 2.06 of the Purchase Agreement. I am informed that the Buyer may waive any closing condition of the Purchase Agreement in its sole discretion.

**Immediacy Of The Sale**

40. In the Debtor's business judgment, the proposed Sale is in the best interest of its creditors and the Bankruptcy Estate. The Company explored a number of strategic alternatives and made numerous and arduous attempts to obtain financing prior to the filing of the case. Based on the extensive marketing of the Company over the past months and its financial condition, the Debtor does not believe that additional time will yield any additional bids than may be presented pursuant to the Bid Procedures. The Company's financial situation also requires that the Sale close as soon as possible.

**The Purchase Price**

41. The Debtor is informed and believes that the Sale allows the Estate to realize a going concern value for the Purchased Assets without risk of future reduction in value and is anticipated to provide employment to many of the Debtor's employees and relieve the Debtor of certain liabilities, including those under the Assumed Contracts, following the Closing. Moreover, the disposition of the Purchased Assets as proposed herein, with the submission of a stalking horse bid and the implementation of a Court-approved Auction and Bid Procedures, affords additional assurance that the highest and best price will be realized for the Purchased Assets. Notice of the proposed Sale has been provided to all persons the Debtor believes may have an interest in the Purchased Assets. The Debtor believes that notice to such parties will encourage overbids for the Purchased Assets.

42. The Debtor is informed and believes that the Sale will result in the highest purchase price for the assets being sold. The Company's assets have been marketed both prior to the Petition Date and during the bankruptcy case.

43. Based on the history of the Company and circumstances of this case, the Debtor believes that Purchase Price represented by ARINC's offer (subject to overbid at the Sale Hearing) is fair and reasonable.

**Good Faith**

44. The relationship between the Debtor and ARINC is summarized at Paragraph 25 above. The Debtor and ARINC have at all times acted in good faith. The Purchase Agreement was negotiated between the Debtor and ARINC at arms-length without collusion or fraud of any kind.

DAK
Compvu Labs\Sale mot dec Shepard 57.docx

Case: 10-53056    Doc#: 57-1    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page: 13 of 14

13    DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .

The Purchase Price contemplated by the Purchase Agreement was not limited or controlled by an agreement among potential bidders at the Sale. ARINC is not an insider or affiliate of the Debtor.

I declare under penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct to the best of my knowledge, information and belief, and that this Declaration was executed on this 13th day of April, 2010.

*/s/ Randall L. Shepard*
Randall L. Shepard

Case: 10-53056  Doc# 57-1  Filed: 04/13/10  Entered: 04/13/10 16:08:42  Page 14 of 14

14  DECLARATION OF RANDALL L. SHEPARD IN SUPPORT OF MOTION BY DEBTOR TO SELL CERTAIN ASSETS FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND . . .