STEPHEN T. O'NEILL (115132)
DORIS A. KAELIN (162069)
THOMAS T. HWANG (218678)
MURRAY & MURRAY
A Professional Corporation
19400 Stevens Creek Blvd., Suite 200
Cupertino, CA 95014-2548
Telephone: (650) 852-9000; (408) 907-9200
Facsimile: (650) 852-9244
Email: soneill@murraylaw.com
Email: dkaelin@murraylaw.com
Email: thwang@murraylaw.com

Attorneys for Debtor

# UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN JOSE DIVISION

|  |  |
|---|---|
| In re:<br><br>**IMPEVA LABS, INC.,**<br><br>Debtor.<br><br>2570 West El Camino Real, Suite 100<br>Mountain View, California 94040<br><br>Employer Tax I.D. No.: 20-2084435 | Case No. 10-53056-ASW-11<br><br>Chapter 11<br><br>Date:  May 4, 2010<br>Time:  10:00 a.m.<br>Place:  United States Bankruptcy Court<br>280 S. First St., Room 3020<br>San Jose, CA  95113<br>Judge:  Honorable Arthur S. Weissbrodt |

### Exhibit "A"

### To

### Declaration Of Randall L. Shepard In Support Of Motion by Debtor to Sell Certain Assets Free And Clear Of Liens, Claims, Encumbrances And Other Interests

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 1 of 35

# ASSET PURCHASE AGREEMENT

This ASSET PURCHASE AGREEMENT (this "Agreement") is made and entered into as of _____, 2010 (the "Agreement Date"), by and among Impeva Labs, Inc., a California corporation ("Seller"), and ARINC Engineering Services, LLC, a Delaware limited liability company and ARINC Acquisition, LLC, a Delaware limited liability company (collectively, "Buyer"). Buyer and Seller are sometimes hereinafter referred to individually as a "Party" and collectively, as the "Parties."

## RECITALS

A.    Seller is engaged in the business of providing high technology systems and software solutions for asset tracking systems to commercial, aerospace and government customers (the "Business"), which Business is conducted primarily at 2570 West El Camino Real, Suite 100, Mountain View, California 94040-1309.

B.    Seller intends to seek relief under Chapter 11 of Title 11 of the United States Bankruptcy Code (the "Bankruptcy Code") by filing a voluntary chapter 11 petition commencing a case (the "Chapter 11 Case") in the United States Bankruptcy Court for the Northern District of California (the "Bankruptcy Court").

C.    Buyer desires to purchase certain of the assets of Seller related to or used by Seller in connection with the Business and to assume selected executory contracts and/or unexpired leases (the "Purchased Assets") (as more particularly defined in Article I) of Seller related to the Business, and Seller desires to sell, assign and transfer to Buyer the Purchased Assets, as more particularly described herein and in accordance with Sections 105, 363 and 365 of the Bankruptcy Code.

D.    The Purchased Assets will be sold pursuant to an order or orders of the Bankruptcy Court approving sale procedures (the "Bidding Procedures Order") and approving such sale and assumption of executory contracts and/or expired leases under Sections 363 and 365 of the Bankruptcy Code (the "Sale Approval Order").

NOW, THEREFORE, in consideration of the facts recited above, the mutual agreements set forth herein and for other good and valuable consideration, the Parties hereby agree as follows:

## ARTICLE I

## DEFINITIONS

Section 1.01    Certain Defined Terms.  As used in this Agreement, the following terms will have the following meanings:

"Affiliate" means, with respect to any specified Person, any other Person that directly or indirectly controls, is controlled by, or is under common control with, such specified Person.

"Ancillary Agreements" will have the meaning set forth in Section 3.02.

LDR/277947

"<u>Applicable Laws</u>" will mean with respect to any Person any law, statute, treaty, rule, regulation, ordinance, permit, license, judgment, order, writ, injunction, decree, directive, determination or other requirement of any governmental entity or arbitrator, in each case, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"<u>Assumed Contracts</u>" means those executory contracts and unexpired leases to be assumed by Buyer in accordance with Section 365 of the Bankruptcy Code and as set forth on Schedule 5.04(f).

"<u>Assumed Liabilities</u>" means those liabilities set forth on Schedule 2.03.

"<u>Auction</u>" has the meaning set forth in Section 5.04(d).

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals.

"<u>Bidding Procedures Order</u>" has the meaning set forth in Section 5.04(d).

"<u>Bill of Sale</u>" will have the meaning set forth in Section 2.06(a).

"<u>Business</u>" has the meaning set forth in the recitals.

"<u>Business Contract</u>" means any Contract: (a) to which Seller is a party; (b) by which Seller or any of its assets is or may become bound or under which Seller has, or may become subject to, any obligation; or (c) under which Seller has or may acquire any right or interest.

"<u>Business Day</u>" means any day that is not a Saturday, a Sunday or other day on which banking organizations in Washington, D.C. are authorized or required by law to close.

"<u>Business Records</u>" means all of Seller's marketing and sales information, including customer pricing, marketing plans, business plans, financial and business projections, customer lists, customer relationship management and sales tracking software and data and all other files and records (or applicable portions thereof), including accounting records, pertaining to the Business.

"<u>Chapter 11 Case</u>" has the meaning set forth in the recitals.

"<u>Closing</u>" and "<u>Closing Date</u>" will have the respective meanings specified for such terms in Section 2.05.

"<u>Closing Day Cash Payment</u>" will have the meaning set forth in Section 2.04.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended, and the rulings and regulations promulgated thereunder.

"<u>Contract</u>" means any written, oral, implied or other agreement, contract, understanding, arrangement, instrument, note, guaranty, indemnity, representation, warranty, deed, assignment,

-2-

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 3 of 35

power of attorney, certificate, purchase order, delivery order, work order, insurance policy, benefit plan, commitment, covenant, assurance or undertaking of any nature.

"Control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management policies of a Person, whether through the ownership of stock or other equity, as an officer, director, trustee or executor, by contract or otherwise.

"Deposit" shall have the meaning set forth in Section 2.04.

"Debtor-In-Possession Financing" or "DIP Loan" means the proposed financing to be made available to Seller in the aggregate amount of up to $1,200,000 to fund the administrative costs of the Chapter 11 Case and for other general corporate purposes, made pursuant to that certain Secured Super-Priority Debtor-in-Possession Loan Agreement, dated as of April 1, 2010, by and between Seller, as Borrower, and ARINC Engineering Services, LLC, as Lender, as approved by an interim and/or Final Order of the Bankruptcy Court.

"Documentation" means, collectively, programmers' notes or logs, source code annotations, user guides, manuals, instructions, software architecture designs, layouts, any know-how and any other designs, plans, drawings, documentation, materials, supplier lists, software code and object code, net lists, photographs, development tools, blueprints, media, memoranda and records that are related in any manner to any Intellectual Property, whether in tangible or intangible form.

"Encumbrance" means any pledge, lien, collateral assignment, security interest, mortgage, title retention, conditional sale or other security arrangement, or any charge, adverse claim of title, ownership or right to use, or any other encumbrance of any kind whatsoever, whether written or oral.

"Excluded Assets" will have the meaning set forth in Section 2.02.

"Excluded Liabilities" will have the meaning set forth in Section 2.03.

"Expense Reimbursement" will have the meaning set forth in Section 5.04(d).

"Final Order" means an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended and any and all appeal periods with respect to such order, judgment or other decree have expired.

"Fixed Assets" means all fixed assets used or held for use in the conduct of the Business by Seller, including those listed on Exhibit A, which shall include all servers and computers used to develop and maintain code in various operating environments, and all development environment and software currently residing on such computers.

"Government Contract" means any prime contract with the United States Government and any Contract with a prime contractor or higher-tier subcontractor under a prime Contract

LDR/277947

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 4 of 35

with the United States Government ("Subcontract"), including any teaming agreement or basic ordering agreement. A task, purchase or delivery order under a Government Contract shall not constitute a separate Government Contract, for purposes of this definition, but shall be part of the Government Contract to which it relates.

"Intellectual Property" means any and all of the following which is owned by, licensed by, licensed to, used or held for use by Seller, including any Affiliate on behalf of Seller, (including all copies and embodiments thereof, in electronic, written or other media): (a) all registered and unregistered U.S. and foreign trade names, trademarks, trade dress, domain names, URLs, web pages and service marks, together with any applications related thereto and the goodwill symbolized thereby ("Marks"); (b) all inventions (whether patentable or unpatentable), all improvements thereto, and all patent, patent applications and disclosures related thereto, together with all reissuances, continuations, continuations in part, revisions, extensions and re-examinations thereof and all issued U.S. and foreign patents and pending patent applications, patent disclosures and improvements thereto (collectively, the "Patents"); (c) all registered and unregistered U.S. and foreign works of authorship, fixed in any tangible medium of expressions regardless of the availability of copyright protection, but including all copyrights and moral rights recognized by Law and all applications to register and renewals of any of the foregoing ("Copyrights"); (d) Software and all related Documentation; (e) all categories of ideas, trade secrets, know-how, inventions (whether or not patentable and whether or not reduced to practice), improvements, processes, procedures, drawings, specifications, designs, techniques, plans, proposals, technical data, copyrightable works, financial, marketing, and business data, pricing and cost information, business and marketing plans, customer and supplier lists and information, other confidential and proprietary information, manufacturing and production processes and techniques, molds, dies, casts and product configurations ("Proprietary Rights"); (f) all licenses and other Contracts pursuant to which Seller, including any Affiliate on behalf of Seller, has acquired rights in or to any of the Marks, Patents, Copyrights, Software or Proprietary Rights; and (g) all licenses and other Contracts to which Seller, including any Affiliate on behalf of Seller, has sold, licensed, leased or otherwise transferred or granted any interest or rights to any Marks, Patents, Copyrights, Software or Proprietary Rights.

"Liabilities" means any and all debts, liabilities and obligations, whether accrued or fixed, absolute or contingent, matured or unmatured, determined or determinable, known or unknown, including those arising under any law, action or governmental order and those arising under any Contract.

"Loss" will have the meaning set forth in Section 8.01.

"Person" means an individual, corporation, partnership, limited liability company, firm, joint venture, association, joint stock company, trust, unincorporated organization or other entity, or any governmental entity or quasi-governmental body or regulatory authority.

"Purchased Assets" means all of Seller's property and assets, real, personal or mixed, tangible and intangible, of every kind and description, wherever located, including the following (but excluding the Excluded Assets):

LDR/277947

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 5 of 35

(a)     all Intellectual Property rights of Seller, including any Affiliate on behalf of Seller, related to or used in connection with the assets described on <u>Exhibit B,</u> including all software and rights used or held for use in connection with Global Sentinel™ Units and Mist™ Net devices and other device management applications;

(b)     the Documentation;

(c)     copies of all training materials;

(d)     the Fixed Assets;

(e)     all executory Contracts and/or unexpired leases that are listed on Schedule 5.04(f) (as amended by Buyer from time to time prior to two calendar days before the hearing on approval of the Bidding Procedures Order), to the extent transferable by their terms or with the consent of the non-debtor party to the particular executory Contract or unexpired lease (the "<u>Assumed Contracts</u>");

(f)     all inventory, including raw materials, work in process and finished goods used in connection with the Business

(g)     a copy of the Business Records;

(h)     a copy of the books and records used in the conduct of the Business, including accounting records, all credit records, billing records, computer records, computer programs, contracts, agreements, operating manuals, schedules of assets, correspondence, books of account, customer lists, files, papers, books and all other public and confidential business records, whether such records are in hard copy form or are electronically or magnetically stored;

(i)     licenses in favor of Seller that are used or held for use in or necessary for the conduct of the Business, including any export licenses and tools export license data, to the extent transferable by their terms or pursuant to any consent as required by Applicable Law;

(j)     all good will and other intangibles owned by the Seller;

(k)     warranties that Seller has received from third parties with respect to the Purchased Assets, including such warranties that are set forth in any lease agreement, equipment purchase agreement or consulting agreement, all claims, choses in action, rights of recovery, rights of set-off, rights to refunds, and similar rights, and the like made by Seller on its behalf in the conduct of the Business; and

(l)     website data.

"<u>Purchase Price</u>" will have the meaning set forth in Section 2.04.

"<u>Restricted Stockholders</u>" will have the meaning set forth in Section 5.07(a).

"<u>Sale Approval Order</u>" has the meaning set forth in the recitals.

"<u>Seller's Confidential Information</u>" will have the meaning set forth in Section 5.03.

LDR/277947

"Seller's Knowledge" shall include actual knowledge, after due inquiry, of any of Mr. Randall L. Shepard, Mr. Michael L. Baumgartner, Mr. Brian J. Donlan, Mr. Anthony K. Moroyan and Mr. George Rassam.

"Seller Material Adverse Effect" means any change, event, circumstance or effect whether or not such change, event, circumstance or effect is caused by or arises in connection with a breach of a representation, warranty, covenant or agreement of Seller in this Agreement that is or is reasonably likely to be materially adverse to the business as now conducted, assets (including intangible assets), capitalization, financial condition, operations or results of operations or employees of Seller, taken as a whole, except to the extent that any such change, event, circumstance or effect primarily results from (i) the filing of the Chapter 11 case; (ii) changes in general economic condition; (iii) changes affecting the industry generally in which Seller operates (provided that such changes do not affect Seller in a substantially disproportionate manner) or (iv) any actions specifically required to be taken pursuant to this Agreement.

"Software" means, collectively, all of the software (including all software programs, modules, routines, algorithm and code, in both source code and object code form) that are more fully described in Exhibit B, and includes (i) any other software owned by Seller that is used or held for use by Seller in connection with the development or utilization of the software described in Exhibit B; and (ii) all derivative works of any of the software described in Exhibit B.

"Straddle Periods" will have the meaning set forth in Section 6.02.

"Tax" or "Taxes" means all foreign, federal, state and local taxes of any kind whatsoever (whether payable directly or by withholding), including sales, use, excise, franchise, ad valorem, property, inventory, value added and payroll taxes, together with any interest and penalties, additions to tax or additional amounts with respect thereto, imposed by any taxing authority.

"Trade Secrets" means any information which (i) is used in a business, (ii) is not generally known to the public or to Persons who can obtain economic value from its disclosure, and (iii) is subject to reasonable efforts to maintain its secrecy or confidentiality; the term may include but is not limited to inventions, processes, know-how, formulas, computer software, and mask works which are not patented and are not protected by registration (e.g., under copyright or mask work laws); lists of customers, suppliers, and employees, and data related thereto; business plans and analyses; and financial data.

"Transactions" means the purchase and sale of the Purchased Assets, and the other transactions contemplated by this Agreement and the Ancillary Agreements.

"Transaction Taxes" will have the meaning set forth in Section 6.01.

LDR/277947

# ARTICLE II

## PURCHASE AND SALE OF PURCHASED ASSETS

Section 2.01    <u>Agreement to Sell and Purchase</u>.  Subject to the terms and conditions of this Agreement and the approval of this Agreement by the Bankruptcy Court, and pursuant to Sections 105, 363 and 365 of the Bankruptcy Code, on the Closing Date, Seller will sell, assign, transfer, convey and deliver to Buyer, and Buyer will purchase and acquire from Seller, free and clear of any Encumbrances, all of Seller's right, title and interest in, under and to the Purchased Assets.

Section 2.02    <u>Excluded Assets</u>.    Notwithstanding anything to the contrary herein, Purchased Assets shall not include, and Seller shall not be obligated to assign, or transfer to Buyer, those assets set forth in Schedule 2.02 (the "<u>Excluded Assets</u>"), including any executory contracts and/or unexpired leases that are not Assumed Contracts, including, but not limited to, those set forth on Schedule 2.02.

Section 2.03    <u>No Liabilities Assumed</u>.  Except for performance of obligations arising after the Closing Date under the Assumed Contracts and the liabilities not to exceed $1,000,000 set forth on Schedule 2.03 ("<u>Assumed Liabilities</u>"), as a material consideration and inducement to Buyer to enter into this Agreement, Seller will retain, and will be solely responsible for paying, performing and discharging when due, and Buyer will not assume or otherwise have any Liability for, any and all Liabilities of Seller ("<u>Excluded Liabilities</u>").

Section 2.04    <u>Purchase Price</u>. Subject to the conditions set forth in Sections 2.06 and 2.07, including entry of a Final Order approving the sale, the aggregate purchase price for the Purchased Assets to be paid by Buyer hereunder will be $2,000,000 (the "<u>Purchase Price</u>").  Such Purchase Price, less any amounts loaned and any unpaid accrued interest thereon pursuant to the Debtor-In-Possession Financing and less the Deposit ("<u>Closing Day Cash Payment</u>"), shall be paid at the Closing by wire transfer or the delivery of other immediately available funds. As of the date hereof, Buyer has delivered to counsel for Seller a deposit in the amount of $50,000 (together with any interest accrued thereon, the "<u>Deposit</u>") to be held in accordance with the terms of this Agreement and to be applied to the Purchase Price at Closing.  In the event of termination of this Agreement, the Deposit shall be disbursed as provided in Section 5.04(d).

Section 2.05    <u>Closing</u>.  The closing of the sale and purchase of the Purchased Assets hereunder (the "<u>Closing</u>") shall take place at the offices of Arent Fox LLP, 1050 Connecticut Avenue, N.W., Washington, DC 20036 on the first Business Day after the satisfaction or waiver of the conditions to Closing set forth in Section 2.06 and Section 2.07 (or by such other means, including a remote Closing wherein the relevant documents are delivered by means of facsimile, mail or courier) as Seller and Buyer may mutually agree.  The date of the Closing shall be referred to herein as the "<u>Closing Date</u>."

Section 2.06    <u>Certain Closing Deliveries by Seller to Buyer; Conditions to Closing</u>.  At the Closing, Seller will deliver or cause to be delivered to Buyer all of the following items:

LDR/277947

(a)     counterparts of the Bill of Sale and Assignment Agreement in substantially the form of Exhibit D (the "Bill of Sale") executed on Seller's behalf by Seller's Chief Executive Officer and President;

(b)     the Purchased Assets, which will be delivered to Buyer in the form and on a "where is" basis; provided, that Buyer agrees to accept delivery of the Purchased Assets through electronic delivery or in another manner reasonably calculated and legally permitted to minimize or avoid the incurrence of transfer and sales Taxes so long as Seller retains no copies of any Purchased Assets following the Closing and such method of delivery does not adversely affect the condition, operability or usefulness of any Purchased Asset;

(c)     a receipt for the Closing Day Cash Payment executed by Seller's Chief Executive Officer and President;

(d)     assignments from Seller to Buyer of any and all patents and patent applications included in the Purchased Assets, which assignment will be in substantially the form of Exhibit E (the "Patent Assignment"), executed on Seller's behalf by Seller's Chief Executive Officer and notarized, and in a form acceptable for recording with the United States Patent and Trademark Office (or other applicable jurisdiction);

(e)     assignments from Seller to Buyer of all registered and unregistered Copyrights included in the Purchased Assets and all pending applications for registration or recordation of any Copyrights and included in the Purchased Assets, duly executed on behalf of Seller by Seller's Chief Executive Officer and notarized, and in a form acceptable for recording with the United States Copyright Office, and in substantially the form of Exhibit F (the "Copyright Assignment");

(f)     assignments from Seller to Buyer of all Marks included in the Purchased Assets and all pending applications for registration or recordation of any Marks included in the Purchased Assets, duly executed on behalf of Seller by Seller's Chief Executive Officer and notarized, and in a form acceptable for recording with the United States Patent and Trademark Office, and in substantially the form of Exhibit G (the "Mark Assignment");

(g)     copies of all current business proposals outstanding for Seller's utilization of the Purchased Assets;

(h)     as identified in writing to Seller on or before 5 Business Days prior to the Closing, all consents, waivers and approvals from third parties and governmental entities necessary to effect the assignment and transfer to Buyer of the Purchased Assets free and clear of all Encumbrances;

(i)     a certificate, dated the Closing Date and executed on behalf of Seller by a duly authorized officer of Seller certifying that (i) each of the representations and warranties of Seller contained in this Agreement is true and correct, (ii) all covenants and agreements of the Seller to be performed by it on or prior to the Closing under this Agreement have been performed, and (iii) there will have not been any Seller Material Adverse Effect occurring since the Agreement Date, whether or not resulting from a Seller breach in any representation, warranty or covenant in this Agreement;

-8-

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 9 of 35

(j)     Concurrently with the execution of this Agreement by the Restricted Stockholders, Buyer and each of the individuals set forth on Schedule 2.06(j) will enter into employment agreements (to become effective on the Closing Date) between the Buyer and each of the individuals set forth on Schedule 2.06(j); and

(k)     execution of an agreement with Impeva Labs Closed Joint Stock Company to supply software engineering services to Buyer on mutually agreeable terms.

Section 2.07    Certain Closing Deliveries by Buyer; Conditions to Closing.    At the Closing, Buyer will deliver to Seller, an amount equal to the Closing Day Cash Payment by wire transfer of immediately available funds to the account designated by Seller.

# ARTICLE III

## REPRESENTATIONS AND WARRANTIES OF SELLER

Seller represents and warrants to Buyer that, except as specifically set forth in Seller's Disclosure Schedule attached as Exhibit H ("Disclosure Schedule"), each of the representations, warranties and statements in this ARTICLE III is true and correct as of the Agreement Date and the Closing Date:

Section 3.01    Corporate Existence and Authority.    Seller is a corporation duly incorporated, validly existing and in good standing under the laws of the State of California. Seller has all corporate power and authority required to carry on the Business as currently conducted, to own or use the properties and assets that it purports to own or use, and to perform all obligations under the Business Contracts.   Seller is duly qualified to transact business, and is in good standing, in each jurisdiction where the character of the properties owned, leased or operated by it or the nature of its activities make such qualification necessary, except where such failure would not, individually or in the aggregate, have a Seller Material Adverse Effect.

Section 3.02    Authorization.    Subject to approval of the Bankruptcy Court of this Agreement and the Transactions contemplated herein, Seller has all requisite corporate power and authority to enter into, execute, deliver and perform its obligations under this Agreement and the Bill of Sale (the Bill of Sale, together with all other assignments and documents that Seller is to execute and deliver pursuant to this Agreement being hereinafter collectively referred to as the "Ancillary Agreements") and to consummate the Transactions.

Section 3.03    Consents and Approvals.    Except as set forth in Schedule 3.03 and as set forth in Section 5.04, the execution and delivery of this Agreement and the Ancillary Agreements by Seller does not, and the performance of this Agreement and the Ancillary Agreements by Seller will not, require any consent, approval, authorization or other action by, or filing with or notification to, any third party, including any governmental or regulatory authority.

Section 3.04    Title to and Condition of Purchased Assets; Sufficiency of Purchased Assets.    Seller owns all the Purchased Assets and has good and marketable title in and to all the Purchased Assets.  Upon entry of the Sale Approval Order, Seller will have authority to transfer the Purchased Assets to Buyer free and clear of all Encumbrances pursuant to the terms of such

LDR/277947

Sale Approval Order. Excluding "off the shelf" and "shrink wrap" software licensed to Seller in the ordinary course of business, none of the Purchased Assets is licensed from any third party and none of the Purchased Assets is licensed to any third party.

Section 3.05    Full Force and Effect.  Each permit, franchise or other instrument assigned to or assumed by Buyer pursuant to this Agreement or any of the Ancillary Agreements is in full force and is not subject to any breach or default thereunder by any party thereto.

Section 3.06    Litigation.  Except as set forth in Schedule 3.06, there is no claim, action, suit, investigation or proceeding of any nature pending or, to Seller's Knowledge, threatened, at law or in equity, by way of arbitration or before any court, governmental department, commission, board or agency that:  (a) may adversely affect, contest or challenge Seller's authority, right or ability to sell or convey any of the Purchased Assets to Buyer hereunder or otherwise perform Seller's obligations under this Agreement or any of the Ancillary Agreements; (b) challenges or contests Seller's right, title or ownership of any of the Purchased Assets; (c) asserts that any Purchased Asset, or any action taken by any employee or agent of Seller with respect to any Purchased Asset, infringes any Intellectual Property rights of any third party or constitutes a misappropriation or misuse of any Intellectual Property rights, trade secrets or proprietary rights of any party; (d) seeks to enjoin, prevent or hinder the consummation of any of the Transactions; (e) would impair or have an adverse affect on Buyer's right or ability to use or exploit any of the Purchased Assets or impair or have an adverse effect on the value of any Purchased Asset; or (f) involves a wrongful termination, harassment or other employment-related claim by any employee, potential employee or contractor of Seller.  Except as set forth in Schedule 3.07, there are no judgments, decrees, injunctions or orders of any court, governmental department, commission, agency, instrumentality or arbitrator pending or binding against Seller that affect the Purchased Assets.

Section 3.07    Tax Matters.  Each Tax required to have been paid, or claimed by any Person to be payable, by Seller has been duly paid in full on a timely basis.  Any Tax required to have been withheld or collected by Seller has been duly withheld and collected; and (to the extent required) each such Tax has been paid to the appropriate Person; except where the failure to withhold, collect or pay such Tax would not reasonably be expected to result in a Seller Material Adverse Effect.

Section 3.08    Compliance with Laws.  Seller has complied with and has not received any notices of violation with respect to, any federal, state or local statute, law or regulation (including environmental laws), domestic or foreign, applicable to the Business, Seller's conduct of the Business or any of the Purchased Assets, including (a) all applicable Tax laws and regulations with respect to consultants, (b) the Export Administration Act and regulations promulgated thereunder and all other laws, regulations, rules, orders, writs, injunctions, judgments and decrees applicable to the export or re-export of controlled commodities or technical data and (c) the Immigration Reform and Control Act, except where the failure to so comply would not reasonably be expected to result in a Seller Material Adverse Effect.

LDR/277947

Section 3.09    Intellectual Property.

(a)      Purchased Assets include all Intellectual Property rights necessary to enable Buyer to conduct the Business in the manner in which such business was conducted on December 31, 2009, without the need for any license or similar rights from any Person.

(b)      The Purchased Assets and the distribution, sale and license of such Purchased Assets, do not infringe upon any Intellectual Property rights of any third party and no third party has asserted or threatened to assert against Seller any claim of infringement of Intellectual Property rights.

(c)      Seller owns, possesses, has the exclusive right to make, use, sell, license, has the right to bring actions for the infringement of, and where necessary, has made timely and proper applications for, the Intellectual Property used or held for use in the Business that are included in the Purchased Assets.

(d)      Seller has not granted any third party any outstanding licenses or other rights to any of the Purchased Assets.

(e)      None of the Purchased Assets is held or used pursuant to a license or similar grant of rights by any third party.

(f)      Neither Seller nor any of its Affiliates is liable for, nor has made any contract or arrangement whereby it may become liable to, any Person for any royalty, fee or other compensation for the ownership, use, license, sale, distribution, manufacture, reproduction or disposition of any Purchased Asset.

(g)      All employees and consultants of Seller and any other third parties who have been involved in the product development of the Business or Software or who were otherwise involved in the creation or development of any Software, the Documentation, the Proprietary Rights or any other Intellectual Property of Seller have executed invention assignment agreements in the form delivered to Buyer and all employees and consultants of Seller who have access to confidential information or trade secrets of the Business or which relate to Purchased Assets have executed appropriate nondisclosure agreements in the form delivered to Buyer.

(h)      Seller has taken reasonable action, consistent with industry standards, to protect the secrecy and confidentiality of all Software, Documentation and Intellectual Property rights of Seller.

Section 3.10    Product Warranties; Defects.    Each product and service, sold, manufactured, licensed, leased or delivered by Seller in connection with the Business has been in substantial conformity with all applicable contractual commitments and all express warranties made by Seller and there is, to the best of Seller's knowledge, no basis for any current or future action, suit, proceeding, hearing, investigation, charge, complaint, claim, or demand against any such contractual commitments or express warranties for replacement or repair thereof or other damages in connection therewith.  No service or product sold, manufactured, licensed, leased or delivered by Seller in connection with the Business is subject to any guaranty, warranty, or other indemnity beyond Seller's applicable standard terms and conditions of sale, lease or licensing (as

-11-

LDR/277947

set forth in written agreements that Seller has delivered to Buyer) or beyond that imposed by applicable law.

Section 3.11    [Intentionally Omitted]

Section 3.12    [Intentionally Omitted]

Section 3.13    <u>Certain Government Contracting Matters</u>.  Neither the United States Government nor any prime contractor or higher-tier subcontractor under a Government Contract nor any other Person has notified Seller of any actual or alleged violation or breach of any statute, regulation, representation, certification, disclosure obligation, contract term, any such proceeding, condition, clause, provision or specification, except where such violation or breach would not reasonably be expected to result in a Seller Material Adverse Effect.  Neither Seller nor any director, officer, employee, consultant or Affiliate thereof has been or is currently debarred or proposed for debarment from contracting with any governmental entities, and no conditions, events or facts exist which could cause or give rise to such debarment or proposed debarment.

Section 3.14    <u>Export Compliance</u>.  Seller is in compliance with all Applicable Laws regarding United States export control, including in respect of United States Department of State International Trafficking in Arms Regulations, United States Department of Commerce Export Administration Regulations, United States/Canada Joint Certification Program and United States customs requirements, except where the failure to so comply would not reasonably be expected to result in a Seller Material Adverse Effect.

Section 3.15    <u>Foreign Corrupt Practices</u>. Neither Seller nor any Affiliate of Seller, nor to Seller's Knowledge any other Person associated with or acting for or on behalf of the any of the foregoing, has directly or indirectly taken any action which would cause Seller to be in violation of the United States Foreign Corrupt Practices Act of 1977, as amended. Neither Seller, nor any Affiliate of Seller, nor any other Person associated with or acting for or on behalf of any of the foregoing, has  Seller nor any Affiliate of Seller directly or indirectly (a) made any contribution, gift, bribe, rebate, payoff, influence payment, kick-back, or other payment to any Person, private or public, regardless of form, whether in money, property or services (i) to obtain favorable treatment in securing business, (ii) to pay for favorable treatment for business secured, (iii) to obtain special concessions or for special concessions already obtained, for or in respect of Seller or any Affiliate of Seller, or (iv) acted in violation of any Applicable Laws, or (b) established or maintained any fund or asset that has not been recorded in Seller's books and records.

Section 3.16    <u>Liabilities</u>.

(a)    Set forth on Schedule 3.16(a) are all Liabilities of Seller that are fixed or determinable or otherwise includable in a balance sheet presentation of liabilities of Seller prepared in a manner consistent with prior periods and which materially represents the Liabilities of Seller.  There are no material contingent Liabilities of Seller except as set forth on Schedule 3.16(a).

(b)    Schedule 3.16(b) provides an accurate and complete: (i) breakdown and aging of the accounts payable of Seller; (ii) breakdown of any customer deposits or other deposits held by

-12-

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 13 of 35

Seller as of the date of this Agreement; and (iii) breakdown of all notes payable and other indebtedness of Seller as of the date of this Agreement.

Section 3.17   No Brokers.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Seller or its Affiliates.

## ARTICLE IV

## REPRESENTATIONS AND WARRANTIES OF BUYER

Buyer represents and warrants to Seller as follows:

Section 4.01   Incorporation and Authority.   Buyer is a limited liability corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all necessary company power and authority to enter into this Agreement to carry out its obligations hereunder and to consummate the Transactions.   This Agreement has been duly and validly executed and delivered by Buyer, and (assuming due authorization, execution and delivery by Seller) this Agreement constitutes a legal, valid and binding obligation of Buyer enforceable against Buyer in accordance with its terms.

Section 4.02   No Conflict.   The execution, delivery and performance of this Agreement does not (a) violate or conflict with the Certificate of Formation or Operating Agreement of Buyer, or (b) conflict with or violate any law, rule, regulation, order, writ, judgment, injunction, decree, determination or award applicable to Buyer except such conflicts or violations as would not prevent or delay Buyer from consummating the Transactions.

Section 4.03   No Brokers.   No broker, finder or investment banker is entitled to any brokerage, finder's or other fee or commission in connection with the Transactions based upon arrangements made by or on behalf of Buyer.

## ARTICLE V

## ADDITIONAL COVENANTS

Section 5.01   Employees.   Except as set forth in Section 2.06(j), nothing herein shall be construed as an agreement on the part of Buyer to hire any of Seller's employees.   Buyer is not obligated to hire any of Seller's employees but may interview and hire any of Seller's employees upon approval of this Agreement by the Bankruptcy Court and conditioned on the Closing.

Section 5.02   Books and Records.   If, to properly prepare documents required to be filed with governmental authorities (including the Bankruptcy Court) or its financial statements, it is necessary that either Party or any successors be furnished with additional information relating to the Purchased Assets or the Business, and such information is in the possession of the other Party, such Party agrees to use its reasonable efforts to furnish such information to such other Party, at the cost and expense of the Party being furnished such information.

-13-

LDR/277947

Section 5.03   Confidentiality.  All copies of financial information, marketing and sales information, pricing, marketing plans, business plans, financial and business projections, customer lists, methodologies, know-how, product designs, product specifications and drawings, and other confidential or proprietary information of Seller related to the Business or any of the Purchased Assets (collectively, "Seller's Confidential Information") will, be held by Seller in strict confidence and, at all times following the Closing, will not be used or disclosed by Seller to any third party and, upon Buyer's request, will be promptly destroyed by Seller or delivered to Buyer; except that Seller may use internally copies of Business Records that it is entitled to retain under Section 5.02 solely to prepare and file tax returns and prepare Seller's financial statements. Seller's Confidential Information will not include information that is now, or later becomes, part of the general public knowledge, other than as a result of a breach of this Agreement by Seller.

Section 5.04   Bankruptcy Covenants.

(a)   Seller Confirmation.  Seller confirms that its negotiation of this Agreement with Buyer is critical to Seller obtaining the highest and best price for its assets, that without Buyer's commitment of substantial time and expense to the process, Seller would have to employ a less orderly process for the sale of the Purchased Assets and therefore risk attracting lower prices, and that negotiation of this Agreement, subject to the procedures set forth below, will enhance the proposed bidding process.  Seller acknowledges that Buyer would not have invested the time and incurred the expense of negotiating and documenting this Agreement and the Transactions if Buyer were not entitled to the Expense Reimbursement provided in Section 5.04(d) herein.

(b)   Motions and Orders.  Seller shall promptly provide Buyer with the proposed final forms of orders that Seller proposes to submit to the Bankruptcy Court which relate to the approval of this Agreement, the Purchased Assets, or the consummation of the transactions contemplated hereby, or any provision therein or herein, and shall provide Buyer and its counsel with a reasonable opportunity to review and comment on such orders or pleadings.

(c)   Cure of Defaults.  Seller shall promptly, on or prior to the Closing Date, cure any and all defaults and breaches and satisfy any liability or obligation arising from or relating to pre-Closing periods under the Assumed Contracts, except as expressly assumed by Buyer under this Agreement, so that such Assumed Contracts may be assigned by Seller to Buyer in accordance with the provisions of Section 365 of the Bankruptcy Code, the Sale Approval Order, any other orders of the Bankruptcy Court effectuating such assignments, and this Agreement.

(d)   Bidding Procedures Order.  Without limiting the generality of the foregoing Section 5.04(b), the bidding procedures order, in the form annexed hereto as Exhibit I   (the "Bidding Procedures Order"), shall be reasonably acceptable in form and substance to Buyer and shall include provisions, among other things (i) setting the earliest available date for a hearing to approve the sale of the Purchased Assets so as to provide regular notice and opportunity for overbids (the "Sale Hearing"), (ii) authorizing Seller to conduct an auction (the "Auction") of the Purchased Assets in the event that qualified bids are received for the sale of the Purchased Assets in accordance with the Bidding Procedures Order and setting a date for such Auction, (iii) establishing bidding procedures acceptable to Buyer, (iv) approving the selection of Buyer as the stalking horse bidder, (v) approving the payment of Buyer's actual and reasonable costs and expenses, including fees to professionals, incurred in connection with this Agreement and the

-14-

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 15 of 35

Transactions in an amount not to exceed $300,000 (the "Expense Reimbursement") upon the occurrence of the following: (1) entry of a final order approving the sale of the Purchased Assets to another bidder; (2) close of a sale to another bidder; and (3) approval by the Bankruptcy Court, (vi) providing that Buyer's claim to the Expense Reimbursement shall be entitled to administrative expense claim treatment in the Bankruptcy Case, (vii) providing that no prospective purchaser will be permitted to bid at the Auction unless such party has been deemed "qualified" in accordance with objective criteria set forth in the Bidding Procedures Order, which at a minimum, shall require any such prospective purchaser to provide documentation establishing that such prospective purchaser has sufficient cash on hand or a binding financial commitment from an established financial institution or other credit worthy party to ensure such prospective purchaser's ability to meet its commitments pursuant to its bid, (viii) providing that no prospective purchaser who bids for the Purchased Assets at the Auction shall be entitled to purchase the Purchased Assets unless such prospective purchaser submits to Seller in writing in accordance with the Bidding Procedures Order a bid at least equal to $200,000, and then $50,000 greater for any additional incremental bid, accompanied by a commitment to proceed to a closing on contractual terms at least as favorable to Seller as those set forth in this Agreement plus a cash deposit of $50,000, (ix) requiring Seller to provide to Buyer, upon receipt thereof, a copy of any and all bids received by Seller, and (x) authorizing any other procedural matters that Seller and Buyer reasonably deem appropriate. Should overbidding take place, Buyer shall have the right, but not the obligation, to participate in the overbidding and to be approved as the successful overbidder at the Sale Hearing based upon any such overbid, provided, however, that Buyer shall receive a credit against any additional incremental bid in an amount equal to the Expense Reimbursement and any amounts due under the DIP Loan. Seller shall use its best efforts to obtain entry of the Bidding Procedures Order. To the extent there is any inconsistency between this paragraph and the Bidding Procedures Order, the Bidding Procedures Order shall govern. Seller shall promptly notify Buyer of any hearing relating to the approval of the bidding procedures or this Agreement or the consummation of the transactions contemplated hereby.

(e)     Sale Approval Order. Without limiting the generality of the foregoing Section 5.5(b), the Sale Approval Order, reasonably acceptable in form and substance to Buyer, shall include provisions, among other things (i) providing that Buyer shall not incur any liability as a successor to the Business other than those liabilities assumed by this Agreement or the Sale Approval Order, (ii) approving the sale of the Purchased Assets to Buyer on the terms and conditions set forth in this Agreement and authorizing Seller to proceed with this transaction, (iii) stating that any objections filed with respect to the sale of the Purchased Assets, which have not been withdrawn, are overruled or the interests of such objections have been otherwise satisfied or adequately provided for by the Bankruptcy Court, (iv) finding that the Purchase Price represents the highest and best offer received for the Purchased Assets, (v) finding that the sale is in the best interests of Seller's estate and creditors, (vi) based on evidence submitted by the Buyer, finding that Buyer is a good faith purchaser of the Purchased Assets under Section 363(m) of the Bankruptcy Code and that the provisions of Section 363(n) of the Bankruptcy Code have not been violated, (vii) providing that the sale of the Purchased Assets to Buyer shall be free and clear of all liens, claims, interests and Encumbrances whatsoever under Section 363 of the Bankruptcy Code and any other applicable sections of the Bankruptcy Code to the fullest extent permitted by the Bankruptcy Code, (viii) providing that the Bankruptcy Court shall retain jurisdiction, among other things, for the purpose of enforcing the provisions of the Sale Approval Order including, without limitation, compelling delivery of the Purchased Assets to Buyer and

-15-

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 16 of 35

protecting Buyer against any Encumbrances against Seller or the Purchased Assets, (ix) finding that there are no brokers involved in consummating the sale and no brokers' commissions are due, (x) providing that the parties hereto shall be authorized to close this transaction immediately upon execution of the Sale Approval Order pursuant to Rules 6004(g) and 6006(d) of the Federal Rules of Bankruptcy Procedure, (xi) authorizing Seller to execute, deliver, perform under, consummate and implement this Agreement, together with all additional instruments and documents that may be reasonably necessary or desirable to implement the foregoing, (xii) determining that Buyer is not a successor to Seller or otherwise liable for any of the Excluded Liabilities or Excluded Assets and permanently enjoining each and every holder of any of the Excluded Liabilities or Excluded Assets from commencing, continuing or otherwise pursuing or enforcing any remedy, claim, cause of action or Encumbrance against Buyer or the Purchased Assets related thereto. To the extent that there is any inconsistency between this paragraph and the Sale Approval Order, the Sale Approval Order shall govern.

(f)     Assumed Contracts.  Prior to Closing, Seller shall not reject under Section 365 of the Bankruptcy Code, waive or release any of its rights under, amend or otherwise modify any of the Assumed Contracts, which are set forth in Schedule 5.04(f), without the prior written consent of Buyer, which shall not be unreasonably withheld, Seller shall obtain an order or orders (which may include the Sale Approval Order) in a form reasonably satisfactory to Buyer, among other things (i) approving the assumption and assignment of the Assumed Contracts to Buyer pursuant to, and subject to the provisions of, Section 365 of the Bankruptcy Code, and (ii) providing that all defaults of Seller under the Assumed Contracts arising or accruing prior to the date of the Closing (without giving effect to any acceleration clauses or any default provisions in such contracts of a kind specified in Section 365(b)(2) of the Bankruptcy Code) have been cured or will be promptly cured by Seller so that Buyer shall have no liability or obligation with respect to any default or obligation arising or accruing prior to the date of the Closing or in respect of any cure obligations, except as may otherwise be specifically agreed as set forth in this Agreement and (iii) in the absence of an objection that is sustained by the Bankruptcy Court, providing that the Assumed Contracts shall be transferred to, and remain in full force and effect for the benefit of, Buyer, notwithstanding any provision in any such Assumed Contract or in applicable Law (including those described in Sections 365(b)(2) and (f) of the Bankruptcy Code) that prohibits, restricts, or limits in any way such assignment or transfer.

(g)     Rejected Contracts.  In conjunction with the entry of the Sale Approval Order or as a term of the Sale Approval Order, pursuant to Section 365 of the Bankruptcy Code, the Seller shall request the entry of an order rejecting all executory contracts and/or unexpired leases that are not Assumed Contracts, that confirms Buyer's rights to enforce any restrictions, terms or conditions contained in such rejected contracts, including licensees' use or exploitation of the licenses Intellectual Property from and after the Closing

(h)     Other Bankruptcy Covenants.  Seller shall promptly make any filings, take all actions, and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the sale of the Purchased Assets, subject to its obligations to comply with any order of the Bankruptcy Court.  In the event an appeal is taken, or a stay pending appeal is requested, from any of the foregoing orders of the Bankruptcy Court, Seller shall immediately notify Buyer of such appeal or stay request and, upon Buyer's request, shall provide to Buyer within two days after Seller's receipt thereof a copy of the related notice

LDR/277947

of appeal or order of stay. Seller shall also provide Buyer with written notice of any motion, application, brief or other pleading filed in connection with any appeal from any of such orders.

Section 5.05    Regulatory and Other Authorizations; Consents.

(a)    Efforts. Each of Seller and Buyer will use its respective best efforts to obtain all authorizations, consents, orders and approvals of all federal, state and local regulatory bodies, courts and officials that may be or become necessary for the execution and delivery of, and the performance of its obligations pursuant to, this Agreement or any other agreements required to be entered into by such Party pursuant to this Agreement and will cooperate fully with the other Party in promptly seeking to obtain all such authorizations, consents, orders and approvals. The Parties will not take any action that will have the effect of delaying, impairing or impeding the receipt of any required approvals. Any agreement or other documents required by this Section 5.05 shall be prepared by Buyer and related out of pocket costs required with respect to the following shall be borne by Buyer.

(b)    Communication. Seller and Buyer will promptly inform the other of any material communication between such Party and any federal, state, local or foreign government or governmental authority or court regarding any of the Transactions. If either Seller, Buyer or any Affiliate thereof receives a request for additional information or for documents or any material from any such government or governmental authority with respect to the Transactions, such Party will endeavor in good faith to make or cause to be made, as soon as reasonably practicable and after consultation with the other Party, an appropriate response in compliance with such request.

(c)    Further Actions. From and after the Closing, each of the Parties will execute and deliver such documents and other papers and take such further actions as may be reasonably required to carry out the provisions of this Agreement or any other agreements required to be entered into by such Party pursuant to this Agreement and give effect to the Transactions.

Section 5.06    Furnishing of Outstanding Business Proposals. Prior to or concurrently with the Closing, Seller will furnish to Buyer with copies of all business proposals (including names and status of discussions with prospective customers and strategic partners) not previously provided to Buyer and that are pending or outstanding with respect to the Business.

Section 5.07    Non-Competition and Other Covenants.

(a)    Agreement Not to Compete. Unless otherwise agreed by the parties, during the period from the Closing Date to and including the second anniversary thereof, neither Seller, nor any of the individuals listed on Schedule 5.07(a) (the "Restricted Stockholders") shall be engaged or interested in any business that competes directly with the Business as is currently conducted or in the one or more states in which Buyer or its Affiliates has specific plans to conduct the Business as evidenced by the books and records of the Seller and its Affiliates (on behalf of Seller) and Seller or any of the Restricted Stockholders have knowledge of such plans at or prior to the Closing. Each of Seller and the Restricted Stockholders shall be deemed to be interested in a business if it or he is engaged or interested in that business as a stockholder, director, officer, employee, salesman, sales representative, promoter, agent, partner, individual proprietor, consultant or otherwise, but not if such interest is limited solely to ownership of 1% or less of the

LDR/277947

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 18 of 35

equity or debt securities of any class of a corporation whose shares are listed for trading on a national securities exchange or traded in the over the counter market.

(b) <u>Non-solicitation</u>. During the period from the Closing Date to and including the third anniversary thereof, neither Seller, nor Restricted Stockholders shall, directly or indirectly, (i) cause or attempt to cause any customer, client, account or vendor, or prospective customer, client, account or vendor to divert, terminate, limit or in any manner modify or fail to enter into any actual or potential business relationship with Buyer, or (ii) divert, solicit or employ, or attempt to divert, solicit or employ, any of the individuals listed on Schedule 5.07(b). For purposes of this Section 5.07(b), a prospective customer, client, account or vendor shall mean any customer, client, account or vendor that Seller was involved with or any individual listed in Schedule 5.07(b) had knowledge of in his or her position with Seller since December 31, 2009.

(c) <u>Necessary and Reasonable</u>. Seller and Restricted Stockholders agree that the covenants provided for in Section 5.07 are necessary and reasonable to protect Buyer in the conduct of its business, to protect the trade secrets, other intellectual property and other proprietary information of Buyer and to protect Buyer in the utilization of the assets, tangible and intangible, including the goodwill of Buyer, which goodwill is essential, material and a substantial component of the Purchased Assets.

(d) <u>Nonassignability</u>. The rights and obligations under this Section 5.07 cannot be assigned by Seller, any Restricted Stockholder or Buyer, except Buyer may assign all or a portion of its rights under this Section 5.07 to one or more wholly owned subsidiaries of Buyer.

## ARTICLE VI

## TAX MATTERS

Section 6.01 <u>Transaction Taxes</u>. Buyer shall be responsible for, and shall pay all excise, value added, registration, stamp, property, documentary, transfer, sales, use and similar Taxes, levies, charges and fees incurred, or that may be payable to any taxing authority, in connection with the Transactions, including the sale, transfer, and delivery of the Purchased Assets (collectively, "<u>Transaction Taxes</u>"). Buyer and Seller agree to cooperate in minimizing the amount of any such Transaction Taxes and in the filing of all necessary documentation and all Tax returns, reports and forms with respect to all such Transaction Taxes. Seller and Buyer shall cooperate in the allocation of purchase price for federal and state tax purposes.

Section 6.02 <u>Straddle Periods</u>. All property taxes, personal property taxes and similar ad valorem obligations in respect of the Purchased Assets that relate to periods beginning prior to the Closing Date and ending after the Closing Date ("<u>Straddle Periods</u>") shall be prorated in accordance with the rules provided in Code Section 164(d). Seller shall prepare and file, or shall cause to be prepared and filed, on a timely basis, all Straddle Period tax returns. Seller shall provide each Straddle Period tax return to Buyer for review not fewer than 10 Business Days in advance of the due date thereof, and Buyer shall pay to Seller its prorated portion of the tax shown to be due on each such return not less than five Business Days before the due date of such payment.

LDR/277947

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 19 of 35

Section 6.03    Other Taxes.  Except as provided in Section 6.01and Section 6.02 Seller shall be responsible for and shall pay any and all Taxes with respect to the Purchased Assets relating to all periods (or portions thereof) ending on or prior to the Closing Date, and (b) Buyer shall be responsible for and shall pay any and all Taxes with respect to the Purchased Assets relating to all periods (or portions thereof) ending after the Closing Date.

## ARTICLE VII

## POST-CLOSING COVENANTS OF SELLER

Section 7.01    No Transfer.  Other than as may occur as a function of bankruptcy law, Seller shall not sell, pledge, hypothecate, assign or otherwise transfer, directly or indirectly, legally or beneficially, this Agreement or any benefit hereunder.

Section 7.02    Bulk Sales.  Seller shall pay or otherwise satisfy in the ordinary course of business all of its Liabilities.  Buyer and Seller hereby waive compliance with the bulk transfer provisions of any applicable state, federal or local laws in connection with the Transactions.

## ARTICLE VIII

## INDEMNIFICATION

Section 8.01    Loss Defined; Indemnitees.  For purposes of this Article VIII, the term "Loss" will mean and include any and all Liability, loss, damage, claim, expense, cost, fine, fee, penalty, obligation or injury, including those resulting from any and all claims, actions, suits, demands, assessments, investigations, judgments, awards, arbitrations or other proceedings, together with reasonable costs and expenses, including reasonable attorneys' fees and other legal costs and expenses relating thereto.

Section 8.02    Indemnification by Seller.  Seller, subject to the other terms and conditions of this Agreement shall indemnify Buyer against, and hold Buyer harmless from, all Loss arising out of the failure of any representation or warranty of Seller contained in this Agreement or any certificate delivered pursuant to this Agreement, to be true and correct as of the Closing Date or the breach or violation of any covenant or agreement of Seller made herein.

Section 8.03    Limitations on Indemnification.  Notwithstanding anything herein to the contrary, no claim for indemnification under this Article VIII may be brought after the 60th day following the Closing Date for a breach of any representation or warranty contained herein or in any certificate delivered pursuant to this Agreement or for a breach of a covenant or agreement of Seller contained herein that was by its terms to be satisfied before the Closing.  Notwithstanding anything herein to the contrary, in the absence of fraud, Seller's indemnification obligations with respect to the foregoing sentence shall not exceed $300,000. Only the covenants and agreements contained in Sections 5.02, 5.03, 5.05 and 5.07 and Articles 6, 7, 8 and 9 to be performed (in whole or in part) after the Closing shall survive the Closing; provided, however, that notwithstanding the survival of such covenants and agreements, Seller will be permitted (a) to make necessary and reasonable payments to fund the orderly close down of Seller from the Closing through confirmation of its plan of liquidation, or as required by a plan of liquidation

-19-

confirmed by Final Order or as otherwise ordered by the Bankruptcy Court (except to the extent Buyer obtains an order from the Bankruptcy Court restricting Seller from making any such payments) and the Buyer will have no right or recourse against such payments, and (b) to obtain an order closing the Chapter 11 Case. In the absence of fraud, the indemnification rights set forth in this Article VIII represent the sole and exclusive remedy of Buyer with respect to any breach by Seller of any representation or warranty contained in this Agreement or breach of a covenant or agreement of Seller contained herein that was by its terms to be satisfied before the Closing. With respect to breaches which are reasonably capable of being remedied through specific performance, Seller shall, at its option and expense, promptly re-perform the obligation or re-deliver the delivery obligation so that the breached warranty or representation is substantially remedied in the case of a breach of representation or warranty or re-perform to fulfill any covenant or agreement in the case of a breach of covenant or agreement so that the breach of covenant or agreement is materially remedied.

## ARTICLE IX

## GENERAL PROVISIONS

Section 9.01  Expenses.  Except as otherwise provided herein, all costs, expenses or fees, incurred in connection with this Agreement and the Transactions will be paid by the Party incurring such costs or expenses.

Section 9.02  Termination.  This Agreement may be terminated and the Transactions abandoned at any time prior to the Closing as follows:

(a)      by mutual consent of Buyer and Seller;

(b)      by Buyer if there has been a breach of any representation, warranty, covenant, obligation or agreement contained in this Agreement on the part of Seller and such breach has not been cured within 10 Business Days after notice to Seller (provided that Buyer is not in material breach of this Agreement, and provided further, that no cure period shall be required for a breach that by its nature cannot be cured with such 10 Business Days);

(c)      by Seller if there has been a breach of any representation, warranty, covenant, obligation or agreement contained in this Agreement on the part of Buyer and such breach has not been cured within 10 Business Days after notice to Buyer (provided, that Seller is not in material breach of this Agreement, and provided further, that no cure period shall be required for a breach which by its nature cannot be cured within such 10 Business Days);

(d)      by either Party if: (i) there shall be a final, non-appealable order of a federal or state court in effect preventing consummation of the Transactions; (ii) there shall be any final action taken, or any statute, rule, regulation or order enacted, promulgated or issued or deemed applicable to the Transactions by any governmental entity that would make consummation of the Transaction illegal or would prohibit Buyer's ownership or operation of the Business or Purchased Assets, or compel Buyer to dispose of or hold separate all or a material portion of the business or assets of Seller or Buyer as a result of the Transactions; or

-20-

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 21 of 35

(e)     by Buyer or Seller on any day on or after July 1, 2010 if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), provided that the right to terminate this Agreement under this Section 9.02(e) shall not be available to any Party whose failure to fulfill any material obligation under this Agreement has been the cause of, or resulted in, the failure of the Closing Date to occur on or before such date.

(f)     Effect of Termination.  If this Agreement is terminated pursuant to Section 9.02, all of the obligations of the Parties under this Agreement shall terminate, except for such obligations under Section 9.01.  Receipt by Buyer of the Expense Reimbursement as approved by the Bankruptcy Court shall be Buyer's sole and exclusive remedy (as liquidated damages) other than for claims of actual fraud, and Buyer shall not be entitled to any other damages, losses, or payment from Seller, and Seller shall have no further obligation of Liability of any kind to Buyer or its Affiliates on account of this Agreement.   Buyer's obligations under the Mutual Nondisclosure Agreement dated March 12, 2008 (as may be amended) shall survive the termination of this Agreement.

Section 9.03    Notices.  All notices and other communications hereunder shall be in writing and shall be deemed given if sent by facsimile, delivered by hand, sent by a reputable nationwide courier service, or mailed by registered or certified mail (return receipt requested) to the Parties at the following addresses (or at such other address for a Party as shall be specified by like notice) and shall be deemed given on the date on which the facsimile is machine verified as received, so hand-delivered or on the third business day following the date on which so mailed or sent:

(a)     if to Seller:
        2570 West El Camino Real, Suite 100
        Mountain View, California 94040-1309
        Facsimile: _____
        Attention:  Randall L. Shepard

(b)     if to Buyer:
        2551 Riva Road
        Annapolis, Maryland 21401
        Facsimile: _____
        Attention:  Katie Richards

Section 9.04    Headings.  The headings contained in this Agreement are for reference purposes only and will not affect in any way the meaning or interpretation of this Agreement.

Section 9.05    Severability.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner materially adverse to any Party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the Parties will negotiate in good faith

-21-

to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a mutually acceptable manner in order that the Transactions be consummated as originally contemplated to the greatest extent possible.

Section 9.06    Entire Agreement.    This Agreement and the Ancillary Agreements constitute the entire agreement of the Parties with respect to the subject matter hereof and supersede all prior agreements and undertakings with respect to the subject matter hereof, including the letter of intent between the Parties dated February 24, 2010, which is hereby terminated and null and void.

Section 9.07    Assignment.    This Agreement will not be assigned by Buyer or Seller without the prior written consent of the non-assigning Party; provided, however, that Buyer may assign all or a portion of its rights and obligations hereunder to one or more wholly owned subsidiaries of Buyer.

Section 9.08    No Third-Party Beneficiaries.    This Agreement is for the sole benefit of the Parties and their permitted assigns and nothing herein, express or implied, is intended to or will confer upon any other Person any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement.

Section 9.09    Amendment; Waiver.    This Agreement may not be amended or modified except by an instrument in writing signed by the Parties.  Waiver of any term or condition of this Agreement will only be effective if in writing and will not be construed as a waiver of any subsequent breach or waiver of the same term or condition, or a waiver of any other term or condition of this Agreement.

Section 9.10    Governing Law; Venue.    This Agreement will be governed by, and construed in accordance with the Bankruptcy Code and the substantive laws of the state of Maryland without regard to the principles of choice of law or conflicts or law of any jurisdiction.

Section 9.11    Counterparts.    This Agreement may be executed in one or more counterparts, and by the different Parties in separate counterparts, each of which when executed will be deemed to be an original but all of which taken together will constitute one and the same agreement.

Section 9.12    Construction of this Agreement and Certain Terms and Phrases.

(a)    Unless the context of this Agreement otherwise requires, (i) words of any gender include each other gender; (ii) words using the singular or plural number also include the plural or singular number, respectively; (iii) the terms "hereof," "herein," "hereby" and derivative or similar words refer to this entire Agreement and not to any particular provision of this Agreement; and (iv) the terms "Article," "Section," "Schedule" and "Exhibit" without any reference to a specified document refer to the specified Article, Section, Schedule and Exhibit, respectively, of this Agreement.

(b)    The words "including," "include" and "includes" are not exclusive and shall be deemed to be followed by the words "without limitation"; if exclusion is intended, the word "comprising" is used instead.

-22-

LDR/277947

(c)     The word "or" shall be construed to mean "and/or" unless the context clearly prohibits that construction.

(d)     Whenever this agreement refers to a number of days, such number shall refer to calendar days unless Business Days are specified.

(e)     All accounting terms used herein and not expressly defined herein shall have the meanings given to them under United States generally accepted accounting principles.

(f)     Any reference to any federal, state, local or foreign statute or law, including any one or more sections thereof, shall be deemed also to refer to, unless the context requires otherwise, all rules and regulations promulgated thereunder, including United States Treasury Regulations.

(g)     Any representation or warranty contained herein as to the enforceability of a contract, including this Agreement, shall be subject to the effect of any bankruptcy, insolvency, reorganization, moratorium or other similar law affecting the enforcement of creditors' rights generally and to general equitable principles (regardless of whether such enforceability is considered in a proceeding in equity or at law).

(h)     The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions hereof.

The disclosures in the Disclosure Schedule shall relate only to the representations and warranties in the particular Section of ARTICLE III to which they expressly relate and not to any other representation or warranty contained in ARTICLE III.

Section 9.13   Termination of Restricted Stockholders Obligations.   Notwithstanding anything herein to the contrary, any Restricted Stockholder may terminate his obligations under Section 5.07 and Article IX after July 1, 2010 by providing written notice to Buyer pursuant to Section 9.03, provided that the Closing had not occurred before the date such notice is provided. Any such termination by one or more Restricted Stockholders shall not affect the rights and obligations of the other Parties to this Agreement.

LDR/277947

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed as of the date first written above by their respective officers thereunto duly authorized.

Impeva Labs, Inc., a California corporation

By:_____
    Randall L. Shepard
    Chief Executive Officer and President

ARINC Engineering Services, LLC, a Delaware limited liability company

By:_____
    Stephen L. Waechter
    Vice President, Business Operations & Chief Financial Officer

ARINC Acquisition, LLC, a Delaware limited liability company

By:_____
    Stephen L. Waechter
    Vice President, Business Operations & Chief Financial Officer

Notwithstanding anything herein to the contrary, the following parties only personal obligations as Restricted Stockholders under this Agreement are in Section 5.07 and Article IX and other obligations specified thereunder.

Brian J. Donlan

By:_____
    Brian J. Donlan
    Restricted Stockholder of Impeva Labs, Inc.

-24-

LDR/277947

Randall L. Shepard

By:_____
    Randall L. Shepard
    Restricted Stockholder of Impeva Labs, Inc.


Michael L. Baumgartner

By:_____
    Michael L. Baumgartner
    Restricted Stockholder of Impeva Labs, Inc.

LDR/277947

# **EXHIBIT A**

## **FIXED ASSETS**

LDR/277947

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 27 of 35

# EXHIBIT B

## INTELLECTUAL PROPERTY ASSETS

LDR/277947

Case: 10-53056   Doc# 57-2   Filed: 04/13/10   Entered: 04/13/10 16:08:42   Page 28 of 35

**<u>EXHIBIT C</u>**

**RESERVED**

LDR/277947

# EXHIBIT D

## BILL OF SALE

LDR/277947

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 30 of 35

# EXHIBIT E

## PATENT ASSIGNMENT

LDR/277947

**EXHIBIT F**

**COPYRIGHT ASSIGNMENT**

LDR/277947

**EXHIBIT G**

**MARK ASSIGNMENT**

LDR/277947

**<u>EXHIBIT H</u>**

**DISCLOSURE SCHEDULES**

LDR/277947

Case: 10-53056    Doc# 57-2    Filed: 04/13/10    Entered: 04/13/10 16:08:42    Page 34 of 35

# EXHIBIT I

## BANKRUPTCY COURT BIDDING PROCEDURES ORDER

LDR/277947